**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO HOUSING AUTHORITY and RSD GALEWOOD, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BOARD OF DIRECTORS OF THE ENCLAVE AT GALEWOOD CROSSINGS MASTER ASSOCIATION, CHARLES CATCHINGS, MARIE LANE, TASHARIA GARDNER, BIANCA ALARCON, and ELIDA CRUZ,<br><br>Defendants. | ) | Case No. |

**COMPLAINT FOR DECLARATORY,**
**INJUNCTIVE, AND OTHER RELIEF**

Chicago Housing Authority ("CHA") and RSD Galewood, LLC ("RSD"), through its undersigned attorneys, hereby complain of Defendants, Board of Directors of The Enclave At Galewood Crossings Master Association (the "Board"), as well as Charles Catchings ("Catchings"), Marie Lane ("Lane"), Tasharia Gardner ("Gardner"), Bianca Alarcon ("Alarcon"), and Elida Cruz ("Cruz") (Catchings, Lane, Gardner, Alarcon, and Cruz are collectively referred to as the "Individual Defendants," and the Board and Individual Defendants are collectively referred to as "Defendants").

## NATURE OF CASE

The Individual Defendants are members of a board of directors of a master association for residential property located on Chicago's far-west side. They recently orchestrated a vote by unit owners to pass and record an amendment to the master association's declaration that restricts leasing within The Enclave At Galewood Crossings community in the name of, among other

things, "reducing the negative impact of home values in the community." This negative impact is allegedly a consequence of a large number of owners within the community renting their homes. Defendants' motivation for the leasing amendment, however, had nothing to do with property values, but rather was intended to prohibit the CHA from leasing residences to minorities.

Indeed, at a meeting among representatives of the CHA and RSD during which the CHA discussed its plans to purchase and lease units within the association, a Board member stated that "***we don't need any more poor black people living here***." In that vein, the Board, without notifying either RSD or the CHA, surreptitiously organized votes by unit owners to pass an amendment to the master association declaration to prohibit leasing by future unit owners, including the CHA. This amendment, through its application, meets Defendants' goal of keeping "poor black people" from renting homes within The Enclave At Galewood Crossings and thus prohibiting the CHA from leasing any units that it contracted to purchase from RSD.

The timing of the declaration leasing amendment was intentional. Defendants' rush to pass the amendment was a direct response to news that the CHA and RSD had reached an agreement for the CHA to purchase residences within the community so that the CHA could subsequently rent the residences to low to moderate-income individuals and families. On the same day that the CHA and RSD executed their purchase and sale agreement, RSD received notice from Defendants of a special Master Association meeting to vote on a proposed amendment to the Master Association declaration to restrict rentals. While this proposed amendment was ultimately withdrawn by the Master Association Board because it impermissibly created two separate classes of votes within the Master Association, it was nonetheless proposed by the Master Association Board solely because of the CHA's agreement with RSD.

Assuming that the leasing prohibition was no longer an issue, representatives from the CHA and RSD met with the Individual Defendants to discuss both the proposed sale of units to the CHA and the CHA's leasing program. It was during this informational meeting where a Board member indicated that she did not want any more "poor black people" living in the community. Notably, at no time during this meeting or during subsequent discussions between the CHA and Board representatives did the Individual Defendants discuss another proposed leasing restriction. RSD did not learn of the passage of the leasing restriction until late September 2010 *after* the declaration had already been voted on and amended. RSD, who owned several units within the community, was never given notice of a vote on the new proposed amendment.

Between the time that the Board met with the CHA and RSD in August 2010 and the time the leasing restriction amendment was recorded on September 20, 2010, Defendants continued to have a dialogue with the CHA about the CHA's leasing plans. Defendants used this dialogue as an artifice to convince the CHA that it was cooperating with RSD and accepting the CHA's leasing plans. In reality, however, during this time Defendants were orchestrating a vote among unit owners to completely restrict the CHA from leasing any units that it may purchase from RSD.

