# EXHIBIT A

THIS DOCUMENT
PREPARED BY AND
AFTER RECORDING
RETURN TO:

Adam T. Berkoff, Esq.
DLA Piper Rudnick Gray
Cary US LLP
203 North LaSalle Street
Suite 1900
Chicago, Illinois 60601

*This space reserved for Recorder's use only.*



Doc#:  0734434123 Fee: $130.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 12/10/2007 02:07 PM Pg:  1 of 54

## MASTER DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS, EASEMENTS AND RIGHTS FOR THE ENCLAVE AT GALEWOOD CROSSINGS

THIS MASTER DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS, EASEMENTS AND RIGHTS FOR THE ENCLAVE AT GALEWOOD CROSSINGS (this "Declaration") is made and entered into as of the ___5TH___ day of December 2007, by **RSD GALEWOOD, LLC**, an Illinois limited liability company (hereinafter referred to as "Declarant").

## W I T N E S S E T H :

A.     Declarant is the owner and legal title holder of certain real estate in the City of Chicago, County of Cook and State of Illinois, which real estate is legally described in Exhibit A attached hereto and by this reference made a part hereof (the "**Property**").

B.     Declarant has caused a Plat of Subdivision (as hereinafter defined) to be recorded against the Property, and pursuant to the Plat of Subdivision, the Property consists of (1) subdivided lots on which buildings containing the Residential Units (as hereinafter defined) will be located, (2) subdivided lots to be owned by a Townhome Association (as hereinafter defined) for the exclusive use and possession of the members thereof, and (3) the remaining subdivided lots to be owned by the Association (as hereinafter defined) for the use or enjoyment of all of the owners of the Residential Units, subject, however, to this Declaration.

C.     Declarant intends to construct on the Property a development containing approximately One Hundred and Ninety Two (192) Residential Units, together with certain common areas which will require continuing care and maintenance for the privacy, benefit and enjoyment of all persons owning and residing in the Residential Units.

EXECUTION VERSION

D.     Declarant has deemed it desirable for the efficient preservation of the values and amenities of the Property to create an agency to which shall be delegated and assigned the powers of maintaining and administering aspects of the Residential Units, Townhome Common Lots and the Common Area Lots, as hereinafter defined, and administering and enforcing the covenants and restrictions hereinafter contained and created.

E.     The Association has been incorporated under the laws of the State of Illinois as a not-for-profit corporation for the purpose of exercising the functions aforesaid.

F.     Declarant desires to establish for its own benefit and the mutual benefit of all future owners, tenants and occupants of the Property and any part thereof, certain easements or rights in, over, under, upon and along the Property and certain mutually beneficial restrictions and obligations with respect to the use, conduct and maintenance thereof.

**NOW, THEREFORE,** Declarant hereby declares that the Property and such additions thereto as may hereinafter be made is and shall be transferred, held, sold, conveyed and accepted subject to this Declaration. Declarant does hereby further declare that the following easements, covenants, restrictions, conditions, burdens, uses, privileges, charges and liens shall: (1) exist at all times hereafter amongst all parties having or acquiring any right, title or interest in any portions of the Property; (2) be binding upon and inure to the benefit of each owner of each Residential Lot, Residential Unit, Common Area Lot and Townhome Common Lot (as hereinafter defined); and (3) run with the land subjected to this Declaration, to be held, sold and conveyed subject thereto.

## ARTICLE 1

## DEFINITIONS

"**Association**" shall mean and refer to an Illinois not-for-profit corporation, its successors and assigns to be known by the name of "THE ENCLAVE AT GALEWOOD CROSSINGS MASTER ASSOCIATION", or such other name or names as Declarant shall designate. All Residential Unit Owners shall be members of the Association, as more particularly described in this Declaration.

"**Association Maintained Areas**" shall mean the Common Area Lots, Association Maintained Sewer Mains, the Association Maintained Retaining Walls, and the Association Maintained Sidewalk Areas.

"**Association Maintained Sewer Mains**" shall mean those sanitary sewer mains and storm sewer mains which are located on a Townhome Common Lot or a Residential Lot as follows: (1) the sanitary sewer main running within the "sanitary easement" (as such easement is depicted on the Plat) on Lots 1 through 10, inclusive; and (2) the storm sewer main that runs in between Lot 132 and Lot 133 on Lot 164. Except as otherwise provided herein, the Association Maintained Sewer Mains shall be maintained by the Association notwithstanding their location on a Townhome Common Lot or a Residential Lot.

2

"**Association Maintained Retaining Walls**" shall mean those retaining walls which are located within the "sanitary easement" (as such easement is depicted on the Plat) on Lots 1 through 10, inclusive. Except as otherwise provided herein, the Association Maintained Retaining Walls shall be maintained by the Association notwithstanding their location on a Residential Lot.

"**Association Maintained Sidewalk Areas**" shall mean: (1) the sidewalk located on Lots 1 through5, inclusive and Lots 6 through10, inclusive; and (2) that portion of the sidewalk located in the Laramie Avenue right of way which abuts the Subdivision. Except as otherwise provided herein, the Association Maintained Sidewalk Areas shall be maintained by the Association notwithstanding their location on Residential Lots or the public right-of-way.

"**Board**" shall mean the Board of Directors of the Association as constituted at any time or from time to time, in accordance with the applicable provisions of Article 3.

"**Building**" shall mean a structure which contains one or more Residential Units and is located on one Residential Lot.

"**By-Laws**" shall mean the By-Laws of THE ENCLAVE AT GALEWOOD CROSSINGS MASTER ASSOCIATION, a copy of which is attached as Exhibit E hereto and by this reference made a part hereof.

"**City**" shall mean the City of Chicago, a municipal corporation.

"**Common Area Lots**" shall mean Lots 15, 162, 166, 167 and 169 which are legally described on Exhibit C attached hereto. The Common Area Lots shall be owned by the Association and shall be for the exclusive use and possession of the Residential Unit Owners.

"**Condominium Association**" shall mean and refer to an Illinois not-for-profit corporation formed pursuant to the Illinois Condominium Property Act to administer the common elements of a condominium located on one or more Condominium Lots.

"**Condominium Declaration**" shall mean and refer to a declaration of condominium pursuant to which a condominium is formed.

"**Condominium Lot**" shall mean a Residential Lot upon which one or more Condominium Units are situated.

"**Condominium Unit**" shall mean a residential housing unit consisting of one or more rooms which are designed or intended for the exclusive use as living quarters for one family and which is located within a Building on one Residential Lot which Building and Residential Lot have, pursuant to the terms and provisions of a separate Condominium Declaration been submitted to the Illinois Condominium Property Act. Each Condominium Unit shall be governed by and subject to the terms and provisions of a separate Condominium Declaration, in addition to the terms and provisions of this Declaration.

EXECUTION VERSION

"**Declarant**" shall mean and refer to RSD GALEWOOD, LLC, an Illinois limited liability company.

"**Declaration**" shall mean this Master Declaration of Covenants, Conditions, Restrictions, Easements and Rights for The Enclave at Galewood Crossings.

"**Eligible Mortgage Holder**" shall mean each holder of a first mortgage on a Residential Lot or Residential Unit that has requested in writing that the Association notify it of any proposed action that requires consent of a specified percentage of mortgage holders.

"**Emergency Access Easement**" shall mean that certain Easement Agreement dated October 30, 2007 and recorded November 7, 2007 as document number 0731133107 in the Office of the Recorder of Deeds of Cook County, Illinois between RSD Galewood, LLC and Kerasotes Showplace Theatres, LLC providing mutual easements for emergency access between the Property and the property immediately adjacent to the west.

"**Flat Building**" shall mean a multi-story residential housing Building that is divided into two (2) or more residential housing units.

"**Lot**" shall mean and refer to a platted lot of record shown on the Plat of Subdivision.

"**Material Amendment**" shall mean any amendment to this Declaration, the By-Laws or the Association's articles of incorporation that would change any of the following in a manner other than as expressly provided herein: voting rights in the Association; assessment liens; subordination of assessments liens; rights to, or use of, any portion of the Common Area Lots; termination of the legal status of the Association or the Property following substantial destruction or condemnation; or any provisions that expressly benefit holders, insurers or guarantors of mortgages secured by portions of the Property.

"**Member**" shall mean and refer to any person or entity who holds membership in the Association.

"**Metra Easement**" shall mean that certain easement agreement dated November 7, 2007 and recorded November 6, 2007 as document number 0731122072 in the Office of the Recorder of Deeds of Cook County, Illinois between RSD Galewood, LLC and the Commuter Rail Division of the Regional Transportation Authority ("**Metra**") providing access across portions of Lot 169 from Laramie Avenue to the property immediately adjacent to and north of the Property.

"**NFR Letter**" shall mean those certain "No Further Remediation" letters issued by the Illinois Environmental Protection Agency in response to the performance of certain environmental remediation work and submission by Declarant of environmental remediation reports, including the several Remedial Action Completion Reports issued for various portions of the Property and to be recorded upon their issuance against title to the relevant portions Property in the Office of the Recorder of Deeds of Cook County, Illinois, within the time specified therein. Upon completion of

4

construction of every Building to be constructed within the Property, at least one NFR letter will have been issued and recorded against title to every Lot.

"**Occupant**" shall mean any person or persons other than the Residential Unit Owner in possession of a Residential Unit.

"**Percentage Interest**" shall mean each Residential Unit Owner's share of the Association Assessment, as set forth for that Residential Unit Owner's Residential Lot in Exhibit E attached hereto and made a part hereof; provided, however, that in the event that a Residential Lot containing a Flat Building is subjected to a Condominium Declaration, the Percentage Interest for each Condominium Unit in such condominium shall be equal to the Percentage Interest for the Residential Lot upon which such condominium is located divided by the number of Condominium Units created by said Condominium Declaration (to the end that each Condominium Unit on that Residential Lot would have the same Percentage Interest and the aggregate total Percentage Interests of all Condominium Units on that Residential Lot would equal the Percentage Interest for that Residential Lot as set forth on Exhibit E attached hereto).

"**Plat of Subdivision**" shall mean the Galewood Residential Plat of Subdivision recorded March 29, 2007 as document number 0708815072 in the Office of the Recorder of Deeds of Cook County, Illinois, as the same may be amended from time to time.

"**Property**" shall mean and refer to that certain real estate described in Exhibit A attached hereto and by this reference made a part hereof and such additions thereto as may hereafter be brought within the jurisdiction of this Declaration and the Association.

"**Residential Lot**" shall mean each of Lots 1-14 and 16-161, as legally described on Exhibit B attached hereto. Each Residential Lot is intended to be improved or is currently improved with either a Single Family Unit, a Flat Building (which may or may not contain Condominium Units, or a Townhome Unit.

"**Residential Maintained Landscape Area**" shall mean the area generally referred to as a parkway or more particularly the landscape area in the front or side of a Building located between a Residential Lot sidewalk and the roadway and between the lot lines of the Residential Lot if those lot lines were extended to the roadway. Except as otherwise provided herein, the Residential Maintained Landscape Areas shall be maintained by the Residential Unit Owners despite its location within the Common Area Lots.

"**Residential Unit**" shall mean (i) a Single Family Unit, (ii) a Flat Building that has a single owner and does not contain Condominium Units, (iii) a Townhome Unit or (iv) a Condominium Unit, if any.

"**Residential Unit Owner**" shall mean and refer to the record owner, whether one or more persons or entities, of a fee simple title to any Residential Unit, including contract sellers, but excluding those having such interest merely as security for the performance of an obligation. The term "Residential Unit Owner" shall include Declarant to the extent of the number of Residential

5

Units owned by Declarant and also includes the interest of Declarant as contract seller of any Residential Units.

"**Sewer Covenant**" shall mean that certain Covenant dated March 1, 2007 and recorded March 8, 2007 as document number 0706739002 in the Office of the Recorder of Deeds of Cook County, Illinois.

"**Single Family Unit**" shall mean a detached residential housing Building consisting of a group of rooms which are designed or intended for the exclusive use as living quarters for one family and which is located on a single Residential Lot.

"**Townhome Association**" shall mean and refer to the Illinois not-for-profit corporation to be formed to own the Townhome Common Lots and to administer maintenance of the Townhome Common Lots and any common exterior walls, roofs and similar elements of a group of Townhome Units contiguous and adjacent to each other and/or to one Townhome Common Lot.

"**Townhome Common Lots**" shall mean Lots 163, 164, 165 and 168 as legally described on Exhibit D attached hereto. The Townhome Common Lots shall be owned by the Townhome Association and shall be for the exclusive use and possession of the Residential Unit Owners which are members in the Townhome Association, as more particularly described in the townhome declaration of covenants, conditions, restrictions and easements for the Townhome Units.

"**Townhome Unit**" shall mean an attached residential housing Building consisting of one or more rooms which are designed or intended for the exclusive use as living quarters for one family and which is located upon a separate Residential Lot even though such Townhome Unit shares a common exterior wall, roof or other structural or common component with one or more other Townhome Units. Each Townhome Unit shall be governed by and subject to the terms and provisions of the declaration of covenants, conditions, restrictions and easements applicable to the Townhome Units, in addition to the terms and provisions of this Declaration.

"**Transfer Date**" shall mean the date which is the earlier of: (i) the date on which seventy-five percent (75%) of the Residential Units have been conveyed to Residential Unit Owners other than Declarant, (ii) three (3) years after the first Residential Unit is conveyed to a Residential Unit Owner other than Declarant or (iii) such date as Declarant may, in its sole discretion, determine prior to the occurrence of the events set forth in the foregoing clauses (i) and (ii).

## ARTICLE 2

## MEMBERSHIP

Every Residential Unit Owner, including a contract seller, shall be a member of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation. No Residential Unit Owner shall have more than one membership. Membership shall be appurtenant to and may not be separated from ownership of any Residential Unit which is subject to assessment by the Association. Ownership of such

6

Residential Unit shall be the sole qualification of membership. Nothing herein contained shall be interpreted to exclude Declarant from membership while it or its successors in interest, if any, owns one or more Residential Units. Voting rights with regard to each Member are set forth in Article 3 hereof.

## ARTICLE 3

### VOTING RIGHTS AND BOARD OF DIRECTORS

3.1    The Association shall have two classes of voting membership:

Class A.  Class A Members shall be all those Residential Unit Owners as defined in Article 2, provided that Declarant shall not be a Class A Member until the Transfer Date. Class A Members shall be entitled to the number of votes equal to the total of their respective Percentage Interests. When more than one person holds such interest in any Residential Unit, all such persons shall be Members. The vote for such Residential Unit shall be exercised as they among themselves determine, but all votes of such Residential Unit shall be cast by one Member.

Class B.  The Class B Member shall be Declarant. The Class B Member shall be entitled to the number of votes equal to three (3) times the Percentage Interest of each Residential Unit in which it holds the interest required for membership by Article 2; provided that the Class B membership shall cease and be converted to Class A membership on the Transfer Date.

3.2    The provisions of Section 3.1 hereof shall be mandatory. No owner of any interest in any Residential Unit shall have any right or power to disclaim, terminate or withdraw from his membership in the Association or any of his obligations as such Member, and no purported disclaimer, termination or withdrawal thereof or therefrom on the part of any such owner shall be of any force or effect for any purpose.

