Elements, the Units, or to any personal property located in the Unit or Common Elements or any loss of income caused by fire or other casualty to the extent that such damage or loss of income is covered by fire or other form of casualty insurance or would be covered by insurance for which such Unit Owner is responsible pursuant to Section 5.8(g).

(k)     The Board shall have the right to select substantial deductibles to the insurance coverages required or permitted under this Section 5.8 if the economic savings justifies the additional risk and if permitted by law; provided, however, that no deductibles shall exceed the lesser of (i) $10,000.00 ($5,000.00 with respect to a Flood insurance policy); or (ii) one percent (1%) of the face amount of the insurance policy to which such deductible applies, and further provided that funds to cover any deductible amounts shall be maintained as part of the Capital Reserve (as defined in Section 6.2 below). The deductibles shall be on a per occurrence basis irrespective of the number of insureds suffering injury or damage. Expenses included within the deductible amount arising from insurable loss or damage shall be treated as Common Expenses.

(l)     If at the time of a loss under an Association's policy there is other insurance in the name of a Unit Owner covering the same property covered by the policy, the Association's policy shall be considered to be the primary insurance.

(m)     Contractors and vendors (except public utilities) doing business with the Association under contracts exceeding $10,000 per year must provide certificates of insurance evidencing each such party's maintenance of commercial general liability and employer liability insurance and in the case of general liability insurance, naming the Association, its Board and its managing agent as additional insured parties.

(n)     Any insurer defending a liability claim against the Association must notify the Association of the terms of the settlement no less than 10 days before settling the claim. The Association may not veto the settlement unless otherwise provided by contract or statute.

(o)     Upon receiving written request from a Unit Owner or a First Mortgagee, the Board shall provide the requesting party with written evidence of the insurance obtained by the Association pursuant to this Section 5.8.

5.9     **Liability of the Board of Directors and Officers of the Association**. Neither the members of the Board nor the officers of the Association shall be liable to the Unit Owners for any mistake of judgment or for any other acts or omissions of any nature whatsoever as such Board members and officers, except for any acts or omissions finally adjudged by a court to constitute gross negligence or actual or intentional fraud. The Unit Owners (including the members of the Board and the officers of the Association in their capacity as Unit Owners) shall indemnify and hold harmless each of the members of the Board and each of the officers of the Association against all contractual and other liabilities to others arising out of contracts made by or other acts of the Board and officers of the Association on behalf of the Unit Owners or arising out of their status as Board members or officers of the Association, unless any such contract or act shall have been finally adjudged by a court to have been made with actual or intentional fraud

or with gross negligence. It is intended that the foregoing indemnification shall include indemnification against all costs and expenses (including, but not limited to, counsel fees, amounts of judgments paid and amounts paid or received in settlement) reasonably incurred in connection with the defense of any claim, action, suit or proceeding, whether civil, criminal, administrative, or other, in which any member of the Board or officers of the Association may be involved by virtue of such persons being or having been such member or officer; provided, however, that such indemnity shall not be operative with respect to (a) any matter as to which such person shall have been finally adjudged in such action, suit or proceeding to be liable for gross negligence or fraud in the performance of his or her duties as such member or officer, or (b) any matter settled or compromised, unless, in the opinion of independent counsel selected by or in a manner determined by the Board, there is not reasonable ground for such persons being adjudged liable for gross negligence or fraud in the performance of his or her duties as such member or officer. It is also intended that the liability of any Unit Owner arising out of any contract made by or other acts of the Board or officers of the Association, or out of the aforesaid indemnity in favor of the members of the Board or officers of the Association, shall be limited to such proportion of the total liability hereunder as such Unit Owner's percentage of interest in the Common Elements bears to the total percentage interest of all the Unit Owners in the Common Elements. Every agreement made by the Board on behalf of the Unit Owners shall be deemed to provide that the members of the Board are acting only as agents for the Unit Owners, and shall have no personal liability thereunder (except as Unit Owners) and that each Unit Owner's liability thereunder shall be limited to such proportion of the total liability thereunder as such Unit Owner's percentage of interest in the Common Elements bears to the total percentage interest of all Unit Owners in the Common Elements.

5.10 **Resale of Units**. In the event of a resale (i.e. any sale made after the initial sale) of any Unit Ownership by a Unit Owner other than the Developer or the Declarant, and within thirty (30) days after the written request by such Unit Owner, the Board shall deliver a copy of each of the documents and make the disclosures described in and required by Section 22.1 of the Act. The Board shall be allowed to charge a reasonable fee, not to exceed the maximum amount prescribed by the Act, for providing such information.

## ARTICLE 6
## COMMON EXPENSES

6.1 **Covenant for Assessments.** Developer, or Declarant, as applicable, for each Unit it owns (for so long as it owns such Units) hereby covenants, and each Unit Owner of a Unit by acceptance of a deed therefor, whether or not it shall be so expressed in such deed or other conveyance instrument, is deemed to covenant and agree, to pay to the Association all general and special condominium assessments levied for Common Expenses pursuant to this Declaration. Such assessments, together with such interest and late charges thereon and costs of collection thereof (including reasonable attorneys' fees), as hereinafter provided, shall be a charge on the land and shall be a continuing lien upon the Unit against which each such assessment is made, subject to Article 10 hereof. Each such assessment, together with such interest, late charges and costs of collection, shall also be the personal obligation of the person who was the Unit Owner of such Unit at the time when the assessment fell due. Except as otherwise provided in this Declaration, any such personal obligation shall not pass to said Unit

Owner's successors in title unless expressly assumed by them or as may be required by applicable law. In addition to the annual assessments described in Section 6.3 below, the Association may levy special assessments for the purpose of defraying, in whole or in part, the cost of any construction or reconstruction, unexpected repair, maintenance or replacement item not contemplated in the annual budget as more particularly described in Section 6.4 below. The foregoing special assessments may be levied notwithstanding the fact that the Association may have then accumulated a reserve.

6.2 **Purpose and Use of Assessments.** The assessments levied pursuant to this Declaration shall be used for the purpose of promoting the health, safety, and welfare of the residents in the Property and in particular for the improvement and maintenance of the Property, services and facilities devoted to this purpose and related to the use and enjoyment of the Property, and of the Units situated upon the Property, and for such other purposes as may be described in this Declaration, including, but not limited to, any fees payable to any management agent engaged by the Association to manage the Property and to collect and prosecute the collection of any unpaid assessments owed to the Association. In addition, such assessments may include additional amounts to be paid by the Unit Owners as "Residential Unit Owners" (as such term is defined in the Master Declaration) pursuant to the Master Declaration, as set forth in Article 14 below. Such uses shall include, but are not limited to, the cost to the Association of any and all insurance premiums with respect to, and the expense of operation, repair, replacement and maintenance of, the Condominium, and other facilities and activities including, but not limited to, caring for the grounds, landscaping, paving, equipment, sanitary and storm sewer and water service lines which service the Condominium, structures and appurtenances (other than facilities and activities maintained by the Master Association or any governmental authority or utility company), and other charges required by this Declaration or that the Board shall determine to be necessary or desirable to meet the primary purpose of the Association. In addition, water, waste removal and/or any utilities which are not separately metered or otherwise directly charged to individual Unit Owners shall be paid for by the Association from such assessments. The Board reserves the right to levy additional assessments against any Unit Owner to reimburse it for excessive use by such Unit Owner of any utility or other service.

6.3 **Preparation of Annual Budget**. On or before November 1 of each calendar year, the Board shall cause to be prepared a detailed proposed budget for the ensuing calendar year. Such budget shall take into account the estimated annual Common Expenses and cash requirements for said ensuing year, including wages, materials, insurance, services, supplies and all other Common Expenses, together with a reasonable amount considered by the Board to be necessary for adequate reserves, including, without limitation, amounts to maintain a Capital Reserve (as hereinafter defined in Section 6.4). The annual budget shall also take into account the estimated net available cash income for the year from the operation or use of the Common Elements and, to the extent that the assessments and other cash income collected from the Unit Owners during the preceding year are more or less than the expenses for the preceding year, the surplus or deficit shall also be taken into account. On or before November 15 of each year, the Board shall notify each Unit Owner in writing as to the proposed annual budget, with reasonable itemization thereof, including those portions intended for capital expenditures or repairs or payment of real estate taxes and containing each Unit Owner's respective assessment; provided, however, that such proposed annual budget shall be furnished to each Unit Owner at least

thirty (30) days prior to its adoption by the Board. On or before January 1 of the ensuing calendar year, and the first day of each and every month of such year, each Unit Owner, jointly and severally, shall be personally liable for and obligated to pay to the Board (or as it may direct) one-twelfth (1/12) of such Unit Owner's proportionate share of the Common Expenses for that year as shown by the annual budget. Such proportionate share of the Common Expenses for each Unit Owner shall be in accordance with such Unit Owner's respective percentage of ownership in the Common Elements as set forth in Exhibit B attached hereto. On or before April 1 of each calendar year following the initial meeting of the Unit Owners, the Board shall supply to all Unit Owners an itemized accounting of the Common Expenses for the preceding calendar year actually incurred and paid, together with a tabulation of the amounts collected pursuant to the estimates provided, and showing the net amount over or short of the actual expenses plus reserves. Any net shortage or excess shall be applied as an adjustment to the installments due under the current year's estimate in the succeeding six (6) months after rendering of the accounting, subject, however, to the provisions of Section 6.4. Each Unit Owner shall receive notice, in the same manner as is provided for meetings of the Unit Owners, of any meeting of the Board concerning the adoption of the proposed annual budget.