By their actions, Defendants make clear that the sole reason that they proposed and facilitated a vote on the leasing restriction in the Master Association's declaration was to prohibit the CHA from leasing units to racial minorities, including "poor black people." Defendants' actions violate the Fair Housing Act because (i) Defendants intentionally discriminated against minorities in passing the leasing restriction, and (ii) the leasing restriction has a disparate impact on minorities in that minorities make up a large number of individuals to whom the CHA

customarily leases homes within Chicago and, to that end, they would be prohibited from leasing units within the Enclave At Galewood Crossings community.

Both the CHA and RSD bring this suit to, among things: (i) void Defendants' leasing-restriction amendment to the master declaration, (ii) enjoin Defendants from implementing the leasing-restriction amendment, (iii) enjoin Defendants from discriminating against CHA's tenants or taking any actions that disparately impact such tenants, (iv) mandate that Defendants record an amendment to the master declaration that rescinds the illegal leasing restriction, and (v) recover their reasonable attorneys' fees and costs as permitted under Section 3613(c)(2) of the Fair Housing Act.

## THE PARTIES

1. The CHA is a municipal corporation with jurisdiction for the administrative oversight of public housing within the City of Chicago. It is regularly engaged in the sale and leasing of housing to qualifying low- and moderate-income individuals. The CHA is a party to a purchase and sale agreement with RSD for the purchase of residential units within The Enclave At Galewood Crossings.

2. RSD is an Illinois limited liability company with its principal place of business in Northbrook, Illinois. It is the legal entity which owns real estate, and is selling residential units, in The Enclave At Galewood Crossings property. RSD is a party to a purchase and sale agreement with the CHA to sell the CHA residential units within The Enclave At Galewood Crossings.

3. The Board is a duly elected board of directors of The Enclave At Galewood Crossings Master Association.

4. Catchings is a domiciliary of the State of Illinois and maintains a residence at 1843 N. Lockwood Avenue, Chicago, Illinois. He is a member of the Board.

5. Lane is a domiciliary of the State of Illinois and maintains a residence at 1848 N. Lockwood Avenue, Chicago, Illinois. She is a member of the Board.

6. Gardner is a domiciliary of the State of Illinois and maintains a residence at 5218 W. Galewood Avenue, Chicago, Illinois. She is a member of the Board.

7. Alarcon is a domiciliary of the State of Illinois and maintains a residence at 5421 W. Galewood Avenue, Chicago, Illinois. She is a member of the Board.

8. Cruz is a domiciliary of the State of Illinois and maintains a residence at 5347 W. Galewood Avenue, Chicago, Illinois. She is a member of the Board.

## JURISDICTION AND VENUE

9. This Court has federal-question jurisdiction over the controversy pursuant to 42 U.S.C. § 3613(a).

10. This Court has personal jurisdiction over all Defendants because all Defendants are citizens of the State of Illinois.

11. Venue is proper in this judicial district because, pursuant to 28 U.S.C. §1391, Defendants are residents in the district in which this Court sits.

12. Under Federal Rule of Civil Procedure 20(a)(1), Plaintiffs are permitted to join this suit because it involves common questions of both law and fact relative to both Plaintiffs.

## FACTS COMMON TO ALL COUNTS

***The Galewood Crossings Development***

13. The Enclave At Galewood Crossings ("Galewood Crossings") is a residential planned unit development on Chicago's far-west side. It consists of, among other things, townhomes, single-family homes, and 2-flat buildings, some of which are condominiums.

14. RSD is developing and selling resident units in Galewood Crossings.

***The Defendants' Board Duties under the Master Association Declaration***

15. There are at least three governing bodies operating within the Galewood Crossings development: the Board of the Master Association (the "Master Association"), which is a defendant in this suit, a separate boards of director for the development's townhomes (the "Townhomes Association") and one or more condominium associations (the "Condominium Association").