3.3    The Association shall have a Board of five (5) Directors who shall be elected by the Members of the Association at such intervals as the corporate charter and By-Laws of the Association shall provide, except that the first Board may be appointed by Declarant (or its beneficiary or designee). Each member of the Board, with the exception of the Board members appointed by Declarant (or its designee) shall be one of the Residential Unit Owners (including Declarant); provided, however, that in the event a Residential Unit Owner is a corporation, partnership, trust, limited liability company, or other legal entity other than a natural person or persons, then any director or officer of such corporation, partner of such partnership, individual trustee or beneficiary of such trust, manager, officer or member of such limited liability company, or manager or principal of such legal entity, shall be eligible to serve as a member of the Board. The Association shall have such officers as shall be appropriate from time to time, who shall be elected by the Board and who shall manage and conduct the affairs of the Association under the direction of the Board, all as provided for in the By-Laws. Except as expressly otherwise provided by the Association's articles of incorporation, this Declaration or the By-Laws, all power and authority to act on behalf of the Association both pursuant to this Declaration and otherwise shall be vested in its

7

Board from time to time and its officers under the direction of the Board, and shall not be subject to any requirement of approval on the part of its Members. The articles of incorporation and By-Laws of the Association may include such provisions for the protection and indemnification of its officers and directors as shall be permissible by law.

3.4     The Association, being a not-for-profit corporation, shall not distribute to its Members any sums in the nature of dividends upon its shares. To the extent that funds shall not be required for current expenditures or for such reserves, the next monthly assessments may, in the discretion of the Board, be eliminated or the amount thereof appropriately reduced. Such reduction shall not prevent reinstatement of, or increase in, such assessments when required, but such reinstatement or increase shall not be retroactive.

3.5     Whenever possible, the Association shall perform its functions and carry out its duties by entering into agreements for the performance thereof with such persons and business entities regularly engaged in the performance of generally similar functions and duties as the Board shall determine, which agreements shall be for such length of time, at such rates of compensation and upon such other terms and provisions as the Board shall determine from time to time; provided however, that if the Association, Declarant or Board shall enter into an agreement or agreements for the professional management of the Property before the Transfer Date, each such agreement shall provide that it is terminable by the Association without cause at any time after the Transfer Date and shall not require the payment of any penalty by the Association and shall not require advance notice of termination of more than ninety (90) days. Such persons or business entities may, but need not, be persons or business entities owning or otherwise directly or indirectly interested in the Property or any part thereof. The Association itself shall also have power to perform its functions and carry out its duties.

3.6     The Association, through the resolutions of the Board, shall have the right to adopt rules and regulations governing the Residential Units and the Common Area Lots and the use thereof; provided, however, that no rule or regulation shall conflict with this Declaration, or any applicable laws, ordinances or codes.

3.7     A copy of this Declaration, the By-Laws and the Association's books, records and financial statements to be kept by the Board shall be available for inspection by any Residential Unit Owner or any representative of a Residential Unit Owner duly authorized in writing, or any holder, insurer or guarantor of a first mortgage lien on a Residential Unit at such reasonable time or times during the normal business hours as may be requested by the Residential Unit Owner or by the holder of said first mortgage lien.

3.8     Neither the Directors nor the officers of the Association shall be liable to the Residential Unit Owners for any mistake of judgment or for any other acts or omissions of any nature whatsoever made by such individuals as such Directors and officers, except for any acts or omissions finally adjudged by a court of competent jurisdiction to constitute gross negligence or fraud. The Residential Unit Owners (including the Directors and the officers of the Association in their capacity as Residential Unit Owners) shall indemnify and hold harmless each of the Directors and each of the officers of the Association against all contractual and other liabilities to others arising out of

8

contracts made by or other acts of the Board and officers of the Association on behalf of the Residential Unit Owners or arising out of their status as Directors or officers of the Association, unless any such contract or act shall have been finally adjudged by a court of competent jurisdiction to have been made fraudulently or with gross negligence. It is intended that the foregoing indemnification shall include indemnification against all costs and expenses (including, but not limited to, attorneys' fees, amounts of judgments paid and amounts paid or received in settlement) reasonably incurred in connection with the defense of any claim, action, suit or proceeding, whether civil, criminal, administrative, or other, in which any Director or officer of the Association may be involved by virtue of such persons being or having been such Director or officer; provided, however, that such indemnity shall not be operative with respect to (a) any matter as to which such person shall have been finally adjudged in such action, suit or proceeding to be liable for gross negligence or fraud in the performance of such person's duties as such Director or officer, or (b) any matter settled or compromised, unless, in the opinion of independent counsel selected by or in a manner determined by the Board, there is not reasonable ground for such person being adjudged liable for gross negligence or fraud in the performance of such person's duties as such Director or officer. It is also intended that the liability of each Residential Unit Owner arising out of any contract made by, or other acts of, the Board or officers of the Association, or out of the aforesaid indemnity in favor of the Directors or officers of the Association, shall be limited to an amount equal to the total liability thereunder multiplied by such Unit Owner's Percentage Interest. Every agreement made by the Board on behalf of the Residential Unit Owners shall be deemed to provide that the Directors are acting only as agents for the Residential Unit Owners, and shall have no personal liability thereunder (except as Residential Owners) and that each Residential Unit Owner's liability thereunder shall be limited to an amount equal to the total liability thereunder multiplied by such Unit Owner's Percentage Interest.

3.9    One or more Condominium Associations may be formed in connection with the establishment of one or more condominiums with respect to the Flat Buildings, and each such condominium shall be governed by, and be subject to, the terms and provisions of a separate Condominium Declaration creating easements, establishing restrictions and governing matters pertaining to the common elements and other rights and obligations of said condominium. In addition to strictly complying with all provisions of the Condominium Property Act of the State of Illinois, each Condominium Declaration shall specifically include those provisions set forth in Exhibit G attached hereto and by this reference made a part hereof. The formation of such condominiums and Condominium Associations, as well as the recording of appropriate Condominium Declarations shall be in addition to, and in no way in lieu of, the restrictions, easements and covenants contained herein. In the event of any conflict, ambiguity or contradiction between the terms of this Declaration and the terms of any such Condominium Declaration, the terms of this Declaration shall in all cases control and prevail.

3.10    It is Declarant's intention and expectation that a Townhome Association will be formed: (i) in connection with the establishment of a grouping of Residential Units; and (ii) to administer maintenance of the Townhome Common Lots and applicable common exterior walls, roofs and similar elements and that such grouping, ownership and maintenance responsibilities shall be governed by, and subject to, the terms and provisions of a declaration of covenants, conditions, restrictions and easements creating easements, establishing restrictions and governing other matters

9

pertaining to the maintenance of certain common features and the administration of other matters common to said grouping. The formation of such Townhome Association, as well as the recording of an appropriate declaration of covenants, conditions, restrictions and easements, shall be in addition to, and in no way in lieu of, the restrictions, easements and covenants contained herein. In the event of any conflict, ambiguity or contradiction between the terms of this Declaration and the terms of such other declaration of covenants, conditions, restrictions and easements, the terms of this Declaration shall in all cases control and prevail.

## ARTICLE 4

## PROVISIONS RELATING TO THE COMMON AREA LOTS

4.1     **Description of the Common Area.** The Common Area Lots will include, among other things, alleys, lanes or roads providing access to certain Residential Units, the gated entry system, sidewalks, perimeter fencing, landscaping, the stormwater management facilities, storm sewer and related appurtenances, water main and related appurtenances and sanitary sewer and related appurtenances, play areas, a tot lot, parks, a dog park, open space and other improvements, all as may be located on the Common Area Lots. The Common Area Lots are intended to be for the non-exclusive mutual use and enjoyment of all Residential Unit Owners.

4.2     Every Residential Unit Owner and such Residential Unit Owner's tenants, guests and invitees shall have a non-exclusive right and easement of ingress and egress in, over, upon and to, and use and enjoyment of, all portions of each Common Area Lot and all portions of each Common Area Lot shall be held for the use and benefit of each Residential Unit. Vehicular, bicycle and other means of access (other than pedestrian access) shall be limited to those portions of each Common Area Lot specifically improved for such purpose (e.g., those portions of the Common Area Lots improved with roadways, walkways, etc.) and shall not be permitted in any other location. Further, no active recreational use (e.g., picnics, play areas and similar activities of any type or description) shall be permitted on any Common Area Lot unless such Common Area Lot is specifically improved for such purpose (e.g., tot lots). The use and enjoyment of the Common Area Lots shall be subject to such reasonable rules and regulations as are adopted from time to time by the Association; provided, however, that in no event shall any rule or regulation have the effect of reducing or adversely affecting the obligations of the Association to maintain all portions of the Common Area Lots. The aforesaid non-exclusive right and easement shall be appurtenant to and shall pass with the title to every Residential Unit, subject to the following reserved rights and easements in favor of the parties specified below:

(a)     The right of the Association as legal titleholder thereto to dedicate or transfer all or any part of any Common Area Lot to any public agency, authority, or utility for such purposes and subject to such conditions as may be agreed to by the Board. No such dedication or transfer shall be effective unless an instrument agreeing to such dedication or transfer has been recorded, which instrument has been signed by (i) Declarant until the Transfer Date or (ii) the Board (after approval of those Residential Unit Owners who hold not less than three-fourths (3/4) of the votes of the membership) after the Transfer Date.

10

(b)     The rights of Metra under the Metra Easement.

(c)     To the extent not granted by Declarant, the Association hereby reserves the right, without the necessity of having to obtain any Member's consent, to grant, at any time and from time to time after title to the Common Area Lots have been conveyed to the Association, utility easement(s) for sanitary and storm sewers, water, gas, electricity, telephone, cable television and any other necessary public or municipal service over, through, upon and across all or any portion of any Common Area Lot, all upon such terms and conditions as the Board deems necessary or appropriate.

(d)     As part of the overall program of development of the Property into a residential community and to encourage the marketing and construction thereof, at any time until the completion of the development of the Property, Declarant hereby reserves for itself, its contractors and their respective subcontractors, agents and employees the right and easement of ingress and egress and of access and use in, over, upon, under and across each and every portion of the Common Area Lots, for sales, marketing and construction purposes, as well as the right and easement of use of certain Residential Lots and facilities thereof, all without charge during the entire sales, marketing and construction period on the Property.

(e)     At any time prior to the Transfer Date, and notwithstanding that Declarant may have theretofore conveyed title to the Common Area Lots to the Association, Declarant shall have and hereby reserves the right, without having to obtain the consent of any other party, (i) to grant and record such easements (in addition to the easements set forth and granted on the Plat of Subdivision) over, under, through, across, upon, in and on the Common Area Lots or portions thereof for the provision of any utility service, landscaping, buffering, ingress and egress, and such other purposes as Declarant, in its reasonable discretion, deems necessary, desirable or required by the final engineering plans for the Property or by the "as-built" condition of the Property, or any part or portion thereof; (ii) to add to the Common Area Lots by causing a deed to be recorded which conveys to the Association fee simple title to the real property which is to be added to the Common Area Lots, provided, however, that the addition of said real property (and its designation) is consistent with the intent and purposes of this Declaration; and (iii) to reclassify any of the Residential Lots then owned by Declarant or Common Area Lots (such as, for example, to convert a Residential Lot (or any portion thereof) then owned by Declarant to Common Area Lots or vice versa) which reclassification results from the "as-built" condition of the Property as a matter of convenience or for any other reason and shall be accomplished by causing an amendment to this Declaration to be recorded in the manner hereinafter set forth for Special Amendments, which amendment shall designate by legal description or attached plat, or both, what real property is being so reclassified; provided, however, that each such reclassification shall in all events be consistent with the intent and purposes of this Declaration.

11

4.3 **Improvement of the Association Maintained Areas**.

(a)    Declarant shall initially cause to be constructed, installed, renovated and/or located upon the Association Maintained Areas (including the Common Area Lots) such landscaping, private streets and lanes, perimeter fencing, the gated entry system, tot lots and play areas, benches, sidewalks, roadways, storm water retention or detention vaults and other improvements, all as Declarant shall from time to time determine to be necessary, appropriate or desirable or to be required by governmental laws, ordinances and regulations as shall be in effect during, and applicable to, the development of the Property. Subsequent to the Transfer Date, the Association shall have the right, subject to obtaining the approval of a majority of the Members, to further improve the Association Maintained Areas in a manner consistent with the intent and purpose of this Declaration or as required or permitted by any governmental laws, ordinances or regulations then in effect.

(b)    In the event, in the course of undertaking the construction, installation and/or location of improvements permitted hereunder on a Residential Lot or a Common Area Lot, a Residential Unit Owner (or anyone undertaking such construction, installation and/or location on behalf of a Residential Unit Owner) causes damage to a Common Area Lot or other portions of the Association Maintained Areas which, in the opinion of the Board, requires the repair or restoration thereof, such restoration or repairs shall be undertaken by the Association and such Residential Unit Owner shall reimburse the Association for the Association's costs of such repair or restoration within thirty (30) days of receipt of a written invoice from the Association therefor, and in the event such Residential Unit Owner fails to pay the amounts the Association incurs to undertake such repair or restoration within said thirty (30) days, such amounts, together with interest and all reasonable costs of collection, including attorneys' fees and litigation expenses, shall become a lien upon such Residential Unit Owner's Residential Unit (if a Condominium Unit) or upon such Residential Unit Owner's Residential Unit and Residential Lot, enforceable by an action similar to the type of action instituted to foreclose the lien of a mortgage or deed of trust on real property.

(c)    If, due to the willful misconduct or negligent act or omission of a Residential Unit Owner, or of a member of such Residential Unit Owner's family or household pet or of a guest or other authorized occupant or visitor of such Residential Unit Owner, damage shall be caused to: (i) the Common Area Lots, or (ii) a Residential Unit owned by others, or maintenance, repairs or replacements shall be required which would otherwise be charged to the Association, then such Residential Unit Owner shall pay for such damage and such maintenance, repairs and replacements as may be determined by the Board.