6.4 **Capital Reserve; Supplemental Budget**. The Association shall segregate and maintain a special reserve account to be used solely for making capital expenditures and paying for the costs of deferred maintenance in connection with the Common Elements (the "**Capital Reserve**"). The Board shall determine the appropriate level of the Capital Reserve based on a periodic review of the useful life of improvements to the Common Elements and equipment owned by the Association as well as periodic projections of the cost of anticipated major repairs or improvements and maintenance, repairs and replacements necessary to the Common Elements or the purchase of equipment to be used by the Association in connection with its duties hereunder and those matters set forth in Section 9(c)(2) of the Act. Each budget shall disclose that percentage of the annual assessment which shall be added to the Capital Reserve and each Unit Owner shall be deemed to make a capital contribution to the Association equal to such percentage multiplied by each installment of the annual assessment paid by such Unit Owner. Extraordinary expenditures not originally included in the annual estimate which may become necessary during the year shall be charged first against such portions of any specific contingency reserve or the Capital Reserve, as applicable, which remains unallocated. If the estimated Common Expenses contained in the budget prove inadequate for any reason or in the event a nonrecurring Common Expense is anticipated for any year, then the Board may prepare and approve a supplemental budget covering the estimated deficiency or nonrecurring expense for the remainder of such year, copies of which supplemental budget shall be furnished to each Unit Owner, and thereupon a special or separate assessment shall be made to each Unit Owner for such Unit Owner's proportionate share of such supplemental budget. All Unit Owners shall be personally liable for and obligated to pay their respective adjusted monthly amount. In addition to the foregoing, any Common Expense not set forth in the annual budget or any increase in assessments over the amount set forth in the adopted annual budget shall be separately assessed against all Unit Owners. Assessments for additions and alterations to the Common Elements or to property owned by the Association not included in the adopted annual budget shall be separately assessed against all Unit Owners and, except if relating to an emergency or mandated by law, shall be subject to the affirmative vote of at least two-thirds (2/3) of the total votes of all Unit Owners at a meeting specifically called for the purpose of approving such special or

separate assessment. The Board may adopt special or separate assessments payable over more than one fiscal year. Unless such multi-year assessment relates to an emergency or is mandated by law or is for an addition or alteration to the Common Elements or to the property owned by the Association and is not included in the adopted annual budget, the entire amount of such multi-year assessment shall be deemed considered and authorized in the first fiscal year in which such multi-year assessment is approved. Any separate or special assessment for expenditures relating to an emergency or mandated by law may be adopted by the Board without being subject to Unit Owner approval pursuant to Section 5.6(b) or otherwise. As used in this Section 6.4, "emergency" means an immediate danger to the structural integrity of the Common Elements or to the life, health, safety or property of the Unit Owners. Each Unit Owner shall receive notice, in the same manner as is provided for meetings of the Unit Owners, of any meeting of the Board concerning the adoption of any supplemental budget or any special or separate assessment.

6.5     **Initial Budget**. The initial Board appointed by the Developer shall determine and adopt, prior to the conveyance of the first Unit Ownership hereunder, an initial budget commencing with the first day of the month in which the sale of the first Unit Ownership is closed and ending on December 31 of the calendar year in which such sale occurs, and shall continue to determine the proposed annual budget for each succeeding calendar year until such time as the first Board elected by the Unit Owners takes office, and which may include such sums as collected from time to time at the closing of the sale of each Unit Ownership. Assessments shall be levied against the Unit Owners during such period as provided in Section 6.3 of this Article, except that if the closing of the sale of the first Unit Ownership is not on January 1, monthly assessments to be paid by Unit Owners shall be based upon the amount of the budget and the number of months and days remaining in such calendar year.

6.6     **Failure to Prepare Annual Budget**. The failure or delay of the Board to give notice to each Unit Owner of the annual budget shall not constitute a waiver or release in any manner of such Unit Owner's obligation to pay such Unit Owner's respective monthly assessment, as provided in this Declaration, whenever such monthly assessment shall be determined, and in the absence of the annual or adjusted budget, the Unit Owner shall continue to pay monthly assessment at the then existing monthly rate established for the previous period until the monthly assessment which is due more than ten (10) days after notice is given of such new annual budget.

6.7     **Records of the Association**.

(a)     The management agent or the Board shall maintain the following records of the Association available for inspection, examination and copying during normal business hours by the Unit Owners, First Mortgagees, Insurers and Guarantors, and their duly authorized agents or attorneys:

(i)     Copies of this Declaration (including the By-Laws) and any amendments, Articles of Incorporation of the Association, annual reports and any rules and regulations adopted by the Association or its Board, and the Association's books, records and financial statements shall be available. Prior to the organization of the Association, the Developer shall be responsible to

maintain and make available the records set forth in this subsection (i) for examination and copying.

(ii)   Detailed accurate records in chronological order of the receipts and expenditures affecting the Common Elements, specifying and itemizing the maintenance and repair expenses of the Common Elements and any other expense incurred, and copies of all contracts, leases, or other agreements entered into by the Association shall be maintained.

(iii)   The minutes of all meetings of the Association and the Board shall be maintained. The Association shall maintain these minutes for a period of not less than seven (7) years.

(iv)   Ballots and proxies relating thereto for all elections to the Board and for any other matters voted on by the Unit Owners shall be maintained for a period of not less than one (1) year; provided that if the Association has adopted the secret ballot process under Section 18 of the Act and under this Declaration, unless directed by court order, only the voting ballot excluding a Unit number or symbol shall be subject to inspection and copying.

(v)   Such other records of the Association as are available for inspection by members of a not for profit corporation pursuant to Section 107.75 of the General Not For Profit Corporation Act of 1986, as amended, shall be maintained.

(b)   A reasonable fee may be charged by the Association or its Board for the cost of copying.

(c)   Upon ten (10) days' notice to the Board and payment of a reasonable fee, any Unit Owner shall be furnished a statement of such Unit Owner's account setting forth the amount of any unpaid assessments or other charges due and owing from such Unit Owner.

6.8   **Status of Collected Funds**. All funds collected hereunder shall be held and expended for the purposes designated herein, and (except for such special assessments as may be levied hereunder against less than all the Unit Owners and for such adjustments as may be required to reflect delinquent or prepaid assessments or user charges) shall be deemed to be held for the benefit, use and account of all the Unit Owners in the percentages set forth in Exhibit B.

6.9   **Start-Up Costs**. At the time the initial sale of each Unit Ownership is closed, the purchaser of the Unit Ownership shall pay to the Association an amount equal to two (2) times the first full monthly assessment for such Unit Ownership based on the latest budget adopted by the Association prior to closing. This sum shall be used and applied for start-up costs and as a working capital fund in connection with all initial operating expenses for the Common Elements and held for future working capital needs. This payment shall not be refundable or be applied as a credit against the Unit Owner's monthly assessments. The Board or the Developer shall have

the right to transfer such funds from time to time as may be necessary to fund the Capital Reserve. The Developer may not use the working capital fund to defray any of the Developer's expenses, reserve contributions or construction costs, or to make up any budget deficits while the Developer is in control of the Association in accordance with Section 13.1.

6.10 **User Charges**. The Board, or the Declarant or Developer, acting pursuant to Section 13.1, may establish, and each Unit Owner shall pay, user charges to defray the expense of providing services, facilities, or benefits which may not be used equally or proportionately by all of the Unit Owners or which, in the judgment of the Board, should not be charged to every Unit Owner. Such expense may include such services and facilities provided to Unit Owners which the Board determines should not be allocated among all of the Unit Owners in the same manner as the Common Expenses. Such user charges may be billed separately to each Unit Owner benefitted thereby, or may be added to such Unit Owner's share of the Common Expenses, as otherwise determined, and collected as a part thereof. Nothing contained in this Declaration shall require the establishment of user charges pursuant to this Section 6.8, and the Board or the Declarant or Developer may elect to treat all or any portion thereof as Common Expenses.

6.11 **Non-Use and Abandonment**. No Unit Owner may waive or otherwise escape liability for the assessments provided for in this Declaration by non-use of the Common Elements or abandonment of such Unit Owner's Unit.

## ARTICLE 7
## COVENANTS AND RESTRICTIONS
## AS TO USE AND OCCUPANCY

7.1 **Use and Occupancy of the Property.**

(a) Each Residential Unit (or any two or more adjoining Residential Units used together) shall be used for residential purposes only and each Unit Parking Space shall be used only for the parking of one (1) operable passenger vehicle or motorcycle only. That part of the Common Elements separating any two or more adjoining Units which are owned by the same Unit Owner, including, without limitation, walls and/or ceilings separating such Units and hallways serving only such Units, may be altered, removed or made part of such Units to afford ingress and egress to and from such adjoining Units, and new walls obstructing such hallways may be added to the Common Elements; provided, however, that (i) such alteration or removal shall not impair or weaken the structural integrity of any Unit or any portion of the Common Elements; (ii) the Unit Owner shall furnish to the Board not less than thirty (30) days prior to the date the Unit Owner desires to commence such work all plans detailing the work to be done; (iii) the Board consents to the performance of such work and grants permission to the Unit Owner to use such Common Elements as Limited Common Elements; (iv) the expense of such alterations shall be paid in full by the Unit Owner making such alterations; and (v) such Unit Owner shall pay in full the expense of restoring such Common Elements to their former condition prior to such alterations in the event such Units cease to be used together; provided, however, that the foregoing subsections (ii)

through (v) shall not apply to the Developer or to the Declarant. Notwithstanding anything to the contrary contained herein, each Unit Owner shall have the right (x) to maintain his personal professional library in his Residential Unit; (y) to keep his personal, business or professional records or accounts in his Residential Unit; and (z) to handle his personal, business or professional telephone calls or correspondence from his Residential Unit. A Unit Owner's use of a Unit shall not endanger the health or disturb the reasonable enjoyment of any other Unit Owner or occupant, except that the foregoing restriction on disturbing reasonable enjoyment shall not be deemed to preclude or prohibit any of the rights or activities expressly reserved by or granted in this Declaration to Declarant.

(b) There shall be no obstruction of the Common Elements nor shall anything be stored in the Common Elements (except in areas designed for such purpose, in areas which are Limited Common Elements serving exclusively the Unit of the Unit Owner obstructing such Limited Common Elements and in areas made part of a Unit in accordance with Section 7.1(a)) without the prior consent of the Board or except as hereinafter expressly provided. Each Unit Owner shall be obligated to maintain and keep in good order and repair such Unit Owner's own Unit.

(c) Nothing shall be done or kept in any Unit or in the Common Elements serving any Units which will increase the rate of insurance on any Building or Garage, or the contents thereof without the prior written consent of the Board. In any case, the Unit Owner shall be responsible for payment of any such increase. No Unit Owner shall permit anything to be done or kept in such Unit Owner's Unit or in the Common Elements which will result in the cancellation of insurance on any Building or Garage, or the contents thereof, or which would be in violation of any law. No waste shall be committed in the Common Elements.