16. The Individual Defendants are all board members of the Master Association.

17. The duties of the Master Association are defined by the governing Master Association declaration formally known as the "Master Declaration of Covenants, Restrictions, Easements and Rights For The Enclave At Galewood Crossings" recorded with the Recorder of Deeds of Cook County, Illinois as document number 0734434123 (the "Master Declaration"), a copy of which is attached hereto as *Exhibit A*.

18. The predominant function of the Master Association is to maintain and administer certain aspects of the property, including the Common Area Lots, Association Maintained Sewer Mains, Association Maintained Retaining Walls, and the Association Maintained Sidewalk Areas (the "Association Maintained Areas"). (*See Exhibit A* at Article I, p. 2).

***Previous Rules Governing Leasing Within the Community***

19. Prior to the adoption of the leasing amendment, Section 9.14 of the Master Declaration provided that each unit owner shall have the right to lease his or her residential unit, so long as the lease is for at least one year, made in writing, and is subject to the Master Declaration. (*Id.* at § 9.14).

20. Both the Townhomes Association and the largest Condominium Association are also governed by their respective declarations and by-laws, copies of which are attached hereto as *Exhibit B* (the Declaration of Party Wall Rights, Covenants, Conditions, Restrictions And Easements For The Enclave At Galewood Crossings Townhomes recorded with the Recorder of Deeds of Cook County, Illinois as document number 0800931088, the "Townhomes Declaration") and *Exhibit C* (the Amended And Restated Declaration of Condominium Ownership And Of Easements, Restrictions, Covenants And By-Laws For The Enclave At Galewood Crossings Multi-Building Condominium Association (f/k/a The Enclave At Galewood Crossings Lot 6 Condominium Association recorded with the Recorder of Deeds of Cook County, Illinois as document number 0902316030, the "Condominium Declaration")). Neither the Townhomes Declaration nor the Condominium Declaration materially restricts the rights of unit owners to lease their residential units. To the contrary, both expressly provide for such right. (*See Exhibit B* at § 9.18 and *Exhibit C* at § 12.2).

***The CHA's Agreement to Purchase RSD's Homes***

21. In late 2009, RSD and the CHA began discussing the possibility of the CHA purchasing from RSD homes that RSD owned within the Galewood Crossings community. RSD owns twenty-one constructed units within the community: nine townhomes and twelve units in

2-flat buildings (some of which are condominiums). The CHA is interested in purchasing eight townhomes and one 2-flat building from RSD.

22. As it has done throughout numerous areas in Chicago, the CHA plans to lease the newly acquired units for low and moderate-income housing. A large number of qualifying individuals as tenants in CHA properties are minorities, including African Americans.

23. On July 23, 2010, RSD and the CHA executed a purchase and sale agreement to acquire eight townhomes and one 2-flat building from RSD.

***The Master Association Seeks to Amend the Master Declaration to Restrict Leasing within the Community***

24. Prior to learning that the CHA was in negotiations to purchase and lease units within the Galewood Crossings community, Defendants ***never*** publicly discussed or proposed amendments to the Master Declaration that would restrict leasing.

25. On information and belief, the Individual Defendants first learned of the negotiations between the CHA and RSD some time before June 30, 2010.

26. On June 30, 2010, Defendants issued a notice of a special homeowners meeting to discuss and vote on an amendment to the Master Declaration that would restrict leasing by unit owners.

27. On July 23, 2010, which was the same day that the CHA executed its purchase and sale agreement with RSD, RSD, with no prior notice whatsoever, received Defendants' notice of a special homeowners meeting for amendment consideration. That meeting was to be held *the next day*, on July 24, 2010.

28. The amendment that was to be considered would have limited the number of units that could have been leased at any given time to no more than 48 out of the 192 residential units.

The amendment also would have created two classes of voters within the association which, on its face, was invalid.