4.4    **City Easement**. An irrevocable license and non-exclusive easement is hereby granted to the City and, as applicable, its police, fire, water, public works, engineering, development, health and other authorized officials, employees and vehicles, to go upon the Property, including the Common Area Lots, at any time and from time to time for the purpose of performance of official duties and emergency services and for the purpose of enforcing this Declaration and all applicable ordinances, rules and regulations, and the statutes of the City of Chicago, County of Cook, State of Illinois and the United States and any easements and/or rights granted to the City hereunder or on the

12

Sewer Covenant or on the Plat of Subdivision. In addition to those rights granted under the Sewer Covenant, duly designated officials and employees of the City are hereby also granted a non-exclusive easement to enter upon, on and over the Property, including the Common Area Lots, for the purposes of maintaining and repairing, except as otherwise provided hereunder, stormwater drainage and retention areas, storm and sanitary sewers, water mains, and any other utility or public service located or which may be located in the Common Area Lots or on any Residential Lot and to correct or eliminate nuisances or violations resulting from the failure to exercise maintenance responsibilities by Declarant or its successors and assigns, any Residential Unit Owner or the Association. Said easement rights shall be exercised only to the extent and for such period of time as is required to accomplish said maintenance or repair. Except in the event of emergency situations, the City shall serve written notice upon the Association setting forth the manner in which Declarant, a Residential Unit Owner or the Association has failed to comply with its obligations under this Declaration or the Plat of Subdivision. Said notice shall include a demand that such deficiency be cured within ten (10) days from the date such notice is received. If such deficiency has not been cured within said ten (10) days or any extension thereof granted by the City, the City may (but shall not be obligated to) exercise its easement rights under this Declaration by entering the Common Area Lots and the Residential Lots and performing such maintenance or repair that, in the sole and absolute opinion of the City, Declarant, a Residential Unit Owner or the Association has failed to perform on all or any portion of the Common Area Lots or any Residential Lot. The Association shall reimburse the City for all expenses, including all administrative costs and attorneys' fees, incurred by it in performing such maintenance or repair that, in the City's sole and absolute opinion, Declarant, a Residential Unit Owner or the Association has failed to perform on all or any portion of the Common Area Lots or on any Residential Lot. If the Association has not reimbursed the City in full for all such expenses incurred within thirty (30) days after receipt of a bill detailing such expenses, then the portion of the cost of such maintenance or repair not so reimbursed shall be assessed to the Residential Units and Residential Lots (except in the case of Condominium Units) in accordance with their respective Percentage Interests, and shall become a lien upon such Residential Units/Residential Lots, which lien shall be in all respects subject and subordinate and junior to any prior mortgage recorded against all or any portion of such Residential Units/Residential Lots. Such lien may be enforced by all methods generally available for the enforcement of liens, including all methods available to the Association for enforcement of its lien rights hereunder, as well as by foreclosure through an action brought in a manner similar to the type of action instituted to foreclose the lien of a mortgage or deed of trust. The City shall be under no obligation to exercise the rights herein granted except as it shall determine to be in its best interest. No failure to exercise any right herein granted to the City shall be construed as a waiver of that or any other rights.

4.5 **Landscaping and Planting in the Common Area Lots**. No landscaping or planting shall be installed and/or located within the Common Area Lots which is inconsistent in character and concept with the other portions of the Property.

4.6 **Limitations on Easements and Rights in Common Area Lots**. Notwithstanding any provisions herein to the contrary, the easements and rights in the Common Area Lots and the Residential Lots herein created shall be subject to:

13

(a)     The right of Declarant to execute all documents and do all other acts and things affecting the Property which, in Declarant's sole opinion, are desirable in connection with Declarant's rights hereunder.

(b)     Easements of record (or any recorded rights to grant additional easements) existing on the date hereof (including, but not limited to, the Emergency Access Easement, the Metra Easement, and the Sewer Covenant), any and all easements granted on the Plat of Subdivision and any easements which may hereafter be granted by Declarant or the Association to any public utilities or governmental bodies for the installation and maintenance of electrical, cable television and telephone conduit and lines, gas pipes, sewers or water mains and pipes and related appurtenances to the foregoing, or any other utility services serving any Residential Lot.

4.7     **Dedication of the Common Area Lots**. Nothing contained in this Declaration shall be construed or be deemed to constitute a dedication, express or implied, of any part of the Common Area Lots to or for any public use or purpose whatsoever.

4.8     **Easements to be Contained in Plat**. Easements for serving the Common Area Lots and other properties with public utilities and municipal services are contained in the Plat of Subdivision.

## ARTICLE 5

## MAINTENANCE OF ASSOCIATION MAINTAINED AREAS, RESIDENTIAL LOTS AND RESIDENTIAL UNITS

5.1     **Maintenance of the Association Maintained Areas**.

(a)     The Association shall carry out or cause to be performed all maintenance, improvement, snow removal, repair and replacement of the Association Maintained Areas, excluding those portions of any Common Area Lots or facilities located thereon which have been or are hereafter dedicated, donated or otherwise conveyed to the City, but including, without limitation, alleys, lanes or roads, all perimeter fencing, the gated entry system, sidewalks (including Association Maintained Sidewalk Areas), the Association Maintained Retaining Walls, landscaping (except on the Residential Maintained Landscape Areas), the stormwater management facilities, play areas, tot lot, parks, dog park, open space, stormwater mains (including the Association Maintained Sewer Mains), watermains, sanitary sewer mains (including the Association Maintained Sewer Mains), underground stormwater vaults and other similar matters, whether or not specifically described or existing on the date hereof, except for repairs necessitated by the gross negligence or willful misconduct of one or more Residential Unit Owners or their respective invitees, permittees, Occupants, pets or guests, which shall be the responsibility of such Residential Unit Owners. The Association maintenance obligations shall also specifically include all maintenance obligations set forth in the Sewer Covenant.

14

(b)     The Association shall have the obligation to monitor, maintain and repair all of the engineered barriers on the Common Area Lots described in the NFR Letter and to preserve the validity of the NFR Letter(s) applicable to the Common Area Lots, which obligations include, without limitation, engaging environmental consultants or contractors (including utility companies) working in subsurface areas located beneath such engineered barriers described in the NFR Letter to insure compliance with all requirements of the NFR Letter (including health and safety requirements) and that all replacement of, and other work undertaken with respect to, such engineered barriers is performed in a manner consistent with the NFR Letter and satisfactory to the Illinois Environmental Protection Agency and all other governmental agencies having jurisdiction over the Property.

(c)     The Association shall have the right to ingress and egress over and upon the Common Area Lots and such portions of the Residential Lots as are necessary to obtain access to and undertake work on the Association Maintained Areas and for any and all purposes connected with the use, maintenance, repair, operation, improvement, replacement or reconstruction of the Association Maintained Areas, as well as the performance of all other maintenance, repairs and other responsibilities contemplated by this Declaration to be performed by the Association, including, without limitation, landscaping, fencing and snow removal.  The Association shall exercise its rights contained herein in a manner so as to minimize inconvenience to the Residential Unit Owners.  No Residential Unit Owner shall undertake or construct any improvements on such Residential Unit Owner's Residential Lot which unreasonably interferes with the rights of the Association herein contained.

## 5.2     **Maintenance by the Residential Unit Owners**.

(a)     Each Residential Unit Owner shall have the obligation to maintain in good condition and repair such Residential Unit Owner's Residential Unit and all other permitted improvements located on such Residential Unit Owner's Residential Lot in accordance with the requirements of the applicable provisions of this Declaration; provided, however, that such obligation shall be undertaken by (i) the applicable Condominium Association for each Condominium Lot and the Flat Building located thereon and (ii) the Townhome Association for the Townhome Units and the Residential Lots on which those Townhome Units are located, if and to the extent so provided in the declaration and related documentation establishing such Townhome Association.  Except as may otherwise be provided by the Illinois Condominium Property Act with respect to Condominium Lots upon the occurrence of damage or destruction to a Residential Unit, the Residential Unit Owner of a Residential Unit (or, as the case may be, the applicable Condominium Association or Townhome Association) shall be required to take promptly one of the following actions: restore or rebuild to the condition existing prior to such damage or destruction; raze and remove such improvements and landscape the affected Residential Lot in a sightly manner; or construct new improvements which comply with the terms of this Declaration.  All landscaping on any Residential Lot shall be consistent with the terms of this Declaration.  With respect to each Residential Lot, all Residential Unit Owners of such Residential Lot, or the applicable Condominium Association or Townhome Association, shall (i) mow the lawn, (ii) prune all trees and shrubs, (iii) remove snow in accordance with Section 5.2(b) below, (iv) maintain all

15

Residential Maintained Landscape Areas and (v) maintain all landscaping, fences, driveways, Buildings and other improvements in good and sightly condition. Upon the failure of any Residential Unit Owner (or Condominium Association or Townhome Association as aforesaid) to so maintain such Residential Lot in a manner satisfactory to the Association (including all matters set forth in this Section 5.2), the Association, through its agents and employees, is hereby granted the right to enter upon such Residential Lot and make such reasonable repairs, maintenance, rehabilitation or restoration thereof as may be necessary, and the costs thereof shall become a lien upon such Residential Unit(s) and the applicable Residential Lot(s) in the same manner as provided in Article 6 for nonpayment of maintenance assessments.

(b)     Each Residential Unit Owner (or the applicable Townhome Association or Condominium Association), at its expense, shall be responsible for snow removal on all driveways and sidewalks on such Residential Unit Owner's Residential Lot (except for the Association Maintained Sidewalk Areas) and the disposal thereof or storage of such snow in appropriate areas. Each Townhome Association shall be responsible for snow removal over all property subject to such Townhome Association including the Townhome Common Lots (and the disposal thereof or storage of such snow in appropriate areas of the Townhome Common Lots). If any Residential Unit Owner or Townhome or Condominium Association fails to remove snow from its property when such snow removal is reasonably required, the Association may, but shall not be obligated to, remove such snow, and the costs thereof shall become a lien upon the applicable Residential Unit and Residential Lot or property subject to the Townhome Association or Condominium Association in the same manner as provided in Article 6 for nonpayment of maintenance assessments.

(c)     Each Residential Unit Owner, at its expense, shall be responsible for maintaining the water service line and the sanitary sewer line serving his/her Residential Unit, except to the extent such Residential Unit is a Townhome Unit or a Condominium Unit, in which case, the foregoing obligation shall be borne by the Townhome Association or the applicable Condominium Association, as the case may be.

(d)     Within the Property, there are storm water service lines located in between adjacent Flat Buildings and serving those Flat Buildings. Accordingly, each of the Residential Unit Owners owning a Flat Building (or in the case that the Flat Building has been subjected to the Illinois Condominium Act, then the applicable Condominium Association), at their expense, shall be jointly responsible for maintaining the stormwater service line serving the two (2) adjacent Flat Buildings and the cost of maintaining the stormwater service line shall be shared between such Residential Unit Owners owning such Flat Buildings (or the Condominium Association(s), as applicable). If one of the Residential Unit Owners or Condominium Associations incurs any expense in maintaining such stormwater service line and the other Residential Unit Owner or Condominium Association fails pay its share of such maintenance expense within thirty (30) days of request therefor by the maintaining Residential Unit Owner or Condominium Association, such amounts, together with interest and all reasonable costs of collection, including attorneys' fees and litigation expenses, shall become a lien upon such each failing to pay Residential Unit

16

Owner's Residential Unit which the maintaining Residential Unit Owner or Condominium Association shall be entitled to enforce by an action similar to the type of action instituted to foreclose the lien of a mortgage or deed of trust on real property.

(e)     At various locations on the Property (such location always straddling the side yard lot line between two Residential Units), there exists a "depression" to provide light and ventilation to the basement windows of such Residential Units. In each of these depressions, there are two yard drains (one of which connects to the sump pit of one of the Residential Units and the other of which connects to the sump pit of the 'other' Residential Unit). Each Residential Unit Owner, at its expense, shall be responsible for maintaining the side yard drain that connects to the sump pit located in their Building. If any Residential Unit Owner fails to maintain their yard drain, the adjacent Residential Unit Owner who shares the "depression" containing that drain may undertake such maintenance as required and recover the expense of such maintenance from the Residential Unit Owner who failed to maintain his drain. If any Residential Unit Owner who did not maintain his drain fails to reimburse his adjacent Residential Unit Owner for maintaining his drain within thirty (30) days of demand therefor made by the maintaining Residential Unit Owner, such amounts, together with interest and all reasonable costs of collection, including attorneys' fees and litigation expenses, shall become a lien upon such failing to pay Residential Unit Owner's Residential Unit which the maintaining Residential Unit Owner shall be entitled to enforce by an action similar to the type of action instituted to foreclose the lien of a mortgage or deed of trust on real property. In the event that the foregoing condition exists between properties, one or both of which are Flat Buildings which have been subjected to the to the Illinois Condominium Act, then the foregoing references to a "Residential Unit Owner" shall be deemed to apply to the applicable Condominium Association

(f)     Each Residential Unit Owner shall be responsible for all maintenance and repairs to the Property, including, without limitation, maintenance and repairs to the Association Maintained Areas, that are caused by the gross negligence or willful misconduct of such Residential Unit Owner or its pets, invitees, permittees, Occupants or guests.

(g)     Each Residential Unit Owner shall comply with and not undertake any action that would violate the terms of the NFR Letter applicable to such Residential Unit Owner's Residential Lot.

## ARTICLE 6

## COVENANTS FOR MAINTENANCE ASSESSMENTS

6.1     Declarant, for each Residential Unit owned within the Property, hereby covenants, and each Residential Unit Owner of any Residential Unit by acceptance of a deed therefor, whether or not it shall be so expressed in such deed or other conveyance, is deemed to covenant and agree to pay to the Association such Residential Unit's Percentage Interest of the following (the "**Association**

17

Assessment"): (1) annual assessments to be fixed, established and collected from time to time as hereinafter provided; and (2) special assessments to be fixed, established and collected from time to time as hereinafter provided. The annual and special assessments, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the Residential Unit against which each such assessment is made. Each such assessment, together with such interest and costs of collection, including reasonable attorneys' fees, shall also be the personal obligation of the person who was the Residential Unit Owner of such Residential Unit at the time when the assessment fell due. The personal obligation shall not pass to his successors in title unless expressly assumed by them.

6.2     The assessments levied by the Association shall be used exclusively for the purpose of promoting the health, safety, and welfare of the residents in the Property and in particular for the improvement and maintenance of the Property, services and facilities devoted to this purpose and related to the use and enjoyment of the Common Area Lots, and of the Residential Units situated upon the Property. Such uses shall include, but are not limited to, the cost to the Association of all insurance, repair, replacement and maintenance of Common Area Lots and other Association Maintained Areas, the cost of taxes on the Common Area Lots, and other facilities and activities and other charges required by this Declaration or that the Board shall determine to be necessary or desirable to meet the primary purpose of the Association, including the establishment and maintenance of a reserve fund for repair, maintenance, replacements, taxes, and other charges as specified herein. In addition, water, waste removal and/or any utilities which are not separately metered or otherwise directly charged to individual Residential Unit Owners shall be paid for by the Association from the assessments levied hereunder. The Board reserves the right to levy additional assessments against any Residential Unit Owner to reimburse it for excessive use by such Residential Unit Owner of any utility service, the expense of which is included in the assessments.

6.3     At the time of closing of the sale of each Residential Unit by Declarant, the Residential Unit Owner shall pay (in addition to the first monthly assessment) to the manager or managing agent, or as otherwise directed by the Board, an amount equal to two (2) times the first full monthly assessment for such Residential Unit Owner, which amount shall be used and applied as a working capital fund in the manner herein provided.

6.4     It is contemplated that the Property will have a "master water meter", the reading of which will dictate the total monthly water bill for the Property, and the Association shall be responsible for the payment of such water bill. In the event that the Residential Lots are not separately metered and the water bill is not directly charged to the Residential Unit Owners, then the Association shall include in the regular assessments on each Residential Lot a line item charge for water. In the event that the Residential Lots are separately metered but the water bill is not directly charged to the Residential Unit Owners, then the Association shall be responsible for reading each individual water meter and the Association shall levy an assessment on each Residential Lot in an amount equal to each Residential Lot's proportionate share (based on the meter reading) of such total water bill, plus any applicable administrative fees incurred relative to the reading of each water meter. The Board reserves the right to levy additional assessments against any Residential Unit Owner to reimburse it for excessive use by such Residential Unit Owner of any utility service, the expense of which is included in the assessments.