(d) In order to enhance the sound conditioning, the floor covering for all occupied Residential Units shall meet the minimum standard as may be specified by rules and regulations of the Board and by Section 4.5(b)(ii) hereof; provided, however, that the floor covering existing in any Unit as of the date of the recording of this Declaration shall be deemed in compliance with any such rules and regulations. Notwithstanding anything to the contrary contained herein, no Unit Owner shall remove, replace, alter or otherwise change the floor covering in any Residential Unit unless the replacement floor covering complies with all requirements, including, but not limited to, all soundproofing requirements of the City of Chicago, as such requirements may change from time to time. In addition, no Unit Owner shall install or cause or permit to be installed in any Residential Unit any recessed can light fixtures (unless such installation was performed by the Developer as part of the initial buildout of such Unit) without the prior written consent of the Board.

(e) No nuisance, noxious or offensive activity shall be or permitted to be carried on by any Unit Owner on or in his Unit or in the Common Elements nor shall anything be done therein or thereon, either willfully or negligently, which may be or become an unreasonable annoyance or nuisance to any other Unit Owner or Occupant.

(f)     No animals, livestock or poultry of any kind shall be raised, bred, or kept on any Unit or the Common Elements, except dogs, cats or other common household pets (not to exceed a total of three (3) pets for each Unit) may be so kept; provided, that they are not kept, bred, or maintained for any commercial purposes and provided further that they are kept, bred and maintained solely in the Residential Unit and in accordance with rules and regulations adopted by the Board and the Master Association.

(g)     Nothing shall be done in any Unit or in, on or to the Common Elements which will impair the structural integrity of the Building or Garage in which it or they are located or which would structurally change such Building or Garage, except as is otherwise provided herein.  No Unit Owner shall overload the electric wiring in a Building or Garage, or operate machines, appliances, accessories or equipment in such manner as to cause, in the judgment of the Board, an unreasonable disturbance to others or connect any machines, appliances, accessories or equipment to the heating or plumbing system, without the prior written consent of the Board or the management company,  acting in accordance with the Board's direction.  No Unit Owner shall overload the floors of any Unit.  Any furnishings which may cause floor overloads shall not be placed, kept or used in any Unit except only in accordance with advance written Board approval.

(h)     No Unit Owner of any Residential Unit shall display, hang, store or use any clothing, sheets, blankets, laundry or other articles outside his Residential Unit, or which may be visible from the outside of his Residential Unit (other than draperies, curtains or shades of a customary nature and appearance, subject to the rules and regulations of the Board), or paint or decorate or adorn the outside of his Unit, without the prior written permission of the Board or the managing agent, acting in accordance with the Board's direction; provided, however, that the provisions of this Section 7.1(h) shall not apply to the Developer or to the Declarant.  Notwithstanding the foregoing, any draperies, curtains, shades or other window treatment which may be visible at any time from the outside of a Unit Owner's Unit shall be of a color substantially similar to the color of the exterior window frame of any such window.

(i)     All rubbish, trash, and garbage shall be kept in each Unit so as not to be seen from neighboring residents or streets, and shall be regularly removed from each Unit and shall not be allowed to accumulate thereon.  In addition to the foregoing, all rubbish, trash and garbage shall be stored and removed in accordance with the rules and regulations adopted by the Board.

(j)     Television and radio antennae and television satellite dishes having a diameter not exceeding one (1) meter shall be permitted on the exterior of any Residential Unit in an area within the Unit Owner's exclusive control, subject to all applicable laws, ordinances and regulations.

(k)     Drying of clothes shall be confined to the interior of the Residential Units.

(l)　　No barbecues shall be permitted to be used on the Property, except for gas barbecues used exclusively on the patio or deck of each Residential Unit.

(m)　　The Initial Parcel and each Additional Parcel is hereby declared to be subject to an easement and right to and in favor of the Master Association and each and all of its employees, agents and instrumentalities to go upon such Parcel for reasonable inspection thereof from time to time and for the purpose of carrying out any and all of the obligations and functions with respect to such Parcel and the Units located thereon as are herein imposed upon or permitted to the Master Association.

(n)　　Except for Declarant and its activities within the Property, no signage of any type or description (including "For Rent" and "For Sale" signs), billboards, unsightly objects, or nuisances shall be erected, placed or permitted or any portion of the Property.

(o)　　Subject to the requirements of this Section 7.1(o) and Section 12.2 of this Declaration, each Unit Owner shall have the right to lease such Unit Owner's Residential Unit, Unit B Storage Space (if applicable) and Unit Parking Space. Without the prior written consent of the Board or the management company of the Property acting in accordance with the Board's direction, (i) neither the Unit B Storage Space nor a Unit Parking Space shall be leased to any party other than a Unit Owner or Occupant of a Residential Unit and (ii) no Unit Owner shall lease or rent his or her Unit Parking Space for a term of less than six (6) months. No Unit Owner shall lease or rent his or her Residential Unit for a term less than one (1) year without the prior written consent of (i) the Master Association and (ii) the Board or the management agent for the Property acting in accordance with the Board's direction. Every lease shall be in writing and shall be made expressly subject to the requirements, rights, covenants, conditions, restrictions and easements of this Declaration, the By-Laws and the Master Declaration, and the failure of the lessee to comply therewith shall constitute a default under the lease which shall be enforceable by the Board, the Association, and/or the Master Association, and the lease shall be deemed to expressly so provide. Until such time as title to any Unit is conveyed to a bona fide purchaser, Declarant reserves the right to lease such Unit upon such terms and conditions as Declarant may, in its sole discretion, approve. A Unit Owner leasing his or her Residential Unit, Unit B Storage Space or Parking Space shall deliver a copy of the signed lease to the Board within ten (10) days after the lease is executed and prior to occupancy. As part of such lease delivery, such Unit Owner shall also deliver to the Board a forwarding address, telephone number and, if applicable, facsimile number where such Unit Owner can be reached. Such Unit Owner shall update such contact information from time to time as such contact information changes. This Section 7.1(o) may not be amended or deleted without the prior written consent of Declarant and Developer, so long as either Declarant or Developer owns any Unit or has any right under Article 15 to submit any Future Expansion Parcel to the Act.

(p)　　Articles of personal property belonging to any Unit Owner, such as baby carriages, bicycles, wagons, toys, furniture, clothing and other articles, shall not be stored or kept in any area constituting part of the Common Elements except for such articles as may be stored in such Unit Owner's Unit B Storage Space (if applicable).

(q)     No use of a Unit shall be conducted, maintained or permitted to the extent such use is in violation of the uses permitted hereunder or under any applicable laws, statutes, codes, regulations or ordinances governing the Property from time to time (including, without limitation, the relevant provisions of the City of Chicago zoning ordinance).

(r)     During the period that the Declarant, the Developer, or their respective agents, successors or assigns, are engaged in the marketing, sales or leasing of Units, or performing work in or about any Building or Garage located or to be located on any Parcel (including any Future Expansion Parcel to be submitted to the Act pursuant to the provisions of Article 15 of this Declaration), Declarant and Developer and their respective agents, employees, successors, assigns, contractors, subcontractors, brokers, licensees and invitees (and each of them) shall be entitled to (i) have access, ingress and egress to and from each Building, each Garage and all Common Elements and use such portion of each Building, each Garage and Common Elements as may be necessary or desirable in connection with such marketing, sales, leasing of Units or performance of work; (ii) use or show one or more unsold and unconveyed Units or portion or portions of the Common Elements (including, but not limited to, each Garage) as a model Unit or Units (for sale or lease), sales office, construction, or refurbishment office or administrative or management office or for such other purposes deemed necessary or desirable in    connection with such construction, refurbishment, administration, marketing, sales or leasing of Units or performing work in or about any Building and each Garage; (iii) post and maintain such signs, banners and flags, or other advertising material in, on or about each Building, each Garage, and Common Elements in such form as deemed desirable by Declarant or Developer, and as may be deemed necessary or desirable in connection with the marketing, sales, leasing or management of Units or residences throughout the Project or performing work in or about any Building or Garage located or to be located on any Parcel (including any Future Expansion Parcel to be submitted to the act pursuant to the provisions of Article 15 of this Declaration) or in connection with clauses (i) and (ii); and (iv) complete or correct construction of, or make alterations of and additions and improvements to, the Units or the Common Elements in connection with any of the Declarant's or Developer's activities in  connection with the construction, promotion, marketing, sales or leasing of the Units or performing work in or about any Building  or Garage located or to be located on any Parcel (including any Future Expansion Parcel to be submitted to the act pursuant to the provisions of Article 15 of this Declaration). The foregoing are in addition to and not in limitation of the rights granted under Section 4.3(c). The foregoing and the rights granted under Section 4.3(c) shall not be amended or modified in any manner without the express written consent of the Developer or its successors or assigns.

(s)     The provisions of the Act, this Declaration and rules and regulations that relate to the use of the individual Unit or the Common Elements shall be applicable to any person leasing a Unit Ownership and shall be deemed to be incorporated in any lease executed in connection with a Unit Ownership.  The Association may prohibit a tenant from occupying a Unit until the Unit Owner complies with the leasing requirements prescribed in Article 12 or as may be adopted by the Association.  The Board may

proceed directly against a tenant, at law or in equity, or under the provisions of Article IX of the Code of Civil Procedure, for any breach by a tenant of any covenants, rules, regulations or By-Laws, without excluding any other rights or remedies. The remedies set forth in Article IX of the Code of Civil Procedure shall be available to the Association and against the Unit Owner and the Unit Owner's tenant in the event of any violation of this sentence or of any other provision of this Declaration concerning Unit Ownership leasing, without excluding any other rights or remedies.

(t) Each Unit Owner shall deposit with the Board duplicate keys for all locks required for entry to such Unit Owner's Residential Unit and Unit B Storage Space (if applicable).

(u) Except for Unit Parking Spaces owned or controlled by the Declarant (or the Developer) or the Association or for which the Board has given its prior consent to such use or occupancy, no Unit Parking Space shall be used or occupied (other than on a temporary and non-continuous basis) by any party other than a Unit Owner or Occupant of a Unit.

(v) Each Unit Owner shall schedule with the Association all moves into or out of such Unit Owner's Residential Unit (including, without limitation, the initial move-in of Unit Owner following the initial sale of any such Unit Owner's Unit by Developer to such Unit Owner) at least thirty (30) days in advance of any such move.