29. RSD, along with other unit owners, objected to the proposed amendment.

30. Presumably because of the invalidity of the amendment, the amendment did not pass and was withdrawn by Defendants.

***The CHA and RSD Meet with the Board to Discuss the CHA's Plan to Purchase and Lease Residences***

31. The CHA and RSD assumed that after the first leasing amendment was not approved by the ownership, the proposed leasing restriction was no longer an issue. To that end, the CHA and RSD reached out to Defendants to schedule and hold an informational meeting with the Board. The purpose of the meeting was to introduce the CHA to the Board and to explain the CHA's plans to purchase and lease residences within the community.

32. On August 4, 2010, representatives of the CHA and RSD met with Cruz, Lane, Catchings, and Alcaron at Lane's home. During this meeting, the CHA explained its operating procedures, including how it deals with its properties and tenants. It also addressed any issues that the Board had with the CHA's plans to purchase RSD homes and lease them.

33. During the meeting, the Individual Defendants learned that the CHA and RSD had formally executed their purchase and sale agreement. In response, a Board member stated that "***we don't need any more poor black people living here***."

34. Despite this comment, at no time during this meeting did the Individual Defendants indicate that they would be scheduling another vote on a proposed leasing restriction amendment to the Master Declaration. In fact, the topic of leasing restrictions was never discussed at that meeting or during subsequent discussions between the parties.

35. Following the initial August 4, 2010 meeting, and through at least the following month, Defendants and the CHA continued their dialogue regarding the CHA's plans to lease units to low- to moderate-income individuals. Defendants led the CHA to believe that Defendants were genuinely considering the CHA's lease plans.

36. In realty, however, Defendants were working behind the scenes to organize another vote by unit owners on a leasing restriction in the Master Declaration. Defendants *never* notified the CHA and RSD about this new proposed amendment.

***The Master Association Amends the Master Declaration to Prohibit the CHA from Leasing Units***

37. On September 21, 2010, almost seven weeks after meeting with the Individual Defendants, RSD received a memorandum from the Board stating that the Board had recorded the First Amendment to Section 9.14 of the Master Declaration on September 20, 2010, with the Cook County Recorder of Deeds as document number 1026310048. The memorandum enclosed a copy of both the recorded First Amendment and the petition from unit owners approving of the First Amendment. A copy of the September 21, 2010 memorandum, together with the recorded First Amendment and petition approving such, is attached hereto as *Exhibit D*.

38. The First Amendment to Section 9.14 states that:

> Except as otherwise provided herein, no Residential Units may be leased. All Residential Unit Owners who own a Residential Unit *as of the effective date of this Amendment* shall have the right to lease such Residential Unit Owner's Residential Unit.

(*Exhibit D*, Amendment to § 9.14, p. 2) (emphasis added).

39. Because the CHA did not "own a Residential Unit as of the effective date of [the] Amendment," it is prohibited under the First Amendment from leasing any unit that it purchases from RSD.

40. Notably, RSD *never* received notice of the proposed First Amendment before it was passed, and never had an opportunity to discuss or vote on it as it was entitled to do as a unit owner.

41. As it turns out, the Board surreptitiously facilitated the approval of the First Amendment without input from RSD because the express goal of the First Amendment was to prohibit the CHA and RSD from implementing the CHA's plan to lease units within the community to the precise "poor black people" to whom the Individual Defendants referred in the meeting with the CHA and RSD on August 4, 2010.

42. Further, on information and belief, those unit owners that had previously voted against the first proposed amendment had suddenly changed their votes in favor of the leasing restriction. Also on information and belief, Defendants used the CHA's plan to lease units as ammunition to convince unit owners to vote in favor of the leasing restriction.

43. Defendants introduced and facilitated the passing of the First Amendment out of their admitted animus toward "poor black people" and the potential for them to lease units within the development.

44. As a result of the First Amendment, the CHA and RSD cannot close on their deal; the transaction is conditioned on the CHA's ability to subsequently lease the units. The First Amendment prohibits the CHA from doing so.