18

6.5     In addition to the annual assessments authorized above, the Association may levy a special assessment for any proper Association purpose including but not limited to, the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, unexpected repair, maintenance or replacement (including those items of maintenance and repair set forth in Section 5.1 hereof) of a described capital improvement upon any of the Association Maintained Areas.

6.6     Except as set forth in Paragraph 6.10 below, and notwithstanding the manner in which voting rights are apportioned as set forth in Article 3, the amount of both the annual and any special Association Assessment for each Residential Unit shall be allocated among the Residential Units in accordance with such Residential Unit's Percentage Interest. Such Association Assessment shall be levied, paid and collected on a monthly basis or on such other alternative payment schedule as the Board may establish in the manner provided in this Declaration.

6.7     The assessments provided for herein shall commence for all Residential Lots within the Property on the first day of the month following the conveyance of the first Residential Lot, except as otherwise provided in Section 6.10 hereof. A Residential Unit Owner shall first be liable for payment of the full monthly assessment on the 1st day of the month following conveyance of title to him. In addition, the first Residential Unit Owner of each Residential Unit shall also pay the prorated portion of the monthly assessment due for the month during which he acquires his Residential Unit, calculated as of the date title to his Residential Unit is conveyed.

6.8     Any assessments which are not paid when due shall be delinquent. Such assessments, interest and all costs of collection shall be a continuing lien upon the Residential Unit against which each such assessment was made. If the assessment is not paid within thirty (30) days after the due date, then (i) the amount of the assessment shall bear interest from the date of delinquency at the rate per annum which is the lesser of (a) eighteen percent (18%) and (b) the maximum rate allowed by law, and (ii) in addition to said interest, the Association shall have the right, to be exercised in a non-discriminatory manner, to charge a delinquent Residential Unit Owner a late fee of Twenty-Five and no/100 Dollars ($25.00) for each month or portion thereof that said amount remains delinquent, said late fee to cover the Association's administrative costs in monitoring and collecting such amount. The Association may bring an action at law or in equity against the Residential Unit Owner personally obligated to pay the same, or foreclose the lien against the respective Residential Unit and interest, late fees, costs and reasonable attorneys' fees of any such action shall be added to the amount of such assessment. Each Residential Unit Owner, by his acceptance of a deed to a Residential Unit, hereby expressly vests in the Association, or its agents, the right and power to bring all actions against such Residential Unit Owner personally for the collection of such charges as a debt, and to enforce the aforesaid lien by all methods available for the enforcement of such liens, including foreclosure by an action brought in the name of the Association in a like manner as a mortgage or deed of trust lien on real property.

6.9     The lien of the assessments provided for herein shall be subordinate to the lien of any first mortgage now or hereafter placed on the Residential Units and recorded prior to the due date of the delinquent assessment provided, however, that such prior recorded mortgage shall be subject to the lien of all unpaid assessments with respect to such Residential Unit which became due and payable subsequent to the first to occur of the date the holder of said mortgage (i) takes possession of

19

the Residential Unit, (ii) accepts a conveyance of any interest in the Residential Unit and (iii) has a receiver appointed in a suit to foreclose his lien. The lien of the assessments shall not be affected by the sale or transfer of the corresponding Residential Unit unless the sale or transfer is pursuant to the foreclosure of the first mortgage thereon or a deed-in-lieu of foreclosure. In such a case, the transfer of title pursuant to the foreclosure shall extinguish the lien. However, neither the personal obligation of the transferor, if any, nor the resulting pro rata share of the burden of such non-payment or non-enforcement, imposed through a subsequent assessment, shall be affected.

6.10    With regard to all Residential Lots which are vacant or upon which Residential Units are being constructed or have been completed and to which title has not been conveyed by Declarant (the "**Declarant Owned Lots**"), the total aggregate assessment due with respect to all Declarant Owned Lots shall be limited to the amount by which (a) the aggregate amount of actual operating expenses from time to time required to be paid with respect to the Property exceed (b) the amounts required to be paid by the Residential Unit Owners other than Declarant for said actual operating expenses. For purposes of the foregoing calculation, in the event Declarant enters into a lease or installment contract for any Residential Unit, then Declarant shall, as of the first day of occupancy under such lease or contract, be responsible for the payment of all assessments on those Residential Units on the same basis as any other Residential Unit Owner as provided in this Article and consequently, said Residential Unit shall no longer be deemed to be a Declarant Owned Lot hereunder. Actual operating expenses shall mean those ordinary expenses attributable only to the period in question covering the maintenance and operation of the Property and shall not include capital expenditures, amounts set aside as a reserve for contingencies or replacements, prepaid items or inventory items to the extent attributable to subsequent periods. The foregoing amounts owed by Declarant for the Declarant Owned Lots may be paid by Declarant on a monthly basis or, at Declarant's option, paid to the Association at the close of each calendar year without interest. It is expressly understood and agreed that in no event shall Declarant's total obligation under this Section 6.10 with respect to the Declarant Owned Lots ever exceed the amount of assessment which Declarant would owe without the benefit of this Section 6.10 (e.g., the aggregate amount of the assessment due from the Declarant Owned Lots from time to time based on each such Declarant Owned Lot's Percentage Interest).

6.11    Notwithstanding that each Residential Unit Owner shall have the obligation to pay its Percentage Interest of the assessments with respect to such Residential Unit Owner's Residential Unit, the Association, at its sole option, may require that the Condominium Associations (if any) and Townhome Association pay the Association Assessment collectively for all of the Residential Unit Owners forming a part of the applicable Condominium Association or Townhome Association for purposes of the administrative convenience of the affected Residential Unit Owners and acting solely as a collection agent. In no event shall the amount of the Association Assessment collected by said Townhome Association or Condominium Association and paid to the Association be deemed a part of the assessment for such Townhome Association or Condominium Association. In the event a Residential Unit Owner is delinquent in the payment of any Association Assessment as provided in Section 6.8, the applicable Townhome Association or Condominium Association shall give timely notice of such delinquency to the Association, in which event the lien of the Association for such delinquency shall only apply to the affected Residential Unit; however, in the event a Condominium Association or Townhome Association fails to pay the amount of the Association Assessment for

20

each of the Residential Units located on the applicable Residential Lot and fails to timely deliver notice to the Association of the specific delinquent Residential Unit(s), the lien of the Association shall attach to all of the Residential Units of the Residential Unit Owners which are members of the applicable Condominium Association or Townhome Association. Any Association Assessment collected by Condominium Association or Townhome Association pursuant hereto shall be held in trust without any deduction or setoff and no such payment shall be deemed made to the Association until actually received by the Association. No Residential Unit Owner shall be relieved of personal liability for payment of the Association Assessment due to the failure of the applicable Condominium Association or Townhome Association to pay the same to the Association.

## ARTICLE 7

### INSURANCE

7.1     The Association shall be responsible for procuring and maintaining comprehensive general liability insurance, including liability for injuries to, and death of, persons and property damage in combined single limit amount not less than One Million and no/100 Dollars ($1,000,000.00) per occurrence, including non-owned and hired automobile liability; umbrella liability insurance coverage in an amount not less than Two Million and no/100 Dollars ($2,000,000.00); and other liability insurance as it may deem desirable, insuring the Association from liability in connection with the use of the Common Area Lots. In addition, the Association shall be responsible for maintaining such policies of insurance for the Common Area Lots against loss or damage by fire and such other hazards contained in a customary "Special Form" policy provided that such policies shall (i) provide that such policies may not be cancelled or substantially modified without at least thirty (30) days' prior written notice to the Association and all mortgagees of record of the Residential Units; (ii) provide that all mortgagees of record of the Residential Units shall have the right to pay overdue insurance premiums and to obtain new coverage in the event the existing insurance policy lapses; (iii) provide for coverage in the amount of one hundred percent (100%) of current full replacement value; and (iv) contain standard mortgage clause endorsements in favor of the mortgagee(s) of the Residential Units, as their respective interests may appear. Replacement cost shall be determined annually by an independent appraiser or by a method acceptable to the insurance company providing such coverage. The liability policy shall also name as insureds the Association's agents, officers, employees, and each Residential Unit Owner.

7.2     The Association shall be responsible for procuring and maintaining a fidelity bond insuring the Association, the Board and the Residential Unit Owners against loss of funds as a result of the fraudulent or dishonest acts of any employee of the Association or its management agent or of any other person handling the funds of the Association, the Board or the Residential Unit Owners in such amounts as the Board shall deem necessary but not less than 150% of the annual operating expenses of the Association, including reserves. Such bond shall contain waivers of any defense based on the exclusion of persons who serve without compensation from any definition of "employee" or similar expression. Such bond shall provide that it may not be cancelled for non-

21

payment of any premiums or otherwise substantially modified without thirty (30) days prior written notice to all holders of first mortgages of record.

7.3     The Association shall also obtain and maintain Directors and Officers Liability Insurance and, if any portion of the Property falls within the Flood Zone A category, flood risk insurance. In addition, the Association may obtain such other kinds of insurance as the Association shall from time to time deem prudent in such amounts as the Association shall deem desirable including, but not limited to, the following: Earthquake risk and Workman's Compensation and Employer Liability.

## ARTICLE 8

## INTERIM PROCEDURE

8.1     Until each of the various Residential Units shall have been conveyed by Declarant to the first Residential Unit Owner thereof (or to such Residential Unit Owner's nominee), Declarant, with respect to each such unsold Residential Unit and as specified herein, shall have all the rights granted to and obligations imposed upon the Residential Unit Owners.

8.2     Until the initial meeting of the Members, Declarant (or its beneficiary or designees) may appoint the Board which shall have the same powers and authority as given to the Board generally.

8.3     The powers granted to Declarant by Section 8.2 hereof shall include, without limitation, the power to assess upon and collect from the individual Residential Unit Owners, their respective proportionate shares of the funds required for the carrying out of all the duties and obligations of the Association.

## ARTICLE 9

## SPECIFIC RESTRICTIONS AND
## PROVISIONS RELATING TO USE AND IMPROVEMENT
## OF RESIDENTIAL LOTS AND COMMON AREA LOTS

9.1     **City Requirements**. All Residential Units, accessory structures, additions thereto, and any other exterior aspect of a Residential Lot, whether original or replacement, temporary or permanent, shall be constructed, altered, restored, added to, located, remodeled, placed or installed in compliance with all applicable City ordinances and codes.

9.2     **Improvements on a Residential Lot**.

(a)     All Residential Units and additions thereto, and all other exterior improvements, including, without limitation, fences, pools, sheds, outbuildings, play equipment, decks, patios and landscaping, whether original or replacement, temporary or

22

permanent, shall be constructed, altered, restored, added to, located, remodeled on the exterior, placed or installed in a manner that: (i) shall preserve the architectural and aesthetic appearance of the Property; (ii) shall not impair the value of the property of all Residential Unit Owners; (iii) shall be undertaken in a manner that is consistent with the use of the Property as a quality residential subdivision; and (iv) shall be of quality, design, workmanship and materials which are compatible and harmonious with the Property. The Board shall have the right to compel a Residential Unit Owner to remove any improvements that are not of a harmonious nature with the remainder of the Property. Prior to constructing or altering improvements, Residential Unit Owners shall have the right to seek preapproval by the Board of such improvements or alterations; provided, however, that the Board shall have the right to disapprove any such improvements in its sole and absolute discretion.

(b)     Any Residential Unit, accessory structure, additions thereto and any other exterior aspect of a Residential Lot constructed and installed by Declarant in connection with the initial construction of improvements on each Residential Lot shall conclusively be deemed to comply with the standards contained in this Section 9.2.

(c)     No existing Residential Unit or Residential Lot shall hereafter be combined with any other Residential Unit or Residential Lot without the express prior written consent of the Association, which consent may be granted or denied in the Association's sole and absolute discretion. Further, no existing Residential Unit or Residential Lot shall hereafter be divided to create more than one Residential Unit (except for the Flat Buildings, which may be divided or re-combined by the filing of a recording of a Condominium Declaration) or Residential Lot without the express prior written consent of the Association, which consent may be granted or denied in the Association's sole and absolute discretion. Any Residential Unit Owner who combines two or more Residential Units or Residential Lots or who divides a Residential Unit or Residential Lot to create two or more Residential Units or Residential Lots without the express prior written consent of the Association shall be liable for, and shall indemnify, defend and hold the Association harmless from and against, any loss, cost, damage or liability, including attorneys' fees and litigation expenses, incurred by the Association as a result of such unpermitted combination or division of Residential Units or Residential Lots. Any Residential Unit Owner who receives the Association's approval of any such combination or division as aforesaid shall thereafter obtain all required approvals under applicable laws. In the event of any such permitted combination, the voting rights (provided in Article 3) for the Residential Unit or Residential Lot resulting from said combination and the Association Assessment for such Residential Unit or Residential Lot shall equal the combined total of the Percentage Interests allocated to the applicable Residential Units or Residential Lots prior to such combination. In the event of any such permitted division, the voting rights (provided in Article 3) for each of the Residential Units or Residential Lots resulting from said division and the Association Assessment shall equal in the aggregate the amount allocated to the original Residential Unit or Residential Lot prior to such division. Prior to the Transfer Date, the rights of the Association contained in this Section 9.2 shall be exercised by the Declarant in its sole and absolute discretion.

23

9.3     Each Residential Unit shall be used only for residential purposes, as a private residence, and for such professional, business or commercial use as is not otherwise prohibited under applicable ordinances and regulations governing the Property. Each Residential Unit Owner shall have the right (a) to maintain his personal professional library therein; (b) to keep his personal, business or professional records or accounts therein; and (c) to handle his personal, business or professional telephone calls or correspondence therefrom. A Residential Unit Owner's use of a Residential Lot shall not endanger the health or disturb the reasonable enjoyment of any other Residential Unit Owner or occupant, except that the foregoing restriction on disturbing reasonable enjoyment shall not be deemed to preclude or prohibit any of the rights or activities expressly reserved by or granted in this Declaration to Declarant.

9.4     No Residential Unit Owner shall do or permit to be done on his Residential Lot or anywhere else in the Property any act or thing which will impair any easement or hereditament granted to any other party, nor shall any Residential Unit Owner create or permit to exist on his Residential Lot or anywhere else in the Property any condition which will adversely affect the use or enjoyment of the Property or any part or portion thereof by any party entitled to such use or enjoyment.

9.5     No nuisance, noxious or offensive activity shall be or permitted to be carried on by any Residential Unit Owner on his Residential Lot or in his Residential Unit or anywhere else in the Property nor shall anything be done therein or thereon, either willfully or negligently, which may be or become an unreasonable annoyance or nuisance to any other Residential Unit Owner or Occupant.

9.6     No animals, livestock or poultry of any kind shall be raised, bred, or kept on any Residential Lot or Common Area Lots, except dogs, cats or other common household pets (not to exceed a total of three (3) pets for each Residential Unit) may be so kept; provided, that they are not kept, bred, or maintained for any commercial purposes and provided further that they are kept, bred and maintained solely on the Residential Lot and in accordance with rules and regulations adopted by the Board.

9.7     All rubbish, trash, and garbage shall be kept on each Residential Unit or Residential Lot so as not to be seen from neighboring Residential Units or streets generally within the Property, and shall be regularly removed from each Residential Unit and shall not be allowed to accumulate thereon. In addition to the foregoing, all rubbish, trash and garbage shall be stored and removed in accordance with the rules and regulations adopted by the Board.