(w) Each Unit Owner (and its tenants, guests, Occupants, agents and invitees) shall be prohibited from taking any action that may violate the terms of the NFR Letters, including any action which disturbs or breaches any engineered barriers on the Property as specified in the NFR Letters or which in any way interferes or is inconsistent with the institutional controls specified in the NFR Letters.

## ARTICLE 8
## DAMAGE, DESTRUCTION, CONDEMNATION AND RESTORATION

8.1 **Sufficient Insurance**. In the event the improvements forming a part of the Property, or any portion thereof, including any Units, shall suffer damage or destruction from any cause and the proceeds of any policy or policies insuring against such loss or damage, and payable by reason thereof, plus Capital Reserves, shall be sufficient to pay the cost of repair, restoration or reconstruction, then such restoration, repair, replacement or reconstruction shall be undertaken and the insurance proceeds and, if necessary, the Capital Reserve shall be applied by the Board or the payee of such insurance proceeds in payment therefor; provided, however, that in the event within one hundred eighty (180) days after such damage or destruction, the Unit Owners shall elect either to sell the Property as hereinafter provided in Article 9 or to withdraw the Property from the provisions of this Declaration and from the provisions of the Act as therein provided, then such restoration, repair, replacement, or reconstruction shall not be undertaken. In the event such restoration, repair, replacement, or reconstruction is not undertaken, the net proceeds of insurance policies shall be divided by the Board or the payee of such insurance

proceeds among all Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit B, after first paying from the share of each Unit Owner the amount of any unpaid liens on such Unit Owner's Unit, in the order of the priority of such liens.

8.2    **Insufficient Insurance**.

(a)    If the insurance proceeds and the Capital Reserve are insufficient to reconstruct the damaged improvements and the Unit Owners in those Buildings containing the damaged improvements and all other parties in interest with respect to those Buildings do not voluntarily make provision for reconstruction of such damaged improvements within one-hundred eighty (180) days from the date of damage or destruction, then the provisions of the Act shall apply.

(b)    In the case of damage or other destruction in which fewer than one-half (1/2) of the Residential Units are rendered uninhabitable and the insurance proceeds are insufficient to reconstruct, upon the unanimous affirmative vote of the Voting Members for the Unit Owners in those Buildings containing the damaged improvements at a meeting called for the purpose, the damaged improvements shall be reconstructed. The meeting shall be held within thirty (30) days following the final adjustment of insurance claims, if any; otherwise, such meeting shall be held within ninety (90) days of the occurrence of the damage or other destruction. At such meeting the Board or its representatives shall present to the members present an estimate of the cost of repair or reconstruction, and the estimated amount of necessary assessments against each Unit Owner in those Buildings. If the Voting Members for the Unit Owners in those Buildings do not elect to reconstruct, then the Unit Owners shall be deemed to have not voluntarily made provision for reconstruction under the terms of Section 8.2(a) above.

(c)    In the case of damage or other destruction, upon the unanimous affirmative vote of the Voting Members for the Unit Owners in those Buildings containing the damaged improvements at a meeting called for that purpose, any portion of the Property affected by such damage or destruction may be withdrawn from the Act. Upon the withdrawal of any Unit or portion thereof, the percentage of interest in the Common Elements appurtenant to such Unit or portion thereof shall be reallocated among the remaining Units on the basis of the percentage of interest of each remaining Unit. If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board. The payment of just compensation, or the allocation of any insurance or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest, but shall, at least in part, be based on the relative value of the Unit or Units in question as determined by such percentage interest in accordance with this Declaration. Any insurance or other proceeds available in connection with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest therein. Any proceeds

available from the withdrawal of any Limited Common Elements will be distributed in accordance with the interest of those entitled to their use. Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease.

8.3 **Eminent Domain**. In the event any portion of the Property is taken by condemnation or eminent domain proceedings, provision for withdrawal of the portions so taken from the provisions of the Act may be made by the Board. Upon the withdrawal of any Unit or portion thereof due to eminent domain, the percentage of interest in the Common Elements appurtenant to such Unit or portion so withdrawn shall be reallocated among the remaining Units on the basis of the percentage of interest of each remaining Unit. If only a portion of a Unit is withdrawn, the percentage of interest appurtenant to that Unit shall be reduced accordingly, upon the basis of diminution in market value of the Unit, as determined by the Board, and the other Unit Owners' percentages shall be correspondingly increased. The allocation of any condemnation award or other proceeds to any withdrawing or remaining Unit Owner shall be on an equitable basis, which need not be a Unit's percentage interest, but shall, at least in part, be based on the relative value of the Unit or Units in question as determined by such percentage interest in accordance with this Declaration Any condemnation award or other proceeds available in connection with the withdrawal of any portion of the Common Elements, not necessarily including the Limited Common Elements, shall be allocated on the basis of each Unit Owner's percentage interest therein. Proceeds available from the withdrawal of any Limited Common Element will be distributed in accordance with the interests of those entitled to their use. Upon the withdrawal of any Unit or portion thereof, the responsibility for the payment of assessments on such Unit or portion thereof by the Unit Owner shall cease. The Association shall represent the Unit Owners in any condemnation proceedings or in negotiations, settlements and agreements with the condemning authority for the acquisition of the Common Elements or any part thereof, and the Association is hereby appointed as attorney-in-fact for each Unit Owner to represent the Unit Owners in any condemnation proceedings, or in negotiations, settlements and agreements with the condemning authority relating to such acquisitions of the Common Elements or any part thereof. In the event of the total taking of the Property by eminent domain, the condemnation award available in that connection shall be divided by the Association among all Unit Owners according to each Unit Owner's percentage of ownership in the Common Elements as set forth in Exhibit B, after first paying from the share of each Unit Owner the amount of any unpaid liens on such Unit Owner's Unit, in the order of the priority of such liens.

8.4 **Repair, Restoration or Reconstruction of the Improvements**. As used in this Article, "restoration, repair, replacement or reconstruction" of improvements means restoring the improvements to substantially the same condition in which they existed prior to the damage or destruction, with each Unit and Common Element having the same vertical and horizontal boundaries as before, unless, if allowed by the Act, other action is approved by First Mortgagees of Unit Ownerships representing at least sixty-seven percent (67%) of the votes in the Association attributable to Unit Ownerships in the Building(s) that were damaged or destroyed. Any repair, restoration or reconstruction shall be in accordance with law and this Declaration and shall be made subject to the rights of the First Mortgagees, if and as applicable.

**ARTICLE 9**
**SALE OF THE PROPERTY**

9.1 **Sale**. At a meeting duly called for such purpose and attended by all Unit Owners, the Unit Owners by affirmative vote of Unit Owners who own seventy-five percent (75%) or more in the aggregate of the entire percentage ownership interest in the Common Elements may elect to sell the Property as a whole. Within ten (10) days after the date of the meeting at which such sale is approved, the Board shall give written notice of such action to each First Mortgagee. Such action shall be binding upon all Unit Owners, and it shall thereupon become the duty of every Unit Owner to execute and deliver such instruments and to perform all acts as in manner and form may be necessary to effect such sale.

**ARTICLE 10**
**REMEDIES**

10.1 **Violations**. Upon the occurrence of any one or more of the following events, the Board shall have the rights and remedies set forth in Section 10.2:

(a) Failure by a Unit Owner to pay when due any sums required to be paid by such Unit Owner pursuant to Sections 4.5, 4.6 and 4.8, Article 6, or other provisions of this Declaration, for thirty (30) days after written notice of such non-payment shall have been given such Unit Owner; provided that such defaulting Unit Owner shall not be entitled to written notice and opportunity to cure such failure if such Unit Owner has been given three (3) or more notices pursuant to this Section 10.1(a) during the twelve-month period immediately preceding the first day of such failure. If the assessment is not paid within thirty (30) days after the due date, then to the extent permitted by applicable laws, codes and ordinances, (i) the amount of the assessment shall bear interest from the date of delinquency at a rate reasonably determined by the Board, and (ii) in addition to said interest, the Association shall charge a delinquent Unit Owner a late fee equal to $25.00 for each month or portion thereof that any such amount remains delinquent, said late charge to cover the Association's administrative costs in monitoring and collecting such amount. Such assessments, interest, late charges and all costs of collection shall be a continuing lien upon the Unit.

(b) Violation or breach by a Unit Owner or an Occupant of (i) any provision, covenant or restriction of the Act, the Master Declaration, this Declaration, the By-Laws, (ii) any contractual obligation to the Board or Association undertaken by such Unit Owner, or (iii) any rules and regulations promulgated by the Board, and continuation of such violation or breach for thirty (30) days after written notice thereof shall have been given such Unit Owner; provided that such defaulting Unit Owner shall not be entitled to written notice and opportunity to correct such violation or breach if such Unit Owner has been given three (3) or more notices pursuant to this Section 10.1(b) during the twelve-month period immediately preceding the first day of such violation or breach.

10.2 **Remedies**. Upon the occurrence of any one or more of the events described in Section 10.1, the Board shall have the following rights and remedies:

(a)     The Board shall have the right to immediate possession of the defaulting Unit Owner's Unit after service by the Board on such Unit Owner, in the manner set forth in Section 13.2, of a notice to quit and deliver up possession, which right may be enforced by an action for possession under Article IX of the Code of Civil Procedure, as amended.

(b)     For a violation or breach described in Section 10.1(b), the Board shall have the right: (i) to enter upon that part of the Property where such violation or breach exists and summarily abate and remove or do whatever else may be necessary to correct, at the expense of the defaulting Unit Owner, any such violation or breach or the cause of such violation or breach, and the Declarant, or Developer, or their successors or assigns, or the Board, or its agents, shall not thereby be deemed guilty in any manner of trespass, or (ii) to enjoin, abate, or remedy by a proceeding at law or in equity the continuance of any such violation or breach; provided, however, that no summary abatement shall be undertaken in connection with any alteration or demolition of improvements until judicial proceedings are instituted.