45. The First Amendment also has a disparate impact on racial minorities to whom the CHA would be leasing the residences. These minorities would be prohibited from leasing residential units within the Galewood Crossings development.

46. Defendants' conduct represents a clear violation of the Fair Housing Act, 42 U.S.C. § 3604(a)-(c).

***Other Bases to Invalidate the Leasing Restriction***

47. Moreover, the Master Association was proposing the declaration amendment despite the fact that its duties under the Master Declaration are predominately limited to the administration and maintenance of the Association Maintained Areas. (*See Exhibit A* at Article I, p. 2). These duties are more fully enumerated in Section 5.1(a) of the Master Declaration. They do not include restricting unit owners' rights to lease their units to third parties.

48. Additionally, the First Amendment is inconsistent with the express provisions of the Townhomes Declaration (Section 9.18) and the Condominium Declaration (Section 12.2) that permit the units owners to lease their units. (*See Exhibits B* and *C*).

49. Finally, when the total number of votes was counted on the proposed amendment to Section 9.14 of the Master Declaration, the Master Association Board deemed the number of votes in favor of the amendment as sufficient to pass it. Under the Master Declaration, however, at least 75% of total votes on a written instrument must vote for approval, and at least 51% of the Residential Units subject to mortgages held by Eligible Mortgage Holders (as that term is defined in the Master Declaration) must vote for approval. (*See Exhibit A* at § 10.3). On information and belief, the Master Association did not obtain the required 51% approval of the First Amendment by Eligible Mortgage Holders.

50. As a result, Plaintiffs move the Court to declare the First Amendment to Section 9.14 of the Master Declaration invalid, to enjoin Defendants from enforcing the First Amendment and from further discriminating against racial minorities, either expressly or by way of any recorded instrument, including the Master Declaration and By-Laws, and to mandate that Defendants record an amendment that rescinds the First Amendment and the leasing restriction

in Section 9.14 of the Master Declaration. Plaintiffs also seek the reimbursement of their costs and attorneys' fees as permitted by 42 U.S.C. § 3613(c).

**COUNT I**
**(VIOLATION OF FAIR HOUSING ACT - 42 U.S.C. § 3604)**
**Disparate Impact**

51. Plaintiffs re-allege and incorporate Paragraphs 1-50 above as though fully alleged herein as Paragraph 51 for Count I.

52. Plaintiffs qualify as an "Aggrieved Person" as that term is defined in 42 U.S.C. § 3602(i). Plaintiffs have been injured by a discriminatory housing practice on the parts of Defendants. Because of the discriminatory leasing restrictions imposed by Defendants, RSD and the CHA are unable to proceed with their transaction because the amended Section 9.14 of the Master Declaration prohibits the CHA from leasing units since the CHA was not an owner of a Residential Unit "as of the effective date of [the] Amendment."

53. Defendants' proposal, adoption, recordation, and implementation of the First Amendment to Section 9.14 of the Master Declaration represents a "Discriminatory housing practice" as that term is defined in 42 U.S.C. § 3602(f).

54. Pursuant to the Fair Housing Act, Defendants are prohibited from (i) making unavailable or denying residential units within the development to racial minorities, including African Americans, on the basis of their race, (ii) discriminating against racial minorities, including African Americans, on the basis of their race by restricting the ability of the CHA to lease residential units within the development to them, and (iii) making or causing to be made amendments to the Master Declaration that indicate a limitation or discrimination on the basis of race. 42 U.S.C. § 3604(a)-(c).

55. The effect of the First Amendment to Section 9.14 of the Master Declaration has a disparate impact on racial minorities who represent the majority of low and moderate-income individuals that would be eligible to lease residential units in the development from the CHA.

56. 42 U.S.C. § 3613(c)(1) entitles Plaintiffs to declaratory and injunctive relief. Plaintiffs are also entitled to seek the reimbursement of their attorneys' fees and costs under 42 U.S.C. § 3613(c)(2).