9.8     Television and radio antennae and television satellite dishes having a diameter not exceeding one (1) meter shall be permitted on the exterior of any Residential Unit, subject to all applicable laws, ordinances and regulations.

9.9     Parking areas and driveways shall be used for parking operable automobiles, pick-up trucks and trucks of similar size and nature, vans, campers, trailers, boats, snowmobiles and other vehicles, subject to all reasonable rules and regulations promulgated by the Association with respect thereto and to all applicable ordinances. The Board may authorize vehicles parked in violation of the Association's rules and regulations with respect thereto to be towed away and any such towing

24

charge shall become a lien upon the Residential Unit of the Residential Unit Owner who owns such vehicle or of whom the owner of such vehicle is the guest, in the same manner as provided in this Declaration for nonpayment of assessments.

9.10    Drying of clothes shall be confined to the interior of the Residential Units.

9.11    Each Residential Lot is hereby declared to be subject to an easement and right to and in favor of the Association and each and all of its employees, agents and instrumentalities to go upon such Residential Lot for reasonable inspection thereof and of the Building thereon from time to time and for the purpose of carrying out any and all of the obligations and functions with respect to such Residential Lot and the Building located thereon as are herein imposed upon or permitted to the Association. Each Residential Lot is further declared to be subject to an easement in favor of any adjoining Residential Lot to the extent necessary to permit the maintenance, supply, repair, and servicing of utility services to the various Residential Lots and the Buildings located thereon (including, but not limited to, those referenced in Section 4.2).

9.12    The Board may adopt such other rules and regulations from time to time governing the use and enjoyment of the Common Area Lots and the use and/or improvement of the Residential Lots as the Board, in its sole discretion, deems appropriate or necessary.

9.13    Except for Declarant and its activities within the Property, no signage of any type or description (including "For Rent" and "For Sale" signs), billboards, unsightly objects, or nuisances shall be erected, placed or permitted or any portion of the Property.

9.14    Each Residential Unit Owner shall have the right to lease such Residential Unit Owner's Residential Unit. No Residential Unit Owner shall lease or rent his or her Residential Unit for a term less than one (1) year. Every lease of a Residential Unit shall be in writing and shall be made expressly subject to the requirements, rights, covenants, conditions, restrictions and easements of this Declaration and of the By-Laws. Until such time as title to any Residential Unit is conveyed to a bona fide purchaser, Declarant reserves the right to lease such Residential Unit upon such terms and conditions as Declarant may, in its sole discretion, approve.

9.15    Each Residential Unit Owner (and his tenants, guests, Occupants, agents and invitees) and the Association shall be prohibited from installing any potable water well anywhere within the Property and from taking any action that may violate the terms of the NFR Letter, including any action which disturbs or breaches any engineered barriers on the Property as specified in the NFR Letter or which in any way interferes with or is inconsistent with the institutional controls specified in the NFR Letter.

## ARTICLE 10

## MISCELLANEOUS

10.1    The Association, the City (with respect to its express rights hereunder) or any Residential Unit Owner, their successors or assigns, shall have the right to enforce, by any

25

proceeding at law or in equity, all restrictions, easements, conditions, covenants, reservations, liens and charges now or hereafter imposed by the provisions of this Declaration. Any Residential Unit Owner found to be in violation by a court of competent jurisdiction of any of the foregoing shall also be liable for reasonable attorneys' fees incurred by the Association or the City in prosecuting such action. The amount of such attorneys' fees together with court costs, if unpaid, shall constitute an additional lien against the defaulting Residential Unit Owner's Residential Unit, enforceable as other liens herein established. Failure by the Association, the City or any Residential Unit Owner to enforce any covenant or restriction herein contained shall in no event be deemed a waiver of the right to do so thereafter. The Association shall use its best efforts to assist the City in connection with the enforcement of any provisions hereunder, the violation of which shall also be considered a violation of any applicable ordinance.

      10.2    Invalidation of any of these covenants or restrictions by judgment or order shall in no way affect any other provisions which shall remain in full force and effect.

      10.3    The covenants, conditions, easements, rights and restrictions of this Declaration shall run with and bind the land and shall inure to the benefit of and be enforceable by the Association, the City, each Residential Unit Owner and their respective legal representatives, heirs, successors, and assigns, for a term of fifty (50) years from the date this Declaration is recorded, after which time said covenants shall be automatically extended for successive periods of ten (10) years, subject to amendment as hereinafter set forth. The covenants, conditions, easements, rights and restrictions of this Declaration may be amended during the first fifty (50) year period or within any successive ten (10) year period by an instrument signed by those Members (Class A and Class B) entitled to cast seventy-five percent (75%) of the total votes as provided in Section 3.1 hereof and then properly recorded, provided, however, that, except as set forth in Section 10.13(a)(iv) below, no Material Amendment to this Declaration, the By-Laws or the Association's articles of incorporation shall be effective unless approval thereof is obtained from Eligible Mortgage Holders representing at least fifty-one percent (51%) of the Residential Units that are subject to mortgages held by Eligible Mortgage Holders. These covenants and restrictions may also be cancelled by an instrument signed by sixty percent (60%) of Residential Unit Owners executed and recorded within ninety (90) days of the expiration of any successive ten (10) year period, such cancellation or amendment to be effective on the date of commencement of the ten (10) year period in question, provided, however, that no termination or alteration of the legal status of the Association or the Property for reasons other than substantial destruction or condemnation of the Property shall be effective unless approval thereof is obtained from Eligible Mortgage Holders representing at least sixty-seven percent (67%) of the Residential Units that are subject to mortgages held by Eligible Mortgage Holders. Any instrument executed pursuant to the provisions contained in this Section 10.3 shall be filed for record in the Recorder's Office and a true, complete copy of such instrument promptly shall be transmitted to each Residential Unit Owner.

      10.4    If and to the extent that any of the covenants, options or rights provided for in this Declaration would otherwise be unlawful or void for violation of (a) the rule against perpetuities, (b) the rule restricting restraints on alienation, or (c) any other applicable statute or common law rule analogous thereto or otherwise imposing limitations upon the time for which such covenants, options or rights may be valid, then the provision in question shall continue and endure only after the

26

expiration of a period of twenty-one (21) years after the death of the last to survive of the class of persons consisting of all of the lawful descendants of Rod Blagojevich, Governor of the State of Illinois, living at the date of this Declaration.

10.5 Any notices required under the provisions of this Declaration to be sent to any Member, Residential Unit Owner, or to any holder, insurer or guarantor of a first mortgage secured by any portion of the Property shall be deemed to have been properly sent when mailed, postage prepaid, to the last known address of such Member, Residential Unit Owner or holder, insurer or guarantor as it appears on the records of the Association at the time of such mailing.

10.6 If at any time or times the Board shall deem it necessary or advisable to rerecord this Declaration or any part hereof in the Office of the Recorder of Cook County, Illinois, in order to avoid the expiration hereof or of any of the covenants, conditions, restrictions, rights, reservations, easements, agreements or other provisions herein contained under any statute or act relating to or governing marketable title, the Board shall submit the matter to a meeting of the Members called upon not less than ten (10) days' prior written notice, and unless at such meeting the Members entitled to cast two-thirds (2/3rds) or more of the votes as provided in Section 3.1 above shall vote against such rerecording, the Association shall have, and is hereby granted, the power to so rerecord this Declaration or such part thereof, and such rerecording shall be binding upon all Residential Unit Owners in every way and with the full force and effect as though such action were taken by each of said Owners and the rerecorded document executed and acknowledged by each of them.

10.7 All the easements, rights, covenants, agreements, reservations, restrictions and conditions herein contained shall run with the land and shall inure to the benefit of and be binding upon Declarant and each subsequent holder of any interest in any portion of the Property and their grantees, heirs, successors, personal representatives and assigns with the same full force and effect for all purposes as though set forth at length in each and every conveyance of the Property or any part thereof. Reference in the respective deeds of conveyance, or in any mortgage or trust deed or other evidence of obligation, to the easements and covenants herein described shall be sufficient to create and reserve such easements and covenants to the respective grantees, mortgagees or trustees of such parcels as fully and completely as though said easements and covenants were fully recited and set forth in their entirety in such documents.

10.8 In amplification of and in addition to the provisions contained in the other sections and articles of this Declaration, in the event of any default of any Residential Unit Owner, the Association, all other Residential Unit Owners and the City may and shall have all rights and remedies as shall otherwise be provided or permitted by law or in equity.

10.9 Any aggrieved Residential Unit Owner may enforce the provisions of this Declaration, the By-Laws, or any rules and regulations promulgated by the Board, by an action at law or in equity against the defaulting Residential Unit Owner (or Occupant of his Residential Unit).

10.10 The following provisions are intended for the benefit of each Eligible Mortgage Holder and to the extent if at all, that any other provisions of this Declaration conflicts with the following provisions, the provisions of this Section 10.10 shall control:

27

(a)     Upon request in writing to the Association identifying the name and address of the Eligible Mortgage Holder or the insurer or guarantor of a recorded first mortgage or trust deed on a Residential Lot or Residential Unit ("**Insurer or Guarantor**") and the address of the applicable Residential Lot or Residential Unit, the Association shall furnish such Eligible Mortgage Holder, Insurer or Guarantor a written notice of any default in any of the obligations of the applicable Residential Unit Owner under this Declaration which is not cured within thirty (30) days.   Any Eligible Mortgage Holder of a Residential Lot or Residential Unit who comes into possession of the said Residential Lot or Residential Unit pursuant to the remedies provided in the mortgage, foreclosure of the mortgage, or deed (or assignment) in lieu of foreclosure shall, to the extent permitted by law, take such property free of any claims for unpaid assessments or charges in favor of the Association against the mortgaged Residential Lot or Residential Unit which become due prior to (i) the date of the transfer of title or (ii) the date on which said Holder comes into possession of the Residential Lot or Residential Unit, or (iii) the date said Holder has a receiver appointed in a suit to foreclose his lien, whichever occurs first.

(b)     Upon request in writing, each Eligible Mortgage Holder, Insurer or Guarantor shall have the right:

(i)     to examine current copies of this Declaration, the By-Laws, rules and regulations and the books and records of the Association during normal business hours;

(ii)     to receive, without charge and within a reasonable time after such request, copies of such financial statements as are prepared by the Association at the end of each of its respective fiscal years;

(iii)     to receive written notices of all meetings of the Association and to designate a representative to attend all such meetings;

(iv)     to receive written notice of any decision by the Association or Residential Unit Owners to make a Material Amendment to this Declaration, the By-Laws or the articles of incorporation of the Association;

(v)     to receive written notice of any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

(vi)     to receive written notice of any proposed action which would require the consent of a specified percentage of Eligible Mortgage Holders; and

(vii)     to receive written notice of any condemnation or casualty loss that affects either a material portion of the Property or the Residential Lot or Residential Unit on which it holds, insures or guarantees the mortgage.

(c)     No provision of this Declaration, the By-Laws or the articles of incorporation of the Association or any similar instrument pertaining to the Property or the Residential Lots

28

or Residential Units therein shall be deemed to give a Residential Unit Owner or any other party priority over the rights of the Eligible Mortgage Holders pursuant to their mortgages in the case of distribution to Residential Unit Owners of insurance proceeds or condemnation awards for losses to or a taking of the Residential Lots or Residential Units, and/or the Common Area Lots, or any portion thereof or interest therein. In such event, the Eligible Mortgage Holders, Insurers or Guarantors of the Residential Lots or Residential Units affected shall be entitled, upon specific written request, to timely written notice of any such loss.

10.11  If all or any part of the Common Area Lots only shall be taken through condemnation by any governmental authority having power so to do, the net proceeds of such taking shall be paid to and retained by the then owner of the Common Area Lots. If the effect of such condemnation shall be to isolate any part of the Property from the remainder of the Property, and if no residential structures shall then have been constructed or be situated within the portion of the Property so isolated, then all the Residential Units lying wholly or partly within the portion of the Property so isolated shall be deemed to have been and shall be removed from and released from all of the terms and provisions of this Declaration and this Declaration shall be of no further force or effect with respect thereto. For purposes of this Section 10.11, the term **"condemnation"** shall include also any sale under threat of condemnation to any governmental authority having condemnation power.

10.12  Upon any dissolution of the Association, its assets shall be transferred to another homeowner's association having similar purposes.

10.13

(a)     Declarant reserves the right and power, to be exercised without the consent of any Residential Unit Owner or his Eligible Mortgage Holder, to record a special amendment (**"Special Amendment"**) to this Declaration and to the Plat of Subdivision at any time and from time to time which causes this Declaration or the Plat of Subdivision (i) to comply with requirements of the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Federal Housing Association, the Veteran's Administration, or any other governmental agency or any other public, quasi-public, or private entity which performs (or may in the future perform) functions similar to those currently performed by such entities, (ii) to induce any of such agencies or entities to make, purchase, sell, insure, or guarantee first mortgages covering Residential Lots or Residential Units, (iii) to correct clerical or typographical errors in this Declaration or any Exhibit hereto or any supplement or amendment thereto, or (iv) notwithstanding that such change or modification could otherwise be considered a Material Amendment, to change or modify any of the terms or conditions of this Declaration and the Plat of Subdivision based upon Declarant's determination, made in good faith, that such change or modification is in the best interests of the Property and is consistent with the intent and purposes of this Declaration and the Plat of Subdivision; provided, however, that no such change or modification which could

29

reasonably be inferred to affect any of the rights of the City hereunder shall be made without the written consent of the applicable City. In furtherance of the foregoing, a power coupled with an interest is hereby reserved and granted to Declarant to vote in favor of, make, or consent to a Special Amendment on behalf of each Residential Unit Owner as proxy or attorney-in-fact, as the case may be. Each deed, mortgage, trust deed, other evidence of obligation, or other instrument affecting a Residential Lot or a Residential Unit, and the acceptance thereof shall be deemed to be a grant and acknowledgment of, and a consent to the reservation of, the power of Declarant to vote in favor of, make, execute and record Special Amendments. The right of Declarant to act pursuant to rights reserved or granted under this Section 10.13 shall terminate at such time as Declarant no longer holds or controls title to any Residential Lot or Residential Unit.

(b)     Inasmuch as the lot lines for the Residential Lots as set forth on the Plat of Subdivision have been established based upon Declarant's assumption that a certain type and size of Residential Unit will be located on each Residential Lot and Declarant expects that in the sale of Residential Units a configuration of Residential Units may result which is different than the configuration contemplated by the Plat of Subdivision, Declarant hereby expressly reserves to itself the right and power, to be exercised without the consent of any Residential Unit Owner or his Eligible Mortgage Holder, to change, amend or modify the Plat of Subdivision by the recording of a plat of resubdivision (or other appropriate instrument) with respect to the portion or portions of the Property affected for purposes of changing, modifying or adjusting those lot lines dividing two or more immediately adjacent Residential Lots then owned by Declarant; provided, however, that (i) no such lot line change, modification or adjustment shall occur where two Residential Lots are separated by any portion of the Common Area Lots without the approval of the City and (ii) the City shall approve any plat of resubdivision (or other appropriate instrument) prior to its being recorded.