(c)     Upon the occurrence of one of the events described in Section 10.1(a), including, without limitation, failure by a Unit Owner to pay such Unit Owner's percentage share of Common Expenses or user charges, the Board shall have a lien on the interest of the defaulting Unit Owner in such Unit Owner's Unit Ownership in the amount of any sums due from such Unit Owner; provided, however, that such lien shall be subordinate to the lien of a prior recorded first mortgage on the interest of such Unit Owner. Except as hereinafter provided, the lien provided for in this Section 10.2(c) shall not be affected by any transfer of title to the Unit Ownership. Where title to the Unit Ownership is transferred pursuant to a decree of foreclosure or by deed or assignment in lieu of foreclosure, such transfer of title shall, to the extent permitted by law, extinguish the lien described in this Section 10.2(c) for any sums which became due prior to (i) the date of the transfer of title or (ii) the date on which the transferee comes into possession of the Unit Ownership, whichever occurs first. However, the transferee of a Unit Ownership shall be liable for such transferee's share of any sums with respect to which a lien against such Unit Ownership has been extinguished pursuant to the preceding sentence which are reallocated among the Unit Owners pursuant to a subsequently adopted annual revised or special assessment, and non-payment thereof by such transferee shall result in a lien against the transferee's Unit Ownership as provided in this Section 10.2(c).

(d)     The Board shall have the power to issue to the defaulting Unit Owner a ten (10) day notice in writing to terminate the right of such defaulting Unit Owner to continue as a Unit Owner and to continue to occupy, use, or control such Unit Owner's Unit Ownership and thereupon an action may be filed by the Board against the defaulting Unit Owner for a decree declaring the termination of the defaulting Unit Owner's right to occupy, use or control the Unit owned by him and ordering that all the right, title and interest of such defaulting Unit Owner in the Property shall be sold at a judicial sale, upon such notice and terms as the court shall determine, except that the court shall enjoin and restrain the defaulting Unit Owner from re-acquiring such Unit Owner's interest in

the Unit Ownership at such judicial sale. It shall be a condition of any such sale, and the decree shall so provide, that the purchaser shall take the interest in the Unit Ownership sold subject to this Declaration. The proceeds of any such judicial sale shall first be paid to discharge court costs, court reporter charges, reasonable attorneys' fees, and all other expenses of the proceeding and sale, and all such items shall be taxed against the defaulting Unit Owner in such decree. Any balance of proceeds, after satisfaction of such charges and any unpaid assessments or other sums due hereunder or any liens, shall be paid to the defaulting Unit Owner. Upon the confirmation of such sale, the purchaser at such sale shall be entitled to a deed to the Unit Ownership and to immediate possession of the Unit sold and may apply to the court for a writ of assistance for the purpose of acquiring such possession.

(e)     In addition to or in conjunction with the remedies set forth above, the Board or its agents shall have the right to bring an action at law or in equity against the Unit Owner or Occupant as permitted by law including, without limitation, an action (i) to foreclose a lien against the Unit Ownership, (ii) for damages, injunctive relief, or specific performance, (iii) for judgment or for the payment of money and the collection thereof, (iv) for any combination of the remedies set forth in this Article or (v) for any other relief which the Board may deem necessary or appropriate. Any and all rights and remedies provided for in the Act, this Declaration, the By-Laws, any contractual obligation to the Board or the Association undertaken by the Unit Owner or any rules and regulations promulgated by the Board may be exercised at any time and from time to time cumulatively or otherwise by the Board in its discretion. The failure of the Board to exercise any such rights or remedies provided for in the Act, this Declaration, the By-Laws, any contractual obligation of the Unit Owner to the Board or the Association or the rules and regulations of the Board shall in no event be deemed a waiver of the right to do so thereafter.

(f)     All expenses incurred by the Board in connection with any actions, proceedings or self-help in connection with the exercise of its rights and remedies under this Article, including, without limitation, court costs, reasonable attorneys' fees and all other fees and expenses, and all damages, together with interest thereon at the rate of eighteen percent (18%) per annum (or the maximum legal rate allowable by law, whichever is less), shall be charged to and assessed against the defaulting Unit Owner, and shall be added to and deemed part of such Unit Owner's respective share of the Common Expenses, and the Board shall have a lien for all of such amounts upon the Unit Ownership (including all additions and improvements to such Unit Ownership) of such defaulting Unit Owner.

10.3     **Enforcement by Unit Owners**.  Any aggrieved Unit Owner may enforce the provisions of this Declaration, the By-Laws, or any rules and regulations promulgated by the Board by an action at law or in equity (a) against the defaulting Association, (b) against the defaulting Unit Owner or Occupant or (c) upon a violation or breach described in Section 10.1(b) above, against any person or persons, in any case either to restrain such violation or breach or to recover damages.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS RESPECTING MORTGAGES

11.1 **Mortgages**. The following provisions are intended for the benefit of each holder of a recorded first mortgage or trust deed encumbering a Unit Ownership (**"First Mortgagee"**) and to the extent, if at all, that any other provisions of this Declaration conflict with the following provisions, the following provisions shall control:

(a) Upon request in writing to the Association identifying the name and address of the First Mortgagee or the insurer or guarantor of a recorded first mortgage or trust deed on a Unit (**"Insurer or Guarantor"**) and the Unit number, the Association shall furnish each First Mortgagee, Insurer or Guarantor a written notice of any default by a Unit Owner whose Unit is subject to the lien of such First Mortgagee of that Unit Owner's obligations under this Declaration which is not cured within sixty (60) days. Any First Mortgagee of a Unit, as well as any other holder of a prior recorded mortgage on a Unit Ownership, who comes into possession of the Unit Ownership pursuant to the remedies provided in the mortgage, foreclosure of the mortgage, or deed (or assignment) in lieu of foreclosure shall, to the extent permitted by law, take such property free of any claims for unpaid assessments or charges in favor of the Association against the mortgaged Unit Ownership which become due prior to (i) the date of the transfer of title or (ii) the date on which the holder comes into possession of the Unit Ownership, whichever occurs first (except for any sums which are reallocated among the Unit Owners pursuant to the last sentence of Section 10.2(c)).

(b) Upon request in writing, each First Mortgagee, Insurer or Guarantor shall have the right:

(i) to examine current copies of this Declaration, the By-Laws, the Articles of Incorporation of the Association, the rules and regulations and the books, records and financial statements of the Association during normal business hours;

(ii) to receive, without charge and within a reasonable time after such request, any annual audited or unaudited financial statements which are prepared and distributed by the Association to the Unit Owners with respect to and after the end of each of its respective fiscal years; provided, however, that if no audited financial statement is available, any First Mortgagee shall be entitled to have an audited financial statement prepared at its own expense;

(iii) to receive written notices of all meetings of the Association and to designate a representative to attend all such meetings;

(iv) to receive written notice of any decision by the Unit Owners to make a material amendment to this Declaration, the By-Laws or the Articles of Incorporation;

(v)     to receive written notice of any lapse, cancellation or material modification of any insurance policy or fidelity bond maintained by the Association;

(vi)     to receive written notice of any action which would require the consent of a specified percentage of First Mortgagees;

(vii)     to receive written notice of any proposed amendment to this Declaration effecting a change in (A) the boundaries of any Unit or the exclusive easement rights appertaining thereto, (B) the percentage interest in the Common Elements or Limited Common Elements of any Unit Owner or the liability of any Unit Owner for Common Expenses appertaining thereto, (C) the number of votes in the Association appertaining to any Unit or (D) the purposes to which any Unit or the Common Elements are restricted; and

(viii)     to receive written notice of any judgment entered against the Association in a court with appropriate jurisdiction.

(c)     If any Unit or any portion thereof or the Common Elements or any portion thereof (i) is subject to any casualty loss or (ii) is made the subject matter of any condemnation or eminent domain proceeding or is otherwise sought to be acquired by a condemning authority, then the First Mortgagee, Insurer or Guarantor of each affected Unit, and/or in the event the Common Elements or any portion thereof are subject to any casualty loss or are made the subject matter of any condemnation or eminent domain proceeding or are otherwise sought to be acquired by a condemning authority, all First Mortgagees, Insurers and Guarantors, will be entitled to timely written notice, upon specific written request, of any such loss, proceeding or proposed acquisition Notwithstanding any provision contained herein to the contrary, no provision of this Declaration or the Articles of Incorporation of the Association or any similar instrument pertaining to the Property or the Units therein shall be deemed to give a Unit Owner or any other party priority over the rights of the First Mortgagees pursuant to their mortgages in the case of distribution to Unit Owners of insurance proceeds or condemnation awards for losses to or a taking of the Units, or the Common Elements, or any portion thereof or interest therein.

(d)     Unless 67% of the First Mortgagees of all of the Unit Ownerships which are part of the Property, and the applicable Unit Ownerships which are subject to the liens of such First Mortgagees, have given their prior written approval, neither the Association nor the Unit Owners shall be entitled to:

(i)     by act or omission seek to abandon or terminate the condominium regime, except for abandonment provided by the Act in case of substantial loss to or condemnation of the Units or the Common Elements;

(ii)     change the pro rata interest or obligations of any Unit Owner for (A) purposes of levying assessments or charges or allocating distributions of

hazard insurance proceeds or condemnation awards and (B) determining the pro rata share of ownership of each Unit Owner in the Common Elements or rights to their use, except as provided in Sections 8.2 and 8.3 and Article 15; or

      (iii)    use hazard insurance proceeds for losses to any portion of the Property (whether to Units or to Common Elements) for other than the repair, replacement, or reconstruction of such improvements except as otherwise provided in the Act in case of substantial loss to the Units or the Common Elements.

      (e)    Unless at least sixty-seven percent (67%) of the First Mortgagees, based on one vote per Unit, have given their prior written approval, neither the Association nor the Unit Owners shall be entitled to do or permit to be done any of the following:

      (i)    Adoption of an amendment to this Declaration which (A) changes Section 10.2(c), (B) changes Article 11 or any other provision of this Declaration which specifically grants rights to First Mortgagees, (C) changes insurance and fidelity bond requirements, (D) imposes a right of first refusal or similar restriction on the right of a Unit Owner to sell, transfer or otherwise convey such Unit Owner's Unit Ownership materially different from that presently contained in this Declaration or changes the provisions concerning the leasing of Unit Ownerships, (E) changes the responsibility for maintenance and repair of any portion of the Property, (F) changes any provisions of this Declaration concerning repair, restoration, or reconstruction of the Project, (G) changes any provisions of this Declaration to reduce reserves for maintenance, repair and replacement of Common Elements; (H) except as permitted by Article 15, affects voting rights of the Unit Owners or modifies the assessments due by the Unit Owners; (I) modifies the rights of the Unit Owners to use the Common Elements; (J) modifies the boundaries of any Unit or (K) converts any of the Units into Common Elements and any Common Elements into any Units.