WHEREFORE, Plaintiffs, the Chicago Housing Authority and RSD Galewood, LLC, pray for a judgment in their favor and against Defendants: (1) declaring that the First Amendment to Section 9.14 of the Master Declaration has a disparate impact on racial minorities; (2) enjoining Defendants from implementing and enforcing the leasing restrictions in the First Amendment to Section 9.14 of the Master Declaration and from further discriminating against racial minorities, either expressly or by way of any declaration or instrument; (3) mandating that Defendants further record a document to amend the Master Declaration that rescinds the leasing restrictions in the First Amendment to Section 9.14; (4) pursuant to 42 U.S.C. § 3613(c)(2), awarding Plaintiffs their attorneys' fees and costs in prosecuting this action; and (5) awarding Plaintiffs any further relief that this Court deems just and appropriate.

**COUNT II**
**(VIOLATION OF FAIR HOUSING ACT - 42 U.S.C. § 3604)**
**Disparate Treatment**

57. Plaintiffs re-allege and incorporate Paragraphs 1-50 above as though fully alleged herein as Paragraph 57 for Count II.

58. Plaintiffs qualify as an "Aggrieved Person" as that term is defined in 42 U.S.C. § 3602(i). Plaintiffs have been injured by a discriminatory housing practice on the parts of Defendants.

59. Defendants' proposal, adoption, recordation, and implementation of the First Amendment to Section 9.14 of the Master Declaration represents a "Discriminatory housing practice" as that term is defined in 42 U.S.C. § 3602(f).

60. Pursuant to the Fair Housing Act, Defendants are prohibited from (i) making unavailable or denying residential units within the development to racial minorities on the basis of their race, (ii) discriminating against racial minorities on the basis of their race by restricting the ability of the CHA to lease residential units within the development to them, and (iii) making or causing to be made amendments to the Master Declaration that indicate a limitation or discrimination on the basis of race. 42 U.S.C. § 3604(a)-(c).

61. At the time that RSD and the CHA executed their purchase agreement, no leasing restrictions existed. The Master Declaration (prior to being amended), Townhomes Declaration, and Condominium Declaration all expressly permitted unit owners to lease their units, subject to certain immaterial limitations.

62. It was not until the Master Association learned of the possibility of the CHA purchasing RSD's units and leasing them as affordable housing to low- and moderate-income individuals that Defendants proposed amending Section 9.14 of the Master Declaration to prohibit the CHA from leasing the properties.

63. During the meeting with representatives of the CHA and RSD, representatives of the Board expressly stated that they "don't need any more black people living here." Purportedly, they believed that racial minorities, including "poor black people," would cause their property values to decline.

64. In proposing, adopting, recording, and implementing the First Amendment to Section 9.14 of the Master Declaration, Defendants were motivated solely by their animus

toward racial minorities, including African Americans, and sought to intentionally preclude them from leasing units within the development. Defendants' stated purpose for the First Amendment was a pretext for discrimination against racial minorities, including African Americans.

65. Because of the discriminatory leasing restrictions imposed by Defendants, RSD and the CHA are unable to proceed with their transaction because the First Amendment to Section 9.14 of the Master Declaration prohibits the CHA from leasing units because the CHA was not an owner of a Residential Unit "as of the effective date of [the] Amendment."

66. 42 U.S.C. § 3613(c)(1) entitles Plaintiffs to declaratory and injunctive relief. Plaintiffs are also entitled to seek the reimbursement of their attorneys' fees and costs under 42 U.S.C. § 3613(c)(2).

WHEREFORE, Plaintiffs, the Chicago Housing Authority and RSD Galewood, LLC, pray for a judgment in their favor and against Defendants: (1) declaring that the First Amendment to Section 9.14 of the Master Declaration is void based on Defendants' intentional discrimination and violation of 42 U.S.C. § 3604(a)-(c); (2) enjoining Defendants from implementing and enforcing the leasing restrictions in the First Amendment and from further discriminating against racial minorities, either expressly or by way of any declaration or instrument; (3) mandating that Defendants further amend the Master Declaration by recording a document to rescind the leasing restrictions in the First Amendment to Section 9.14; (4) pursuant to 42 U.S.C. § 3613(c)(2), awarding Plaintiffs their attorneys' fees and costs in prosecuting this action; and (5) awarding Plaintiffs any further relief that this Court deems just and appropriate.