10.14   Each Residential Unit Owner shall notify the Association of the name and address of the Eligible Mortgage Holder relating to his respective Residential Unit.

*[Signature Page Follows]*

30

**IN WITNESS WHEREOF**, Declarant has caused this Master Declaration of Covenants, Conditions, Restrictions, Easements and Rights for The Enclave at Galewood Crossings to be executed as of the date first above written.

        **DECLARANT:**

        **RSD GALEWOOD, LLC**, an Illinois
        limited liability company

        By:  **Red Seal Development Corp.**, an
             Illinois corporation, its Manager

        By: _____

          Its: _President + CEO_____

EXECUTION VERSION

STATE OF ILLINOIS    )
                      ) SS.
COUNTY OF COOK    )

I, _____Kathleen McMahon-Ortiz_____, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY THAT Todd Fishbein, the President + CEO of **Red Seal Development Corp.,** an Illinois corporation and sole manager of RSD Galewood, LLC, an Illinois limited liability company and the Declarant under the foregoing Declaration, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such officer appeared before me this day in person and acknowledged that he signed and delivered the said instrument as his own free and voluntary act, and as the free and voluntary act of said corporation in its capacity as the Manager of **RSD GALEWOOD, LLC,** for the uses and purposes therein set forth.

**GIVEN** under my hand and Notarial Seal this 5th day of December 2007.

_____
Notary Public

My Commission Expires

"OFFICIAL SEAL"
Kathleen McMahon-Ortiz
Notary Public, State of Illinois
My Commission Exp. 12/29/2009

## CONSENT OF MORTGAGEE

JP Morgan Chase Bank, N.A. a national banking association, holder of the following two Mortgages on the Property: 1) a Construction Mortgage dated October 5, 2006 and recorded 10/13/2006 as Document No. 0628610084 and 2) a Mortgage dated January 31, 2007 and recorded 3/7/2007 as Document No. 0706642010, hereby consents to the execution and recording of the within Master Declaration of Covenants, Conditions, Restrictions, Easements and Rights for the Enclave at Galewood Crossings and agrees that said Mortgages are subject thereto

     **IN WITNESS WHEREOF**, JP Morgan Chase Bank, N.A. a national banking association, has caused this Consent of Mortgagee to be signed by its duly authorized officers on its behalf; all done at Chicago, Illinois on this 5ᵗʰ day of December, 2007.

                                            **JP Morgan Chase Bank, N.A., a national banking association.**

ATTEST: _(signature)_

Its: __CREDIT BANKER__

                                          By: _(signature) Jennifer S. Kelley_
                                          Its: _Sr. Vice President_

**STATE OF ILLINOIS**      )
                      ) SS
**COUNTY OF COOK**      )

     I, __Debra L. Matteo__, a Notary Public in and for said County and State, do hereby certify that __Jennifer S. Kelley__ and __Michael M Mattick__, the __Senior Vice President__ and __Credit Banker__, respectively of JP Morgan Chase Bank, a national banking association as such officers appeared before me this day in person and acknowledged that they signed, sealed and delivered said instrument as their free and voluntary act, and as the free and voluntary act of said corporation, for the uses and purposes therein set forth.

     **GIVEN** under my hand and notarial seal this 5ᵗʰ day of December, 2007.

                                  _(signature)_

                                     **NOTARY PUBLIC**

```
OFFICIAL SEAL
DEBRA L MATTEO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:06/30/08
```

33

## EXHIBIT A

## LEGAL DESCRIPTION OF THE PROPERTY

Lots 1 to 169, inclusive, in the Galewood Residential Subdivision being a subdivision of the Southwest Quarter of Section 33, Township 40 North, Range 13 East of the Third Principal Meridian according to the Plat thereof recorded March 29, 2007 as document number 0708815072 in Cook County, Illinois.

**PINs**

13-33-300-018
A part of: 13-33-300-019
13-33-300-023
13-33-300-024
A part of: 13-33-300-030
A part of: 13-33-300-032
13-33-310-001
13-33-310-002

A-1

## EXHIBIT B

## LEGAL DESCRIPTION OF THE RESIDENTIAL LOTS

Lots 1 to 14, inclusive and Lots 15 to 161, inclusive in the Galewood Residential Subdivision being a subdivision of the Southwest Quarter of Section 33, Township 40 North, Range 13 East of the Third Principal Meridian according to the Plat thereof recorded March 29, 2007 as document number 0708815072 in Cook County, Illinois.

B-1

## EXHIBIT C

## LEGAL DESCRIPTION OF THE COMMON AREA LOTS

Lots 15, 162, 166, 167 and 169 in the Galewood Residential Subdivision being a subdivision of the Southwest Quarter of Section 33, Township 40 North, Range 13 East of the Third Principal Meridian according to the Plat thereof recorded March 29, 2007 as document number 0708815072 in Cook County, Illinois.

EXECUTION VERSION

## EXHIBIT D

## LEGAL DESCRIPTION OF THE TOWNHOME COMMON LOTS

Lots 163, 164, 165 and 168 in the Galewood Residential Subdivision being a subdivision of the Southwest Quarter of Section 33, Township 40 North, Range 13 East of the Third Principal Meridian according to the Plat thereof recorded March 29, 2007 as document number 0708815072 in Cook County, Illinois.

EXECUTION VERSION

## EXHIBIT E

## BY-LAWS OF

## THE ENCLAVE AT GALEWOOD CROSSINGS MASTER ASSOCIATION

## ARTICLE 1

## PURPOSES AND POWERS

The Association shall be responsible for the general management and supervision of the Property, the ownership of the Common Area Lots and the management and maintenance of the Association Maintained Areas located within the Property (unless otherwise provided in the Declaration) and shall have all of the powers to perform, and shall be responsible to perform, all of the obligations provided in the Declaration. Further, the Association shall have all powers now or hereafter granted by the General Not-For-Profit Corporation Act of the State of Illinois which shall be consistent with the purposes specified herein and in the Declaration.

## ARTICLE 2

## OFFICES

2.1  **Registered Office**. The Association shall have and continuously maintain in this State a Registered Office and a Registered Agent whose office shall be identical with such Registered Office. The Association may have other offices within or without the State of Illinois as the Board of Directors may from time to time determine.

2.2  **Principal Office**. The principal office of the Association shall be maintained in Chicago, Illinois or such other place as reasonably determined by the Association.

## ARTICLE 3

## MEMBERSHIP

3.1  **Voting Members**. Every Residential Unit Owner, including Declarant for each Residential Unit that it owns, shall be a Member of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation. Membership shall be appurtenant to and may not be separated from ownership of each Residential Lot and/or Residential Unit. If the record owner of title to a Residential Lot and/or Residential Unit shall be more than one person, all such persons shall be Members, but the voting rights in the Association attributable to that Residential Lot and/or Residential Unit shall be exercised in the manner hereinafter provided. If the record owner of title to a Residential Lot and/or Residential Unit shall be a trust, corporation, partnership, limited liability company, limited partnership, or other legal entity, then the one individual who shall be entitled to exercise the rights and privileges (such as, to vote and to be a director on the Board), and who shall be responsible to

bear the obligations associated with membership in the Association with respect to that Residential Unit shall be designated by the Residential Unit Owner thereof in writing to the Association. Such designation may be changed from time to time thereafter by notice in writing from the Residential Unit Owner to the Association. No Residential Unit Owner shall have any right or power to disclaim, terminate or withdraw from such Residential Unit Owner's membership in the Association or any of the obligations as such Member, and no purported disclaimer, termination or withdrawal thereof or therefrom on the part of any such Residential Unit Owner shall be of any force or effect for any purpose.

3.2     **Classes of Membership**.  The Association shall have two classes of voting membership:

Class A.  Class A Members shall be all those Residential Unit Owners as defined in Article 2 of the Declaration, provided that Declarant shall not be a Class A Member until the Transfer Date.  Class A Members shall be entitled to the number of votes equal to the total of their respective Percentage Interests.  When more than one person holds such interest in any Residential Unit, all such persons shall be Members.  The vote for such Residential Unit shall be exercised as they among themselves determine, but all votes of such Residential Unit shall be cast by one Member.

Class B.  The Class B Member shall be Declarant.  The Class B Member shall be entitled to the number of votes equal to three (3) times the Percentage Interest of each Residential Lot and/or Residential Unit in which it holds the interest required for membership by Article 2 of the Declaration; provided that the Class B membership shall cease and be converted to Class A membership on the Transfer Date.

3.3     **Meetings**.

(a)     **Quorum; Procedure**.  Meetings of the Members shall be held at the principal office of the Association or at such other place in Cook County, Illinois as may be designated in any notice of a meeting.  The presence at any meeting, in person or by proxy, of a majority of the total votes determined pursuant to Section 3.2 above shall constitute a quorum.  Unless otherwise expressly provided herein or in the Declaration, any action may be taken at any meeting of the Members at which a quorum is present upon the affirmative vote of the Members having a majority of the total votes present (whether in person or by proxy) at such meeting.  Any Member in writing may waive notice of a meeting, or consent to any action of the Association without a meeting.

(b)     **Initial and Annual Meeting**.  The initial meeting of the Members shall be held at such time as may be designated upon not less than twenty-one (21) days' written notice given by the Declarant, provided that such initial meeting shall be held no later than one hundred and twenty (120) days after the Transfer Date.  Thereafter, there shall be an annual meeting of the Members on the first Tuesday of May of each succeeding year, at 7:30 P.M., or at such other reasonable time or date as may be designated by written notice of the Board delivered to the Residential Unit Owners in accordance with Section 3.4.  If the

E-2

date for the annual meeting of Members is a legal holiday, the meeting will be held at the same hour on the first day succeeding such date which is not a legal holiday.

(c) **Special Meetings**. Special meetings of the Members may be called at any time for the purpose of considering matters which, by the terms of the Declaration or these By-Laws, require the approval of all or some of the Members, or for any other reasonable purposes. Said meetings shall be called by written notice, authorized by a majority of the Board or by the Members having twenty percent (20%) of the total votes entitled to be cast by the Members as provided in Section 3.2 above, and delivered not less than five (5) days prior to the date fixed for said meeting. The notices shall specify the date, time and place of the meeting and the matters to be considered.

3.4 **Notices of Meetings**. Notices of meetings required to be given herein may be delivered either personally or by mail to the persons entitled to vote thereat, addressed to each such person at the address given by him to the Board for the purpose of service of such notice, or to the Residential Unit of the Residential Unit Owner with respect to which such voting right appertains, if no address has been given to the Board. Except for notice for special meetings (the requirements of which are set forth above), the notices required herein shall be delivered or mailed not less than twenty-one (21) days prior to the meeting date and shall state the specific purpose and the nature of the business for which the meeting is called. At any meeting, no business may be transacted other than that specified in the notice.

3.5 **Proxies; Absentee Ballots**. At any meeting of Members, a Member entitled to vote may either vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact. No proxy shall be valid after eleven (11) months from the date of its execution unless otherwise provided in the proxy.

## ARTICLE 4

## BOARD OF DIRECTORS AND OFFICERS

4.1 **Board of Directors**. The direction and administration of the Property in accordance with the provisions of the Declaration shall be vested in the Board of Directors, consisting of five (5) persons who shall be elected in the manner hereinafter provided, except for the first Board of Directors appointed by Declarant. The Members having at least two-thirds (2/3) of the total votes may from time to time increase or decrease the term of the office of the Board members at any annual meeting, provided the terms of at least one of the persons on the Board shall expire annually. Each member of the Board, with the exception of the Board members appointed by Declarant shall be one of the Residential Unit Owners (including Declarant); provided, however, that in the event a Residential Unit Owner is a corporation, partnership, trust, limited liability company, or other legal entity other than a natural person or persons, then any director or officer of such corporation, partner of such partnership, individual trustee or beneficiary of such trust, manager, officer or member of such limited liability company, or manager or principal of such legal entity, shall be eligible to serve as a member of the Board and provided further that in the event a member of the Board has entered into a contract to sell his Residential Unit and vacates the Residential Unit prior to the

consummation of that transaction, such member shall thereafter no longer be eligible to serve on the Board and his term of office shall be deemed terminated.

4.2   **Determination of Board to be Binding**. All matters of dispute or disagreement between Residential Unit Owners with respect to interpretation or application of the provisions of the Declaration or these By-Laws shall be determined by the Board as hereinafter provided, which determination shall be final and binding on the Association and on all Residential Unit Owners subject, however, to the jurisdiction of any applicable court of law.

4.3   **Election of Board Members**. The initial Board of Directors designated by Declarant pursuant to Section 4.1 hereof shall serve for a period commencing on the date the Declaration is executed and ending upon the qualification of the directors elected at the initial meeting of Members held as provided in Section 3.3(b) hereof. At the initial meeting of the Members and at all subsequent annual meetings of the Members there shall be elected a Board of Directors. In all elections for members of the Board of Directors, each Member shall be entitled to vote on a non-cumulative basis and the candidates receiving the highest number of votes with respect to the number of offices to be filled shall be deemed to be elected. Five (5) Board Members shall be elected at the initial meeting. The three (3) persons receiving the highest number of votes at the initial meeting shall be elected to the Board for a term of *approximately* two (2) years, in that said term shall run from the date of the initial meeting until the date of the second annual meeting; and the two (2) persons receiving the next highest number of votes shall be elected to the Board for a term of *approximately* one (1) year in that said term shall run from the date of the initial meeting until the date of the first annual meeting. In the event of a tie vote, the members of the Board shall determine which members shall have the two (2) year term and which members shall have the one (1) year terms. Upon the expiration of the terms of office of the Board members so elected at the initial meeting and thereafter, successors shall be elected for a term of two (2) years each.

4.4   **Compensation**. Members of the Board shall receive no compensation for their services, unless expressly allowed by the Board at the direction of the Members having two-thirds (2/3) of the total votes. However, any director may be reimbursed for reasonable expenses incurred in the performance of his duties.

4.5   **Vacancies in Board**. Vacancies in the Board, other than as a result of removal pursuant to Paragraph 4.7 hereof, including vacancies due to any increase in the number of persons on the Board, shall be filled by the remaining members of the Board until the next annual meeting or at a special meeting of the Members called for such purpose. The Declarant may fill any vacancies in the Board during the time prior to the initial meeting.

4.6   **Election of Officers**. The Board shall elect from among its members a President who shall preside over both its meetings and those of the Members, and who shall be the chief executive officer of the Board and Association; a Secretary who will keep the minutes of all meetings of the Members and of the Board and who shall, in general, perform all the duties incident to the office of Secretary; a Treasurer to keep the financial records and books of account, and such additional officers as the Board shall see fit to elect. All officers shall be elected at each annual meeting of the Board and shall hold office at the pleasure of the Board.

E-4

4.7 **Removal of Board Members**. Any Board member may be removed from office by affirmative vote of the Members having at least two-thirds (2/3) of the total votes, at any special meeting called for the purpose in the manner aforesaid. A successor to fill the unexpired term of a Board member removed may be elected by the Members at the same meeting or any subsequent meeting called for that purpose. The Declarant may remove a Board Member during the time prior to the initial meeting.