      (ii)    The abandonment, partition, subdivision, encumbrance, sale or transfer of the Common Elements (except for the granting of easements for public utilities or for other purposes consistent with the intended use of the Property and except for the encumbrance, sale or transfer of the percentage of ownership in the Common Elements in connection with the encumbrance, sale or transfer of a Unit Ownership or the lease, license, concession or grant of easement with respect to the Common Elements permitted by this Declaration);

      (iii)    The sale of the Property;

      (iv)    The removal of all or a portion of the Property from the provisions of the Act and this Declaration; or

      (v)    The effectuation of a decision by the Association to terminate professional management and assume self-management of the Condominium.

(f) Whenever required, the consent of a First Mortgagee shall be deemed granted unless the party seeking the consent is advised to the contrary in writing by the First Mortgagee within thirty (30) days after making the request for consent, provided such request was delivered by certified or registered mail, return receipt requested.

## ARTICLE 12
## TRANSFER OF A UNIT

12.1 **Unrestricted Transfers**. Subject to Sections 2.4 and 7.1(o), a Unit Owner may, without restriction under this Declaration, sell, give, devise, convey, mortgage, lease or otherwise transfer such Unit Owner's entire Unit. Notice of such transfer shall be given to the Board, in the manner provided in this Declaration for the giving of notices, within five (5) days following consummation of such transfer. A Unit Owners shall not assign or transfer, other than as collateral security, the Unit Owner's undivided interest in the Common Elements of the Condominium.

12.2 **Limits on Lease Terms.** In addition to, and not in limitation of the requirements set forth in Section 7.1(o) hereof, no Unit shall be leased by a Unit Owner or Occupant for hotel or transient purposes, no Residential Unit shall be leased by a Unit Owner or Occupant for a term less than twelve (12) months and no portion of a Unit Ownership which is less than the entire Unit Ownership shall be leased, without the prior written consent of the Board. No Unit Parking Space shall be leased to any party other than a Unit Owner or Occupant and no lease of any Unit Parking Space may be for a term of less than six (6) months. The lessee under every lease shall be bound by and subject to all of the obligations under the Declaration, the By-Laws and the rules and regulations of the Association and of the Unit Owner making such lease and the failure of the lessee to comply therewith shall constitute a default under the lease which shall be enforceable by the Board or the Association, and the lease shall be deemed to expressly so provide. The Unit Owner making such lease shall not be relieved thereby from any of said obligations. Each and every lease of a Unit Ownership shall be in writing and the Unit Owner leasing the Unit Ownership shall deliver a copy of the signed lease to the Board within ten (10) days after the lease is executed and prior to occupancy. The provisions of Sections 12.1 and 12.2 shall not apply to a transfer or lease of a Unit, or interest therein, by or to the Board or the Developer, and neither Section 12.1 nor Section 12.2 may be amended or deleted without the prior written consent of Developer and Declarant, as applicable, so long as either (i) Developer or Declarant owns any Units or (ii) the right of Developer or Declarant to submit Additional Parcels to the Act has not expired or been terminated.

12.3 **Financing of Purchase by Association**. The Board shall have authority to make such mortgage arrangements and other financing arrangements, and to authorize such special assessments proportionately among the respective Unit Owners, as the Board may deem desirable, in order to close and consummate the purchase or lease of a Unit Ownership, or interest therein, by the Association.

12.4 **Effect of Non-Compliance**. If any sale, assignment, lease or sublease of a Unit Ownership is attempted or consummated without complying with the provisions of this Article 12, such sale, assignment, lease or sublease shall be subject to the rights and options of

the Board, and remedies available to the Board, hereunder or otherwise, including without limitation denial or termination of possession of the Unit.

12.5 **Miscellaneous**.

(a) The Association shall hold title to or lease of any Unit Ownership, pursuant to the terms of this Declaration, in the name of the Association, or a nominee thereof delegated by the Board, for the sole benefit of all Unit Owners. The Board shall have the authority at any time to sell, mortgage, lease or sublease such Unit Ownership on behalf of the Association upon such terms as the Board shall deem desirable, but in no event shall a Unit be sold (other than pursuant to a foreclosure or deed in lieu of foreclosure) for less than the amount paid by the Association to purchase such Unit Ownership unless Unit Owners owning not less than seventy-five percent (75%) of the total ownership of the Common Elements first authorize the sale for such lesser amount. All of the net proceeds from such a sale, mortgage, lease or sublease shall be applied in such manner as the Board shall determine.

(b) The Board may adopt rules and regulations, from time to time, not inconsistent with the provisions of this Article 12, for the purpose of implementing and effectuating such provisions.

(c) Within a reasonable period of time after the written request of a Unit Owner, the Association shall execute and deliver a certificate stating that the Board or the Association, as applicable, does not have the right of first refusal to purchase or lease such Unit Owner's Unit. Such a certificate may be part of a paid assessment letter.

## ARTICLE 13
## GENERAL PROVISIONS

13.1 **Certain Rights of the Declarant and Developer**. Until the time established by the Declaration for the election of the initial Board by the Unit Owners, the rights, titles, powers, privileges, trusts, duties and obligations vested in or imposed upon the Board in the Act and in this Declaration shall be held and performed by the Declarant or Developer, which may be exercised by the designation of an initial Board in accordance with Sections 5.1 and 5.6. If the initial Board shall not be elected by the Unit Owners at the time established by this Declaration, the Declarant or Developer shall continue in the aforesaid office for a period of thirty (30) days after written notice of its resignation is sent to all of the Unit Owners entitled to vote at such election. In exercising such rights, and the other rights reserved by the Declarant or Developer pursuant to this Declaration, the Declarant or Developer shall not be under any disability which would otherwise be imposed by law by reason of the Declarant's or Developer's interest in the subject matter of any transaction, provided, however, that any such transaction shall have been entered into in good faith.

13.2 **Manner of Giving Notices**. Notices provided for in this Declaration and in the Act to be given to the Board or Association shall be in writing and addressed to the Unit address of each member of the Board or at such other address as otherwise provided herein. Notices

provided for in this Declaration and in the Act to any Unit Owner shall be in writing and addressed to the Unit address of such Unit Owner, or at such other address as otherwise provided herein, including, without limitation, in Section 5.5. Any Unit Owner may designate a different address or addresses for notices to such Unit Owner by giving written notice of such change of address to the Board or Association. Notices so addressed shall be deemed delivered when mailed by United States registered or certified mail or when delivered in person with written acknowledgment of the receipt thereof, or, if addressed to a Unit Owner, when deposited in such Unit Owner's mailbox at such address as is designated pursuant hereto.

13.3 **Notice to Mortgagees**. Upon written request to the Board, notices shall be given to a First Mortgagee as required under Article 11.

13.4 **Notices of Estate or Representatives**. Notices required to be given any devisee, heir or personal representative of a deceased Unit Owner may be delivered either personally or by mail to such party at its address appearing in the records of the court wherein the estate of such deceased Unit Owner is being administered.

13.5 **Conveyance and Leases**. Each grantee of the Declarant, each subsequent grantee by the acceptance of a deed of conveyance, each purchaser under Articles of Agreement for Deed, and each tenant under a lease for a Unit Ownership, accepts such conveyance or lease subject to all restrictions, conditions, covenants, reservations, liens and charges, and the jurisdiction, rights and powers created or reserved by this Declaration, and all rights, benefits and privileges of every character hereby granted, created, reserved or declared, and all impositions and obligations hereby imposed, shall be deemed and taken to be covenants running with the land and shall bind any person having at any time an interest or estate in the Property, and shall inure to the benefit of such Unit Owner in like manner as though the provisions of the Declaration were recited and stipulated at length in each and every deed of conveyance.

13.6 **No Waivers**. No covenants, restrictions, conditions, obligations or provisions contained in this Declaration shall be deemed to have been abrogated or waived by reason of any failure to enforce the same, irrespective of the number of violations or breaches which may occur.

13.7 **Change, Modification or Rescission**. No provision of this Declaration affecting the rights, privileges or duties of the Declarant or Developer may be modified without their respective written consent. The provisions of Article 11 and, Sections 7.1(a), 10.2 and 13.12 and this Section 13.7 may be changed, modified, or rescinded only by an instrument in writing setting forth such change, modification or rescission, signed and acknowledged by the President of the Association, and by all of the Unit Owners and all First Mortgagees. Other provisions of this Declaration may be changed, modified or rescinded as provided in Section 13.12 (subject to any limitations set forth in Article 11 with respect to amending certain provisions of this Declaration) or by an instrument in writing setting forth such change, modification or rescission signed and acknowledged by the President or a Vice-President of the Association, and approved by the Unit Owners having, in the aggregate, at least sixty-seven percent (67%) of the total vote, at a meeting called for that purpose; provided, however, that (a) all First Mortgagees have been notified by certified mail of any change, modification or rescission, (b) an affidavit by the

Secretary of the Association certifying to such mailing is made a part of such instrument and (c) any provisions of this Declaration which specifically grant rights to First Mortgagees, Insurers or Guarantors may be amended only with the written consent of all such First Mortgagees, Insurers or Guarantors, except in those instances in which the approval of less than all First Mortgagees is required. The change, modification or rescission shall be effective upon recordation of such instrument in the Office of the Recorder of Deeds of Cook County, Illinois; provided, however, that no such change, modification or rescission, other than as provided in Section 13.12, shall change the boundaries of any Unit, the allocation of percentages of ownership in the Common Elements and votes in the Association, quorum and voting requirements for action by the Association, or liability for Common Expenses assessed against any Unit, except to the extent authorized by other provisions of this Declaration (including without limitation Article 15 below) or by the Act.

13.8 **Partial Invalidity**. The invalidity of any covenant, restriction, condition, limitation or any other provision of this Declaration, or any part of the same, shall not impair or affect in any manner the validity, enforceability or effect of the rest of this Declaration.