## COUNT III
## (DECLARATORY JUDGMENT)
## Invalidity of the Amendment to the Declaration

67. Plaintiffs re-allege and incorporate Paragraphs 1-50 above as though fully alleged herein as Paragraph 67 for Count III.

68. Plaintiffs have a tangible, legal interest in their rights to close on their agreement for the sale of units within the Galewood Crossings development without undue interference from Defendants and in the CHA's right to lease property as affordable housing to qualifying low- and moderate-income individuals. In order for the parties' transaction to proceed, the CHA cannot be restricted from leasing units within the community.

69. Defendants have a competing interest in prohibiting the CHA from leasing the units, as Defendants contend that such leases would violate Section 9.14 of the Master Declaration as amended.

70. The Master Declaration provides that the Master Association is predominately responsible for the administration and maintenance of Association Maintained Areas. (*See Exhibit A* at Article I, p. 2, and § 5.1(a)).

71. The proposal and facilitation of the adoption, recordation, and implementation of the First Amendment to Section 9.14 exceeds the authority granted to the Master Association under the Master Declaration. Defendants do not have the authority to pass leasing restrictions for unit owners within the Townhomes Association and Condominium Association.

72. The amendment to Section 9.14 expressly conflicts with the leasing provisions in the Townhomes Declaration (Section 9.18) and Condominium Declaration (Section 12.2) that permit the CHA to lease units within the development.

73. Moreover, for the approval of a Material Amendment (as that term is defined in the Master Declaration), the Master Association must obtain the approval of at least 75% of total votes on an instrument, and at least 51% of Residential Units that are subject to mortgages held by Eligible Mortgage Holders. (*Id.* at § 10.3).

74. On information and belief, the Master Association did not obtain the required approval under Section 10.3 of the Master Declaration to pass the amendment to Section 9.14.

75. The parties' disparate positions regarding the validity of the amendment to Section 9.14 constitute a concrete dispute in need of an immediate and definitive determination of the parties' rights.

76. The resolution of the parties' rights will aid in the determination of the controversy presented herein.

WHEREFORE, Plaintiffs, the Chicago Housing Authority and RSD Galewood, LLC, seek a declaratory judgment from the Court that: (1) the First Amendment to Section 9.14 is void and invalid as the Master Association exceeded its authority granted to it in the Master Declaration by proposing, facilitating the adoption of, recording, and implementing the First Amendment; (2) the First Amendment to Section 9.14 is void and invalid because it improperly restricts units owners from leasing their residential units in contravention of their rights under the Townhomes Declaration and Condominium Declaration; (3) the First Amendment is void and invalid because the Master Association did not receive the necessary approval pursuant to Section 10.3 of the Master Declaration; and (4) Plaintiffs are entitled to any further relief that this Court deems just and appropriate.

Dated: December 2, 2010        Respectfully submitted,

        **RSD Galewood, LLC**


        By: /s/ Christopher M. Heintskill


Gary I. Blackman
gblackman@lplegal.com
Christopher M. Heintskill
cheintskill@lplegal.com
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle St., Suite 1300
Chicago, Illinois 60602
(312) 346-8380 - Telephone
(312) 346-8434 - Facsimile

        **Chicago Housing Authority**


        By: /s/ Scott W. Ammarell


Scott W. Ammarell
sammarell@thecha.org
Office of the General Counsel
Chicago Housing Authority
60 East Van Buren
12th Floor
Chicago, Illinois 60605
(312) 913-7116 - Telephone
(312) 913-7117 - Facsimile