4.8 **Meeting of Board**. The initial meeting of the Board shall be held immediately following the initial meeting of the Members and at the same place. At such meeting the Board shall elect its officers to serve until the first annual meeting of the Board which shall be held immediately following the first annual meeting of the Members and at the same place. All subsequent annual meetings of the Board shall be held without notice immediately after, and at the same place as, the annual meeting of Members. Special meetings of the Board shall be held upon call by the President or by a majority of the Board on not less than forty-eight (48) hours' notice in writing to each member, delivered personally or by mail or telegram. Any member may in writing waive notice of a meeting, or consent to the holding of a meeting without notice, or consent to any action of the Board without a meeting. A majority of the number of Board members shall constitute a quorum for the transaction of business. Unless otherwise expressly provided herein, any action may be taken by the Board upon the affirmative vote of those present at its meetings when a quorum is present.

4.9 **Execution of Instruments**. All agreements, contracts, deeds, leases, vouchers for payment of expenditures, and other instruments shall be signed by such officer or officers, agent or agents of the Board and in such manner as from time to time shall be determined by written resolution of the Board. In the absence of such determination by the Board, such documents shall be signed by the President and countersigned by the Secretary.

## ARTICLE 5

## POWERS OF THE BOARD

5.1 **General Powers of the Board**. Without limiting the general powers which may be provided by law, the Declaration or these By-Laws, the Board shall have the following general powers and duties:

(a) to elect the officers of the Association as hereinabove provided;

(b) to administer the affairs of the Association and the Property;

(c) subject to Section 5.3(b) below, to engage the services of a manager or managing agent who shall manage and operate the Property, the Common Area Lots and other areas for which the Association is responsible pursuant to the Declaration;

(d) to formulate policies for the administration, management and operation of the Property, the Common Area Lots and other areas for which the Association is responsible pursuant to the Declaration;

E-5

(e)     to adopt administrative rules and regulations governing the administration, management, operation and use of the Property and the Common Area Lots, and to amend such rules and regulations from time to time;

(f)     to provide for the maintenance, repair and replacement of the Common Area Lots and other areas for which the Association is responsible pursuant to the Declaration and payments therefor, and to approve payment vouchers or to delegate such approval to the officers or the manager or managing agent;

(g)     after notice and an opportunity to be heard, to levy and collect reasonable fines from members for violations of the Declaration, By-Laws and rules and regulations;

(h)     to provide for the designation, hiring and removal of employees and other personnel, including accountants and legal counsel, and to engage or contract for the services of others, and to make purchases for the maintenance, repair, replacement, administration, management and operation of the Common Area Lots and other areas for which the Association is responsible pursuant to the Declaration and to delegate any such powers to the manager or managing agent (and any such employees or other personnel as may be the employees of the managing agent);

(i)     to estimate the amount of the annual budget, and to provide the manner of assessing and collecting from the Residential Unit Owners of such Residential Units which have been occupied for residential purposes, their respective shares of such estimated expenses, as hereinafter provided;

(j)     to dedicate or transfer all or any part of the Common Area Lots owned by the Association to any public agency, authority or utility or to mortgage the Common Area Lots or any portion for such purposes and subject to such conditions as may be agreed to by the Members in accordance with the requirements of Section 4.2(a) of the Declaration; and

(k)     to exercise all other powers and duties vested in or delegated to the Association, and not specifically reserved to the Residential Unit Owners by the Articles of Incorporation, the Declaration or these By-Laws.

5.2     **Tax Relief**.  In connection with the Common Area Lots, the Board shall have the power to seek relief from or in connection with the assessment or levy of any real property taxes, special assessments or any other special taxes or charges of the State of Illinois or any political subdivision thereof, or any other lawful taxing or assessing body, which are authorized by law to be assessed and levied on real property and to charge all expenses incurred in connection therewith to the assessments.

5.3     **Rules and Regulations; Management**.

(a)     **Rules**.  The Board may adopt such reasonable rules and regulations as it may deem advisable for the maintenance, conservation and beautification of the Property, and for the health, comfort, safety and general welfare of the Residential Unit Owners and

EXECUTION VERSION

Occupants. Written notice of such rules and regulations shall be given to all Residential Unit Owners and Occupants, and the entire Property shall at all times be maintained subject to such rules and regulations.

(b)    **Management**. Declarant or the Board shall engage the initial management organization under contracts expiring not later than ninety (90) days after the date the initial meeting of Members is held. Thereafter, the Board may engage the services of an agent to manage the Property to the extent deemed advisable by the Board; provided however, that if the Association, Declarant or Board shall enter into an agreement or agreements for the professional management of the Property before the Transfer Date, each such agreement shall be terminable by the Association without cause at any time after the Transfer Date; shall not require the payment of any penalty by the Association; and shall not require advance notice of termination of more than ninety (90) days. Any management fees incurred pursuant to this Section 5.3(b) shall be paid from the assessments collected pursuant to Article 6 hereof.

(c)    Nothing hereinabove contained shall be construed to give the Board authority to conduct an active business for profit on behalf of the Residential Unit Owners or any of them.

5.4    **Liability of the Directors and Officers of the Association**. Neither the Directors nor the officers of the Association shall be liable to the Residential Unit Owners for any mistake of judgment or for any other acts or omissions of any nature whatsoever made by such individuals as such Directors and officers, except for any acts or omissions finally adjudged by a court of competent jurisdiction to constitute gross negligence or fraud. The Residential Unit Owners (including the Directors and the officers of the Association in their capacity as Residential Unit Owners) shall indemnify and hold harmless each of the Directors and each of the officers of the Association against all contractual and other liabilities to others arising out of contracts made by or other acts of the Board and officers of the Association on behalf of the Residential Unit Owners or arising out of their status as Directors or officers of the Association, unless any such contract or act shall have been finally adjudged by a court of competent jurisdiction to have been made fraudulently or with gross negligence. It is intended that the foregoing indemnification shall include indemnification against all costs and expenses (including, but not limited to, attorneys' fees, amounts of judgments paid and amounts paid or received in settlement) reasonably incurred in connection with the defense of any claim, action, suit or proceeding, whether civil, criminal, administrative, or other, in which any Director or officer of the Association may be involved by virtue of such persons being or having been such Director or officer; provided, however, that such indemnity shall not be operative with respect to (a) any matter as to which such person shall have been finally adjudged in such action, suit or proceeding to be liable for gross negligence or fraud in the performance of such person's duties as such Director or officer, or (b) any matter settled or compromised, unless, in the opinion of independent counsel selected by or in a manner determined by the Board, there is not reasonable ground for such person being adjudged liable for gross negligence or fraud in the performance of such person's duties as such Director or officer. It is also intended that the liability of each Residential Unit Owner arising out of any contract made by, or other acts of, the Board or officers of the Association, or out of the aforesaid indemnity in favor of the Directors or officers of the Association, shall be limited to an amount equal to the total liability thereunder multiplied by such

E-7

Unit Owner's Percentage Interest. Every agreement made by the Board on behalf of the Residential Unit Owners shall be deemed to provide that the Directors are acting only as agents for the Residential Unit Owners, and shall have no personal liability thereunder (except as Residential Owners) and that each Residential Unit Owner's liability thereunder shall be limited to an amount equal to the total liability thereunder multiplied by such Residential Unit Owner's Percentage Interest.

## ARTICLE 6

## ASSESSMENTS

6.1    **Preparation of Estimated Budget**.  Each year on or before December 15, the Board will approve a budget with an estimate of the total amount necessary to pay the cost of wages, materials, taxes, insurance, services and supplies which will be required during the ensuing calendar year for the rendering of all services authorized by the Board, together with a reasonable amount considered by the Board to be necessary for a reserve for contingencies and replacements.  Each Residential Unit Owner shall receive, at least 30 days prior to the adoption thereof by the Board, a copy of the proposed budget.  The Association assessment shall be assessed to the Residential Unit Owners, other than the Declarant, based on their respective Percentage Interests, as provided in Article 6 of the Declaration.  On or before January 1 of the ensuing calendar year, and the first of each and every month of said year, each Residential Unit Owner, other than Declarant, shall be obligated to pay to the Board, or as it may direct, one-twelfth ($1/12^{th}$) of the assessment made pursuant to this Section 6.1.

6.2    **Year End Reconciliation**.  Within 120 days of the end of the fiscal year, the Board shall supply to all Residential Unit Owners an itemized accounting of the maintenance expenses for the preceding fiscal year actually incurred and paid, together with a tabulation of the amounts collected from the Residential Unit Owners pursuant to assessments made during such year (including amounts collected from Declarant) and showing the net amount over or short of the actual expenditures, plus reserves.

6.3    **Paid Assessment Letter**.  The Board shall upon demand at any time furnish a certificate in writing signed by an officer or agent of the Association, setting forth whether the assessments on a specified Residential Unit have been paid.  Such certificates shall be conclusive evidence of payment of any assessment therein.  In addition, the Association will provide such information as may be required by law.  The Board may levy a reasonable fee for the preparation of such certificate and the copying of any documents requested by the Residential Unit Owner.

E-8

6.4 **Budget for First Year**. When the first Board elected hereunder (or appointed by Declarant) takes office, it shall determine the budget for the period commencing on the day of the conveyance of the first Residential Unit and ending on December 31 of the calendar year following said conveyance. The initial budget shall be divided among the remaining monthly installments of such calendar year and assessed to the Residential Unit Owners, other than the Declarant, based on their respective Percentage Interests, as provided in Article 6 of the Declaration.

6.5 **Failure to Prepare Annual Budget**. The failure or delay of the Board to prepare or serve the annual or adjusted estimate on a Residential Unit Owner shall not constitute a waiver or release in any manner of such Residential Unit Owner's obligation to pay the maintenance costs and necessary reserves, as herein provided, whenever the same shall be determined, and, in the absence of any annual estimate or adjusted estimate, the Residential Unit Owner shall continue to pay the monthly maintenance charge at the then existing monthly rate established for the previous period until the monthly maintenance payment which is due more than ten (10) days after such new annual or adjusted estimate shall have been mailed or delivered.

6.6 **Books and Records**. The Board shall keep full and correct books of account in chronological order of the receipts and expenditures affecting the Property, specifying and itemizing the maintenance and repair expenses and any other expenses incurred. Such records and the vouchers authorizing the payments shall be available for inspection by any Residential Unit Owner or any representative of a Residential Unit Owner duly authorized in writing or any holder, insurer or guarantor of a first mortgage secured by any portion of the Property at such reasonable time or times during normal business hours as may be requested by such Residential Unit Owner or his representative or such holder, insurer or guarantor. Upon not less than ten (10) days' prior written request to the Board, any Residential Unit Owner shall be furnished a statement of his account, setting forth the amount of any unpaid assessment or other charges due and owing from such Residential Unit Owner. In addition, the Board shall provide for the preceding fiscal year, upon the written request of any holder, insurer or guarantor of a first mortgage secured by any portion of the Property, any annual audited or unaudited financial statements which are prepared and distributed by the Association to the Residential Unit Owners at the end of each of its respective fiscal years, provided, however, that in the event an audited financial statement is not available, 51% or more of the Eligible Mortgage Holders (by number) shall upon request, be entitled to have such an audited statement prepared at their expense.

6.7 **Status of Collected Funds**. All funds collected hereunder shall be held and expended for the purposes designated herein, and (except for such special assessments as may be levied hereunder against less than all the Residential Unit Owners and for such adjustments as may be required to reflect delinquent or prepaid assessments) shall be deemed to be held in trust for the benefit, use and account of all the Residential Unit Owners, other than Declarant. All funds not otherwise employed shall be deposited from time to time to the credit of the Association in such banks, trust companies or other depositories as the Board may select.

6.8 **Remedies for Failure to Pay Assessments**. Any assessments which are not paid when due shall be delinquent. Such assessments, interest and all costs of collection shall be a continuing lien upon the Residential Unit against which each such assessment was made. If the

E-9

assessment is not paid within thirty (30) days after the due date, then (i) the amount of the assessment shall bear interest from the date of delinquency at the rate per annum which is the lesser of (a) eighteen percent (18%) and (b) the maximum rate allowed by law, and (ii) in addition to said interest, the Association shall have the right, to be exercised in a non-discriminatory manner, to charge a delinquent Residential Unit Owner a late fee of Twenty-Five and no/100 Dollars ($25.00) for each month or portion thereof that said amount remains delinquent, said late fee to cover the Association's administrative costs in monitoring and collecting such amount. The Association may bring an action at law or in equity against the Residential Unit Owner personally obligated to pay the same, or foreclose the lien against the respective Residential Lot and/or Residential Unit and interest, late fees, costs and reasonable attorneys' fees of any such action shall be added to the amount of such assessment. Each Residential Unit Owner, by his acceptance of a deed to a Residential Unit, hereby expressly vests in the Association, or its agents, the right and power to bring all actions against such Residential Unit Owner personally for the collection of such charges as a debt, and to enforce the aforesaid lien by all methods available for the enforcement of such liens, including foreclosure by an action brought in the name of the Association in a like manner as a mortgage or deed of trust lien on real property.

6.9 **Exempt Residential Lots**. With regard to all Residential Lots which are vacant or upon which Residential Units are being constructed or have been completed and to which title has not been conveyed by Declarant (the "**Declarant Owned Lots**"), the total aggregate assessment due with respect to all Declarant Owned Lots shall be limited to the amount by which (a) the aggregate amount of actual operating expenses from time to time required to be paid with respect to the Property exceed (b) the amounts required to be paid by the Residential Unit Owners other than Declarant for said actual operating expenses. For purposes of the foregoing calculation, in the event Declarant enters into a lease or installment contract for any Residential Unit, then Declarant shall, as of the first day of occupancy under such lease or contract, be responsible for the payment of all assessments on those Residential Units on the same basis as any other Residential Unit Owner as provided in this Article and consequently, said Residential Unit shall no longer be deemed to be a Declarant Owned Lot hereunder. Actual operating expenses shall mean those ordinary expenses attributable only to the period in question covering the maintenance and operation of the Property and shall not include capital expenditures, amounts set aside as a reserve for contingencies or replacements, prepaid items or inventory items to the extent attributable to subsequent periods. The foregoing amounts owed by Declarant for the Declarant Owned Lots may be paid by Declarant on a monthly basis or, at Declarant's option, paid to the Association at the close of each calendar year without interest. It is expressly understood and agreed that in no event shall Declarant's total obligation under this Section 6.9 with respect to the Declarant Owned Lots ever exceed the amount of assessment which Declarant would owe without the benefit of this Section 6.9 (e.g., the aggregate amount of the assessment due from the Declarant Owned Lots from time to time based upon each such Declarant Owned Lot's Percentage Interest).

6.10 **Fiscal Year**. The fiscal year of the Association shall be a calendar year from January 1 to December 31.

E-10

## ARTICLE 7

### COVENANTS AND RESTRICTIONS AS TO USE AND OCCUPANCY

All Residential Unit Owners shall maintain, occupy and use their Residential Lots, Residential Units and the Common Area Lots only in accordance with the terms of the Declaration and any additional rules and regulations adopted by the Board or by the Members.

The Board shall have full authority to enforce all such rules and regulations by taking all action as may be necessary.

## ARTICLE 8

### COMMITTEES

8.1     **Board Committees**. The Board, by resolution adopted by a majority of the directors in office, may designate one (1) or more committees, each of which shall consist of one (1) or more directors; said committees, to the extent consistent with law and as provided in said resolution, shall have and exercise the authority of the Board in the management of the Association; but the designation of such committees and the delegation to such committee of authority shall not operate to relieve the Board, or any individual director, of any responsibility imposed upon it or him by law.