13.9 **Perpetuities and Other Invalidity**. If any of the options, privileges, covenants or rights created by this Declaration would otherwise be unlawful or void for violation of (i) the rule against perpetuities or some analogous statutory provisions, (ii) the rule restricting restraints on alienation, or (iii) any other statutory or common law rules imposing time limits, then such provision shall continue only until twenty-one (21) years after the death of the survivor of the now living lawful descendants of George Herbert Walker Bush, former President and Vice President of the United States of America.

13.10 **Liberal Construction; References**. The provisions of this Declaration shall be liberally construed to effectuate its purpose of creating a uniform plan for the operation of a first-class condominium development. All references in this Declaration to any Article, Section, Subsection or Clause that do not refer also to another document or statute shall be deemed to be references to the appropriate Article, Section, Subsection or Clause of this Declaration.

13.11 **Ownership by Land Trustee**. In the event title to any Unit Ownership is conveyed to a land title holding trust, under the terms of which all powers of management, operation and control of the Unit Ownership remain vested in the trust beneficiary or beneficiaries, then the Unit Ownership under such trust and the beneficiaries thereunder from time to time shall be responsible for payment of all obligations, liens or indebtedness and for the performance of all agreements, covenants and undertakings chargeable or created under this Declaration against such Unit Ownership. No claim shall be made against any such title holding trustee personally for payment of any lien or obligation hereunder created and the trustee shall not be obligated to sequester funds or trust property to apply in whole or in part against such lien or obligation. The amount of such lien or obligation shall continue to be a charge or lien upon the Unit Ownership and the beneficiaries of such trust notwithstanding any transfers of the beneficial interest of any such trust or any transfers of title of such Unit Ownership.

13.12 **Special Amendment**. Developer and Declarant reserve the right and power to record a special amendment ("**Special Amendment**") to this Declaration at any time and from

time to time which amends this Declaration (a) to comply with requirements of the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Federal Housing Association, the Department of Veteran's Affairs (formerly known as the Veteran's Administration), or any other governmental agency or any other public, quasi-public or private entity which performs (or may perform) functions similar to those currently performed by such entities, (b) to induce any of such agencies or entities to make, purchase, sell, insure or guarantee first mortgages covering Unit Ownerships, (c) to bring this Declaration into compliance with the Act, or (d) to correct clerical or typographical or similar errors in this Declaration or any Exhibit hereto or any supplement or amendment thereto. In furtherance of the foregoing, a power coupled with an interest is hereby reserved and granted to the Developer or Declarant to vote in favor of, make or consent to a Special Amendment on behalf of each Unit Owner as proxy or attorney-in-fact, as the case may be. Each deed, mortgage, trust deed, other evidence of obligation, or other instrument affecting a Unit Ownership, and the acceptance thereof, shall be deemed to be a grant and acknowledgment of, and a consent to the reservation of, the power to the Developer or Declarant to vote in favor of, make, execute and record Special Amendments. The right of the Developer and Declarant to act pursuant to rights reserved or granted under this Section shall terminate at such time as (y) the Declarant or Developer no longer holds or controls title to a Unit Ownership and (z) the rights of Declarant under Article 15 to subject Future Expansion Parcels to this Declaration and the Act have expired or all Future Expansion Parcels have been subjected to this Declaration and the Act.

13.13  **Assignments by Developer and Declarant**. All rights which are specified in this Declaration to be rights of the Developer or Declarant are mortgageable, pledgeable, assignable and transferable. Any successor to, or assignee of, the rights of the Developer or Declarant hereunder (whether as the result of voluntary assignment, foreclosure, assignment in lieu of foreclosure or otherwise) shall hold or be entitled to exercise the rights of Developer or Declarant hereunder as fully as if named as such party herein. No party exercising rights as Developer or Declarant hereunder shall have or incur any liability for the acts of any other party which previously exercised or subsequently shall exercise such rights.

## ARTICLE 14
## MASTER DECLARATION

14.1  **Subject to Master Declaration**. The Master Declaration provides for certain access easements, easements to use parking areas, rights of enjoyment to the Common Area Lots (as defined in the Master Declaration), and certain Master Association maintenance obligations, as well as certain Master Association rights (including, without limitation, the right to levy and collect assessments and the right to administer, control, maintain and restrict the use of the Common Area Lots) and certain other rights, powers, easements, covenants, conditions and restrictions, all as more particularly described in the Master Declaration. The provisions of this Declaration shall be subject to the provisions of the Master Declaration, and in the event of any conflict between the provisions of this Declaration and the provisions of the Master Declaration, the provisions of the Master Declaration shall prevail. The Association shall perform the obligations imposed on the Condominium or the Property as a whole in the Master Declaration. Any cost incurred by the Association in the performance of any undertaking under the Master

Declaration shall be deemed a Common Expense, the payment of which shall be levied, collected and enforced in the same manner as provided in this Declaration for any other Common Expense. Each Unit Owner further agrees to be bound by, and to perform, as the case may be, any obligation imposed on Unit Owners or occupants of the property governed by the Master Declaration.

14.2 **Master Association Assessments**. The Master Association, at its sole option, may require that the Association pay the Master Association Assessments collectively for all of the Unit Owners for purposes of the administrative convenience of the Unit Owners and acting solely as a collection agent. In no event shall the amount of such Master Association Assessments collected by the Association and paid to the Master Association be deemed a part of the assessment for the Association. In the event a Unit Owner is delinquent in the payment of any Master Association Assessment, the Association shall give timely notice of such delinquency to the Master Association, in which event the lien of the Master Association for such delinquency shall only apply to the affected Unit; however, in the event the Association fails to pay the amount of the Master Association Assessment for each of the Units and fails to timely deliver notice to the Master Association of the specific delinquent Unit(s), the lien of the Master Association shall attach to all of the Units. Any Master Association Assessment collected by the Association shall be held in trust without any deduction or setoff and no such payment shall be deemed made to the Master Association until actually received by the Master Association. No Unit Owner shall be relieved of personal liability for payment of the Master Association Assessment due to the failure of the Association to pay the same to the Master Association.

14.3 **Master Association Management Services.** Subject to the consent of the Master Association, which consent may be granted or denied in the Master Association's sole discretion, the Association may seek to have the Master Association undertake management services normally provided by the Association or its managing agent. Nothing herein shall be deemed an obligation of the Association to seek such an arrangement with the Master Association; rather, such option is provided solely as an alternative which may be exercised by mutual agreement of the Association and the Master Association.

## ARTICLE 15
## ANNEXING ADDITIONAL PROPERTY

15.1 **Additional Parcel**. The Declarant, Developer, and their successors and assigns, hereby reserve the right and option, at any time and from time to time, within ten (10) years from the date of the recording of this Declaration in the Office of the Recorder of Deeds of Cook County, Illinois, to add-on and annex to the Property, from time to time, all or any portion of the property legally described on Exhibit C attached hereto and incorporated herein by reference (**"Future Expansion Parcels"**), and in connection therewith to reallocate percentage interests in the Common Elements as hereinafter described, by recording an amendment or amendments to this Declaration executed by Declarant (every such instrument being hereinafter referred to as an **"Annexation Amendment"**) which shall set forth the legal description of the additional parcel or parcels within the Future Expansion Parcels to be annexed to the Property and which shall otherwise be in compliance with the requirements of the Act. Upon the recording of every such

Annexation Amendment, the portion or portions Future Expansion Parcels described therein shall be deemed submitted to the Act and governed in all respects by the provisions of this Declaration and shall thereupon become part of the Property. No portion or portions of the Future Expansion Parcels shall be subject to any of the provisions of this Declaration, unless and until an Annexation Amendment is recorded annexing such portion or portions to the Property as aforesaid. The Unit Owners shall have no rights whatsoever in or to any portion of the Future Expansion Parcels (except as it relates to any easements or other rights established by the Master Declaration), unless and until an Annexation Amendment is recorded annexing such portion to the Property as aforesaid. Upon expiration of said ten (10) year period, no portion of the Future Expansion Parcels which have not theretofore been made part of or annexed to the Property shall thereafter be annexed to the Property. No portion of the Future Expansion Parcels must be added to the Property. Portions of the Future Expansion Parcels may be added to the Property at different times within such ten (10) year period. Except as may be required by applicable laws and ordinances, there shall be no limitations (a) on the order in which portions of the Future Expansion Parcels may be added to the Property, (b) fixing the boundaries of these portions, or (c) on the location of improvements which may be made on the Future Expansion Parcels. The maximum number of Units which may be created on the Future Expansion Parcels is one hundred twenty (120). Structures, improvements, buildings and units located on portions of the Future Expansion Parcels which are added to the Property need not, except to the extent required by applicable laws and ordinances, be compatible with the Property in relation to density, use, construction or architectural style; provided, however, that such structures, improvements, buildings and units shall be substantially completed prior to annexation and shall be consistent in terms of quality of construction with those currently existing on the Property.

15.2 **Annexation Amendments**. Every Annexation Amendment shall include:

(a) The legal description of the real estate then subject to this Declaration, as amended, which shall add to the then legal description of the Parcels that portion or portions of the Future Expansion Parcels then being annexed to the Property;

(b) An amendment to the Plat which shall show the boundaries of the portion or portions of the Future Expansion Parcels then being annexed to the Parcels, and delineating and describing the Units of the portion or portions of the Future Expansion Parcels then being annexed; and

(c) An amendment to Exhibit B attached hereto which shall set forth the amended percentages of ownership interest in the Common Elements, including the Common Elements attributable to the portion or portions of the Future Expansion Parcels then being annexed to the Property, allocable to every Unit, including all existing Units and additional Units, if any, added by such Annexation Amendment.