8.2     **Special Committees**. Other committees not having and exercising the authority of the Board in the management of the Association may be designated by a resolution adopted by a majority of the directors present at a meeting at which a quorum is present. Except as otherwise provided in such resolution, members of each such committee shall be Members, and the President of the Association shall appoint the members thereof. Any member thereof may be removed whenever in the Board's judgment the best interests of the Association shall be served by such removal.

8.3     **Term**. Each member of the committee shall continue as such until the next annual meeting of the Board and until his successor is appointed and shall have qualified, unless the committee shall be sooner terminated, or unless such member shall cease to qualify as a member thereof.

8.4     **Chairman**. One (1) member of each committee shall be appointed chairman.

8.5     **Vacancies**. Vacancies in the membership of any committee may be filled by appointment made in the same manner as provided in the case of the original appointments.

8.6     **Quorum**. Unless otherwise provided in the resolution of the Board designating a committee, a majority of the whole committee shall constitute a quorum and the act of a majority of the members present at a meeting at which a quorum is present shall be the act of the committee.

E-11

8.7 **Rules**. Each committee may adopt rules for its own government not inconsistent with these By-Laws or with rules adopted by the Board.

### ARTICLE 9

### AMENDMENTS

These By-Laws may be amended or modified from time to time in accordance with and in the same manner as provided by the provisions of Sections 10.3 and 10.10 of the Declaration. Such amendments shall be recorded in the Office of the Recorder of Deeds of Cook County, Illinois.

### ARTICLE 10

### DEFINITION OF TERMS AND CONSTRUCTION

The terms used in these By-Laws shall have the same definition as set forth in the Declaration to which these By-Laws are attached to the extent such terms are defined therein. To the extent of any conflict, ambiguity or contradiction between the terms and provisions contained in these By-Laws and those contained in the Declaration, those contained in the Declaration shall, in all instances, control and prevail.

E-12

## EXHIBIT F

## PERCENTAGE INTERESTS

| LOT # | Unit Type | % Interest | LOT # | Unit Type | % Interest |
|---|---|---|---|---|---|
| 1 | 2-Flat | 0.710% | 46 | Single-Family | 0.710% |
| 2 | 2-Flat | 0.710% | 47 | Single-Family | 0.710% |
| 3 | 2-Flat | 0.710% | 48 | Single-Family | 0.710% |
| 4 | 2-Flat | 0.710% | 49 | Single-Family | 0.710% |
| 5 | 2-Flat | 0.710% | 50 | Single-Family | 0.710% |
| 6 | 2-Flat | 0.710% | 51 | Single-Family | 0.710% |
| 7 | 2-Flat | 0.710% | 52 | Single-Family | 0.710% |
| 8 | 2-Flat | 0.710% | 53 | Single-Family | 0.710% |
| 9 | 2-Flat | 0.710% | 54 | Single-Family | 0.710% |
| 10 | 2-Flat | 0.710% | 55 | Single-Family | 0.710% |
| 11 | Single-Family | 0.711% | 56 | 2-Flat | 0.710% |
| 12 | Single-Family | 0.710% | 57 | 2-Flat | 0.710% |
| 13 | Single-Family | 0.710% | 58 | 2-Flat | 0.710% |
| 14 | Single-Family | 0.711% | 59 | 2-Flat | 0.710% |
| 16 | Townhome | 0.531% | 60 | Single-Family | 0.710% |
| 17 | Townhome | 0.531% | 61 | Single-Family | 0.710% |
| 18 | Townhome | 0.531% | 62 | Single-Family | 0.710% |
| 19 | Townhome | 0.531% | 63 | 2-Flat | 0.710% |
| 20 | Townhome | 0.531% | 64 | 2-Flat | 0.710% |
| 21 | Townhome | 0.531% | 65 | Townhome | 0.531% |
| 22 | Townhome | 0.531% | 66 | Townhome | 0.531% |
| 23 | Townhome | 0.531% | 67 | Townhome | 0.531% |
| 24 | Townhome | 0.531% | 68 | Townhome | 0.531% |
| 25 | Townhome | 0.531% | 69 | Townhome | 0.531% |
| 26 | Townhome | 0.531% | 70 | Townhome | 0.531% |
| 27 | Townhome | 0.531% | 71 | Townhome | 0.531% |
| 28 | Townhome | 0.531% | 72 | Townhome | 0.531% |
| 29 | Single-Family | 0.711% | 73 | Townhome | 0.531% |
| 30 | Single-Family | 0.710% | 74 | Townhome | 0.531% |
| 31 | Single-Family | 0.710% | 75 | Townhome | 0.531% |
| 32 | Single-Family | 0.711% | 76 | Townhome | 0.531% |
| 33 | Single-Family | 0.710% | 77 | Townhome | 0.531% |
| 34 | Single-Family | 0.710% | 78 | Townhome | 0.531% |
| 35 | Single-Family | 0.710% | 79 | Townhome | 0.531% |
| 36 | 2-Flat | 0.710% | 80 | Townhome | 0.531% |
| 37 | 2-Flat | 0.710% | 81 | Townhome | 0.531% |
| 38 | 2-Flat | 0.710% | 82 | Townhome | 0.531% |
| 39 | 2-Flat | 0.710% | 83 | Townhome | 0.531% |
| 40 | 2-Flat | 0.710% | 84 | Single-Family | 0.710% |
| 41 | 2-Flat | 0.710% | 85 | Single-Family | 0.710% |
| 42 | Single-Family | 0.710% | 86 | Single-Family | 0.710% |
| 43 | Single-Family | 0.710% | 87 | Single-Family | 0.710% |
| 44 | Single-Family | 0.710% | 88 | Single-Family | 0.710% |
| 45 | Single-Family | 0.710% | 89 | Single-Family | 0.710% |

F-1

| LOT # | Unit Type | % Interest | LOT # | Unit Type | % Interest |
|---|---|---|---|---|---|
| 90 | Single-Family | 0.710% | 138 | Townhome | 0.531% |
| 91 | Single-Family | 0.710% | 139 | Townhome | 0.531% |
| 92 | Single-Family | 0.710% | 140 | Townhome | 0.531% |
| 93 | Single-Family | 0.710% | 141 | Single-Family | 0.710% |
| 94 | Single-Family | 0.710% | 142 | Single-Family | 0.710% |
| 95 | Single-Family | 0.710% | 143 | Single-Family | 0.710% |
| 96 | Single-Family | 0.710% | 144 | Single-Family | 0.710% |
| 97 | Townhome | 0.531% | 145 | Single-Family | 0.710% |
| 98 | Townhome | 0.531% | 146 | Single-Family | 0.710% |
| 99 | Townhome | 0.531% | 147 | Single-Family | 0.710% |
| 100 | Townhome | 0.531% | 148 | Single-Family | 0.710% |
| 101 | Townhome | 0.531% | 149 | Single-Family | 0.710% |
| 102 | Townhome | 0.531% | 150 | Single-Family | 0.710% |
| 103 | Townhome | 0.531% | 151 | Single-Family | 0.710% |
| 104 | Townhome | 0.531% | 152 | 2-Flat | 0.710% |
| 105 | Townhome | 0.531% | 153 | 2-Flat | 0.710% |
| 106 | Townhome | 0.531% | 154 | 2-Flat | 0.710% |
| 107 | Townhome | 0.531% | 155 | 2-Flat | 0.710% |
| 108 | Townhome | 0.531% | 156 | 2-Flat | 0.710% |
| 109 | Townhome | 0.531% | 157 | 2-Flat | 0.710% |
| 110 | Townhome | 0.531% | 158 | 2-Flat | 0.710% |
| 111 | Townhome | 0.531% | 159 | 2-Flat | 0.710% |
| 112 | Townhome | 0.531% | 160 | 2-Flat | 0.710% |
| 113 | Townhome | 0.531% | 161 | 2-Flat | 0.710% |
| 114 | Townhome | 0.531% | | | |
| 115 | Townhome | 0.531% | | Total | 100.000% |
| 116 | Townhome | 0.531% | | | |
| 117 | Townhome | 0.531% | | | |
| 118 | Townhome | 0.531% | | | |
| 119 | Townhome | 0.531% | | | |
| 120 | Townhome | 0.531% | | | |
| 121 | Townhome | 0.531% | | | |
| 122 | Townhome | 0.531% | | | |
| 123 | Townhome | 0.531% | | | |
| 124 | Townhome | 0.531% | | | |
| 125 | Townhome | 0.531% | | | |
| 126 | Townhome | 0.531% | | | |
| 127 | Townhome | 0.531% | | | |
| 128 | Townhome | 0.531% | | | |
| 129 | Townhome | 0.531% | | | |
| 130 | Townhome | 0.531% | | | |
| 131 | Townhome | 0.531% | | | |
| 132 | Townhome | 0.531% | | | |
| 133 | Townhome | 0.531% | | | |
| 134 | Townhome | 0.531% | | | |
| 135 | Townhome | 0.531% | | | |
| 136 | Townhome | 0.531% | | | |
| 137 | Townhome | 0.531% | | | |

F-2

## EXHIBIT G

## PROVISIONS TO BE INCLUDED IN CONDOMINIUM DECLARATION

### The following definitions must be included in any Condominium Declaration:

**Condominium Association.** The _____ Condominium Association which is formed pursuant to this Condominium Declaration.

**Master Association.** The Enclave at Galewood Crossings Master Association.

**Master Association Assessments**. The assessments owed by the Unit Owners to the Master Association pursuant to the Master Declaration.

**Master Declaration.** The Master Declaration of Covenants, Conditions, Restrictions and Easements for The Enclave at Galewood Crossings, as amended from time to time.

**NFR Letter.** That certain No Further Remediation Letter dated _____, 200__, issued by the Illinois Environmental Protection Agency and recorded against title to the Property in the Office of the Recorder of Deeds of Cook County, Illinois on _____, 200__ as Document No. _____. *[This definition shall reference the NFR Letter recorded against the property upon which the applicable condominiums shall be located].*

**Parcel.** Lot _____ in the Galewood Residential Subdivision Galewood Residential Subdivision pursuant to that certain Plat of Subdivision recorded March 29, 2007 as document number 0708815072.

**Property.** All the land, property and space comprising the Parcel, all improvements and structures erected, constructed or contained therein or thereon including the building located thereon, and all easements, rights and appurtenances belonging thereto, and all fixtures and equipment intended for the mutual use, benefit or enjoyment of the unit owners, submitted to the provisions of the Illinois Condominium Property Act.

**Sewer Covenant** shall mean that certain Covenant dated March 1, 2007 and recorded 3/8/07 as document number 0706739002 in the Office of the Recorder of Deeds of Cook County, Illinois.

### The following provisions must be included in any Condominium Declaration:

**Easements Under Master Declaration**. Easements contained in the Master Declaration are hereby incorporated into this Declaration by reference as though set forth in their entirety herein. The easements contained in the Master Declaration in some cases burden the

G-1

EXECUTION VERSION

Property and in some cases benefit the Property. All easements and rights described in the Master Declaration are easements appurtenant running with the land and, so long as the Property is subject to the provisions of the Master Declaration, shall remain in full force and effect and shall inure to the benefit of and be binding on Declarant, its successors and assigns, and any Unit Owner, purchaser, mortgagee and other person having an interest in the Property, or any part or portion thereof. Each Unit is hereby declared to be subject to an easement and right to and in favor of the Master Association and each and all of its employees, agents and instrumentalities to go upon the Property for reasonable inspection thereof from time to time and for the purpose of carrying out any and all of the obligations and functions with respect to the Property and each such Unit located thereon as are herein imposed upon or permitted to the Master Association.

**Sewer Covenant**. In addition to the easements granted herein, the Sewer Covenant has been previously granted and it is anticipated that the maintenance obligations granted thereunder will be assumed by the Master Association. Notwithstanding that the Master Association will be assuming the maintenance obligations thereunder, the obligations and requirements of the Sewer Covenant are a burden and a benefit to the Property.

**NFR Letter** The Association shall be responsible to monitor, maintain and repair all of the engineered barriers on the Property described in the NFR Letter and to preserve the validity of the NFR Letter, which obligations include, without limitation, engaging environmental consultants or contractors to assist in such monitoring, maintenance, repair or other actions and insuring: (a) that all contractors (including utility companies) working in subsurface areas located beneath such engineered barriers described in the NFR Letter comply with all requirements of the NFR Letter (including health and safety requirements); and (b) that all replacement of, and other work undertaken with respect to, such engineered barriers is performed in a manner consistent with the NFR Letter and satisfactory to the Illinois Environmental Protection Agency and all other governmental agencies having jurisdiction over the Property. Each Unit Owner (and its tenants, guests, Occupants, agents and invitees) and the Association shall be prohibited from installing any potable water well anywhere within the Property and from taking any action that may violate the terms of the NFR Letter, including any action which disturbs or breaches any engineered barriers on the Property as specified in the NFR Letter or which in any way interferes with or is inconsistent with the institutional controls specified in the NFR Letter.

**Subject to Master Declaration**. The Master Declaration provides for, among other things, (a) certain access easements, easements to use parking areas, rights of enjoyment to the Common Area Lots (as defined in the Master Declaration), (b) certain Master Association maintenance obligations, (c) certain Master Association rights (including, without limitation, the right to levy and collect assessments and the right to administer, control, maintain and restrict the use of the Common Area Lots) and (d) certain other rights, powers, easements, covenants, conditions and restrictions, all as more particularly described in the Master Declaration. The provisions of this Declaration shall be subject to the provisions of the Master Declaration, and in the event of any conflict between the provisions of this Declaration and the provisions of the Master Declaration, the provisions of the Master

G-2

Declaration shall prevail. The Association shall perform the obligations imposed on the Condominium or the Property as a whole under the Master Declaration. Any cost incurred by the Association in the performance of any undertaking under the Master Declaration shall be deemed a Common Expense under this Declaration, the payment of which shall be levied, collected and enforced in the same manner as provided in this Declaration for any other Common Expense. Each Unit Owner further agrees to be bound by, and to perform, as the case may be, any obligation imposed on Unit Owners or occupants of the property governed by the Master Declaration.

**Master Association Assessments**. The Master Association, at its sole option, may require that the Association pay the Master Association Assessments collectively for all of the Unit Owners for purposes of the administrative convenience of the Unit Owners and acting solely as a collection agent. In no event shall the amount of such Master Association Assessments collected by the Association and paid to the Master Association be deemed a part of the assessment for the Association. In the event a Unit Owner is delinquent in the payment of any Master Association Assessment, the Association shall give timely notice of such delinquency to the Master Association, in which event the lien of the Master Association for such delinquency shall only apply to the affected Unit; however, in the event the Association fails to pay the amount of the Master Association Assessment for each of the Units and fails to timely deliver notice to the Master Association of the specific delinquent Unit(s), the lien of the Master Association shall attach to all of the Units. Any Master Association Assessment collected by the Association shall be held in trust without any deduction or setoff and no such payment shall be deemed made to the Master Association until actually received by the Master Association. No Unit Owner shall be relieved of personal liability for payment of the Master Association Assessment due to the failure of the Association to pay the same to the Master Association.

G-3