15.3 **Determination of Amendments to Percentages of Ownership Interest in Common Elements**. The percentages of ownership interest in the Common Elements allocable to every Unit, as amended by each Annexation Amendment, shall be determined as follows:

(a) The Common Elements, as amended by such Annexation Amendment, shall be deemed to consist of the Common Elements as existing immediately prior to the recording of such Annexation Amendment (the "**Existing Common Elements**") and the Common Elements added by such Annexation Amendment (the "**Added Common Elements**");

(b) The Units, as amended by such Annexation Amendment, shall be deemed to consist of the Units as existing immediately prior to the recording of such Annexation Amendment (the "**Existing Units**") and the Units added by such Annexation Amendment (the "**Added Units**");

(c) The value of the Added Units (which value shall be determined by Developer) shall be added to the value of the Existing Units (which value shall be determined by Developer) and the total of all such values shall be deemed to be the aggregate value of all of the Units as a whole. Values shall be determined by Developer as of the date of recording of every Annexation Amendment and shall be unconditionally binding and conclusive for all purposes notwithstanding the sale price of any Unit or Units;

(d) The percentage of ownership interest in the entire Common Elements (both the Existing Common Elements and the Added Common Elements) to be allocated among all of the Units (both the Existing Units and the Added Units) shall be computed by dividing the value of every Unit, as determined by Developer as described in the preceding subparagraph (c), by the value of the Units as a whole, as determined by the Developer as described in the preceding subparagraph (c);

(e) The Existing Units shall be entitled to their respective percentages of ownership interest in the Common Elements, as set forth in such Annexation Amendment, in the Added Common Elements and in the Existing Common Elements;

(f) The Added Units shall be entitled to their respective percentages of ownership interest in the Common Elements, as set forth in such Annexation Amendment, in the Added Common Elements and in the Existing Common Elements;

(g) All of the provisions of this Declaration, as amended by every successive Annexation Amendment, shall be deemed to apply to all of the Units (both the Added Units and the Existing Units) and to all of the Common Elements (both the Added Common Elements and the Existing Common Elements); and

(h) The recording of an Annexation Amendment shall not alter or affect the amount of any lien for Common Expenses due from the owner of any Existing Unit prior to such recording, nor the respective amounts theretofore assessed to or due from the owner or owners of Existing Units for Common Expenses or other assessments.

15.4 Existing Mortgages. Upon recording of every Annexation Amendment, the lien of every mortgage encumbering an Existing Unit, together with its appurtenant percentage of

ownership interest in the Existing Common Elements, shall automatically be deemed to be adjusted and amended to encumber such Exiting Unit and the respective percentage of ownership interest in the Common Elements for such Existing Unit as set forth in such Annexation Amendment, and the lien of such mortgage shall automatically attach to such percentage interest in the Added Common Elements.

15.5 **Binding Effect**. Every Unit Owner and every mortgagee, grantee, heir, administrator, executor, legal representative, successor and assign of such Unit Owner, by such person's or entity's acceptance of any deed or mortgage or other interest in or with respect to any Unit Ownership, shall be deemed to have expressly agreed and consented to (i) each and all of the provisions of this Article 15; (ii) the recording of every Annexation Amendment which may amend and adjust such person's or entity's respective percentage of ownership interest in the Common Elements, including the Existing Common Elements and the Added Common Elements, from time to time as provided in this Article 15; and (iii) all of the provisions of every Annexation Amendment which may hereafter be recorded in accordance with the provisions of this Article 15. A power coupled with an interest is hereby granted to the Developer as attorney-in-fact to amend and adjust the percentages of undivided ownership interest in the Common Elements from time to time in accordance with every such Annexation Amendment recorded pursuant hereto. The acceptance by any persons or entities of any deed, mortgage or other instrument with respect to any Unit Ownership, in addition to the foregoing, shall be deemed to constitute a consent and agreement to, and acceptance and confirmation by such person or entity of, the grant of such power to such attorney-in-fact and of each of the following provisions as though fully set forth in such deed, mortgage or other instrument:

(a) The percentage of ownership interest in the Common Elements appurtenant to such Unit shall automatically be deemed reconveyed effective upon the recording of every Annexation Amendment and reallocated among the respective Unit Owners in accordance with the amended and adjusted percentages set forth in every such Annexation Amendment;

(b) Such deed, mortgage or other instrument shall be deemed given upon a conditional limitation to the effect that the percentage of ownership interest in the Common Elements appurtenant to such Unit shall be deemed divested pro tanto upon the recording of every such Annexation Amendment and revested and reallocated among the respective Unit Owners in accordance with the amended and adjusted percentages set forth in every such Annexation Amendment;

(c) To the extent required for the purposes of so amending and adjusting such percentages of ownership interest in the Common Elements as aforesaid, a right of revocation shall be deemed reserved by the grantor of such deed, mortgage or other instrument with respect to such percentage of ownership interest in the Common Elements granted therein;

(d) Such adjustments in the percentages of ownership interest in the Common Elements, as set forth in every such Annexation Amendment, shall be deemed to be made by agreement of all Unit Owners and other persons having any interest in the Property,

and shall also be deemed to be an agreement of all Unit Owners and such other persons to such changes within the contemplation of the Act; and

(e)     Every Unit Owner, by acceptance of the deed conveying such Unit Owner's Unit Ownership, agrees for himself or herself and all those claiming under such Unit Owner, including mortgagees, that this Declaration, and every Annexation Amendment, is and shall be deemed to be in accordance with the Act.

## ARTICLE 16
## ORIGINAL DECLARATION

This Declaration contains all of the understandings of the parties hereto in regard to the subject matter hereof and supercedes any and all prior agreements and instruments (written and oral) among the parties regarding the subject matter hereof (including, expressly, but without limitation, the Original Declaration).  This Declaration is intended to amend, restate, and replace in all respects the Original Declaration and upon the recordation of this Declaration, the Original Declaration shall be deemed to be null and void and of no further force or effect.

**IN WITNESS WHEREOF**, the undersigned have has executed this Declaration this 21st day of January, 20089

**DECLARANT/DEVELOPER:**

**RSD GALEWOOD, LLC**, an Illinois limited liability company

By: **Red Seal Development Corp.**, an Illinois corporation, its Manager

By:__________________
Name: Brian Hoffman
Its: CFO

**EXISTING OWNERS:**

__________________
Yvonne V. Herrera

__________________
Rosa Vazquez

**STATE OF ILLINOIS** )
) **SS**
**COUNTY OF COOK** )

I, Nada Popovic, a Notary Public in and for the County and State aforesaid, do hereby certify that Brian Hoffman, as CFO of Red Seal Development Corp., an Illinois corporation, the Manager of RSD Galewood, LLC, an Illinois limited liability company, personally known to me to be the same person whose name is subscribed to the foregoing instrument as such officer appeared before me this day in person and acknowledged that he signed and delivered such instrument as his own free and voluntary act, and as the free and voluntary act of such corporation as the Manager of such limited liability company, for the uses and purposes therein set forth.

**GIVEN** under my hand and notarial seal this 21st day of January, 2008

Nada Popovic
Notary Public

My Commission Expires:

"OFFICIAL SEAL"
NADA POPOVIC
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 07-09-2009

**STATE OF ILLINOIS** )
) **SS**
**COUNTY OF COOK** )

I, Nada Popovic, a Notary Public in and for the County and State aforesaid, do hereby certify that **YVONNE V. HERRERA**, personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that she signed and delivered such instrument as her own free and voluntary act, for the uses and purposes therein set forth.

**GIVEN** under my hand and notarial seal this 24th day of December, 2008

Nada Popovic
Notary Public

My Commission Expires:

"OFFICIAL SEAL"
NADA POPOVIC
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 07-09-2009

**STATE OF ILLINOIS** )
) **SS**
**COUNTY OF COOK** )

I, Nellie Bermudez, a Notary Public in and for the County and State aforesaid, do hereby certify that **ROSA VAZQUEZ**, personally known to me to be the same person whose name is subscribed to the foregoing instrument appeared before me this day in person and acknowledged that she signed and delivered such instrument as her own free and voluntary act, for the uses and purposes therein set forth.

**GIVEN** under my hand and notarial seal this 24th day of December, 2008

Notary Public

My Commission Expires:

September 5, 2011

NOTARY PUBLIC OFFICIAL SEAL STATE OF ILLINOIS
NELLIE BERMUDEZ
MY COMMISSION EXPIRES
SEPTEMBER 5, 2011

**EXHIBIT A**
**TO**
**DECLARATION OF CONDOMINIUM OWNERSHIP AND OF EASEMENTS, RESTRICTIONS, COVENANTS AND BYLAWS FOR THE ENCLAVE AT GALEWOOD CROSSINGS MULTI-BUILDING CONDOMINIUM ASSOCIATION**

**SURVEY OF UNITS**

(To be attached prior to recording)

**LEGAL DESCRIPTION OF THE PROPERTY**

Lot 6 in the Galewood Residential Subdivision being a subdivision of the Southwest Quarter of Section 33, Township 40 North, Range 13 East of the Third Principal Meridian according to the Plat thereof recorded March 29, 2007 as document number 0708815072 in Cook County, Illinois.

PIN: a part of 13-33-300-024

Commonly Known As: 1848 N Laramie Avenue, Chicago, IL 60639

**EXHIBIT B**
**TO**
**DECLARATION OF CONDOMINIUM OWNERSHIP AND OF EASEMENTS, RESTRICTIONS, COVENANTS AND BY-LAWS FOR THE ENCLAVE AT GALEWOOD CROSSINGS MULTI-BUILDING CONDOMINIUM ASSOCIATION**

**PERCENTAGE OF OWNERSHIP**

| UNIT | PERCENTAGE OF OWNERSHIP |
|---|---|
| 6-A | 49% |
| 6-B | 49% |
| 6-P-1 | 1% |
| 6-P-2 | 1% |
| | |
| **TOTAL** | 100.00000% |

**EXHIBIT C**
**TO**
**DECLARATION OF CONDOMINIUM OWNERSHIP AND OF EASEMENTS, RESTRICTIONS, COVENANTS AND BY-LAWS FOR THE ENCLAVE AT GALEWOOD CROSSINGS**
**MULTI-BUILDING CONDOMINIUM ASSOCIATION**

**LEGAL DESCRIPTION OF**
**THE**
**FUTURE EXPANSION PARCELS**

Lots 1, 2, 3, 4, 5, 7, 8, 9, 10, 36, 37, 38, 39, 40, 41, 56, 57, 58, 59, 63, 64, 152, 153, 154, 155, 156, 157, 158, 159, 160, and 161 inclusive in the Galewood Residential Subdivision being a subdivision of the Southwest Quarter of Section 33, Township 40 North, Range 13 East of the Third Principal Meridian according to the Plat thereof recorded March 29, 2007 as document number 0708815072 in Cook County, Illinois.

# EXHIBIT

# ATTACHED TO

75
+1
76
354

Doc#: 0902316030 Fee: $354.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 01/23/2009 02:21 PM Pg: 0

# DOCUMENT

# SEE PLAT INDEX



Job : 55
Date: 7/28/2010
Time: 5:02:50 PM